IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
NO.: 91-0986-CIV-GOLD/SIMONTON
SPECIAL MASTER THOMAS E. SCOTT

ALLAPATTAH SERVICES, INC., et al., )
)
    Plaintiffs, )
)
v. )
)
EXXON CORPORATION, )
)
    Defendant. )
_____)
)
RUSSELL A. CLINE, )
) **CONSOLIDATED WITH**
    Plaintiff, ) **CASE NO.: 05-21338-CIV-GOLD /**
) **SIMONTON**
vs. )
)
THE GARDEN CITY GROUP, INC., )
)
    Defendant. )
_____)

## ORDER REGARDING CONFLICTING CLAIMANT DISPUTE C6.11

THIS CAUSE is before the Special Master pursuant to Class Counsel's Sixth Motion for Adjudication of Conflicting Claims (Motion C6) **[D.E. 4128]**, and the materials submitted[1] by or on behalf of claimant Mario DiDonato (Claim Nos. 1030168A and 1030168B), and claimant Vito Anthony DiDonato (Claim Nos. 1011524A and 1011524B).

On April 10, 2008, the Special Master conducted an evidentiary hearing to resolve various unsettled conflicting claimant disputes contained in Class Counsel's C6 Motion, specifically

---

[1] Such materials include the original Replies and the responses and documentation attached to the claimants'' respective answers to the "Claimant's Questionnaire for the Resolution of Conflicting Claims in the Exxon DFC Class Action," as well as the additional supplements provided by the claimants, and the materials contained within the database maintained by the Claims Administrator.

including dispute C6.11. The parties to this dispute are Mario DiDonato (hereinafter, "Mario"), Claim Nos. 1030168A and 1030168B, and claimant Vito Anthony DiDonato (hereinafter, "Vito"), Claim Nos. 1011524A and 1011524B. Mario was represented at the hearing by his attorney, Ronald Esposito, Esq. Vito was represented at the hearing his attorney, Arthur Lesmez, Esq.

Unfortunately, Mario and Vito—father and son—are at complete odds with one another and have undertaken this bitter dispute, making this matter very difficult. More difficult is the lack of clear documentation to support either claimant's *complete* position, as against the other. As noted throughout this order, it appears that the Exxon documentation shows Mario as the dealer of record for the subject station, except for a four (4) month period (January 4, 1990 to April 16, 1990) near the end of the subject claims period where both Mario and Vito are listed on the Exxon agreement. However, the testimony provided, along with certain other documentation, lends some support to the position that Vito was the owner and operator of the subject station, who purchased the fuel at issue—even if not the owner "of record" per Exxon's internal documentation, possibly the *de facto* owner/operator of the subject station.

Complicating matters more, the testimony elicited from Mario, Vito, and other witnesses, as discussed below, only further clouds the issue of whom was the *true and actual* owner/operator of the station (or the *true and actual* direct-served dealer), and who actually paid for the motor fuel at issue. The testimony also indicates that significant equitable considerations—as opposed to strict principles of legal interpretation—must be considered in arriving at a conclusion of whom is the rightful claimant to the subject proceeds, as between Mario and Vito.

The question raised by this dispute is whether Vito was the *true and actual* owner/operator of

the subject station, including whether he was the one who paid for the motor fuel, and whether Mario was merely on the Exxon agreements due to his past history with Exxon, and Vito's lack of such a history or credit (essentially, whether Mario was listed on the agreements to assist his son starting up a station of Vito's own), or, alternatively, whether Mario was the owner of the station and merely employed Vito as the manager of that station, giving Vito no ownership rights in the station.

After extensively analyzing the materials submitted by the claimants and their counsel, and having reviewed the Court file and the file maintained by the Claims Administrator, and having conducted an evidentiary hearing concerning this dispute, and being otherwise fully advised in the premises, the Special Master makes the following findings and conclusions:

## I.     FINDINGS

1.      From the documentation within the file, and as submitted by the two claimants, it appears that Mario was the individual listed on all the various lease agreements and other documents with Exxon (with the exception of the January 4, 1990 agreement that included Vito),[2] suggesting that Mario was the direct-served dealer of record during the time period which is the subject of these combined claims (from May 20, 1985 to April 16, 1990).

*A.     Original Ownership of the Station and Transfer (or not) to Vito*

2.      The manner in which either Mario and/or Vito obtained ownership of the subject station is matter of great dispute and is quite unclear. Vito asserted that Mario received the station from Mr. John Cuoco, which assertion Mario disputed. Mario stated that Mr. Cuoco was involved with the subject station for a relatively short period of time—when Mr. Cuoco managed the station

---

[2] Of course, this last agreement would only cover a four (4) month period since the claim at issue only goes up to April 16, 1990.

for six weeks while Mario had surgery.

3. Vito's story regarding the origination of ownership of the station is much more detailed, whereas Mario's was vague and relatively unanswered to the undersigned's satisfaction (as to how he first came into possession of the station). Vito stated that when his mother passed away, when Vito was three years old, John and Lena Cuoco—who were family friends of the DiDonatos—took Vito in as their "adoptive" son. It remains unclear, however, whether that was an actual legal adoption, or if the term is a mere colloquialism. As a side note, no such documentation was provided to show any "adoption."

4. Nonetheless, Vito indicated that prior to 1985, John and Lena Cuoco were the owners of the subject station. At that time, the Cuocos purportedly wished to give the station to their son Rocco, and their "adoptive" son Vito. However, Vito asserted that, due to Exxon's guidelines, the "young ages" (though Vito was about 21 or 22 years old at that point) of Vito and Rocco prevented them from signing sales agreements with Exxon in Vito's name.

5. Vito stated that it was thus decided Mario and John Cuoco would sign the required sales agreements with Exxon *on behalf of* Vito and Rocco. As a result, subsequent to the signing of the sales agreement, the name of the station became "C & D Exxon", denoting the initials of each owner's last name. The Special Master notes that even if that was the name of the station, it does not indicate which Cuoco (i.e., John or Rocco) and which DiDonato (i.e., Mario or Vito) are referenced by "C & D Exxon".

6. Vito asserted that he took over operation of the station in June 1985, as at that time,

the Cuocos decided to give Rocco's interest in the station to Vito.[3] Further, Vito asserted that, even in June, 1985, due to the Exxon guidelines, it became necessary for Mario to sign the Exxon agreements (which, according to Vito, is why Mario's name appears on all the subject agreements at issue).

7.     Yet, Vito did not have Lena Cuoco attend the hearing in this matter to testify in support of his version of events—i.e., that John and Lena Cuoco were the ones who gave the station to Vito and Rocco, but merely utilized Mario and John as the signatories to the contract. While John Cuoco may have passed away, Lena Cuoco is alive, and was presumably available to testify (she was listed on Vito's Witness List for the April 10, 2008 hearing), as opposed to Vito reciting what John and/or Lena "said" and "intended". One might assume that Lena Cuoco would be willing to testify if Vito indeed was the adoptive son (either literally or figuratively) of John and Lena Cuoco.

8.     It is noted that the June 19, 1985 (effective July 1, 1985) *"Consent to Assignment"* within Exxon's records is from John Cuoco and Mario DiDonato, as joint Assignors, to Mario DiDonato, as individual Assignee. There is no mention made about Vito. Nor has any separate agreement been provided to indicate that Vito was an intended third party beneficiary of the transaction between Cuoco and Mario.[4]

**B.     *Ownership of the Station, June 1985 – forward.***

---

[3] This is not entirely clear regarding how John and Lena Cuoco could transfer Rocco's "interest" without Rocco's consent, if indeed Rocco, and for that matter Vito, had any legally cognizable interest in the station.

[4] It is noted that Mario provided the "Certification of David P. Heller, C.P.A." (who was Mario's accountant) dated March 4, 2008 which states, *inter alia*, that "at all times, the V&M Exxon station was registered as a sole proprietorship owned *solely* by Mario DiDonato." *See, Certification of David P. Heller, C.P.A.* at ¶3. Clearly, this is incorrect based upon the certified Trade Name Certificate, discussed below, signed by Vito and Mario indicating some sort of partnership or dual interests in the business.

9. Vito stated that, in June, 1985, the name of the station became "V&M Exxon" denoting the initials of the first names of Vito and Mario, and reflecting Vito's ownership in the station. Mario contested this interpretation of the station name, both in his November 15, 2007 Declaration and at the April 10, 2008 hearing, stating that the "V" was a respectful tribute to Mario's father, whose name was also Vito. Mario went a step further and asserted that if the "V" was for his son's name, the station's name would have been "M & V Exxon", purportedly to indicate Mario's superiority in the relationship with his son and/or ownership of the station.

10. Vito did, however, provide the Special Master with a certified *"Trade Name Certificate"* for "V & M Exxon" filed on June 20, 1985. This document is signed by both Vito and Mario. In this document, it is stated that Vito and Mario are both "...persons interested or members of such firm, partnership or business..." This document purports to establish that Vito had an interest in the subject station, and/or a "partner" with Mario. Nonetheless, this document discounts and defeats Mario's attempt to dispute the significance of the name "V & M Exxon." Quite clearly, the "V" stands for "Vito," the son, not for Mario's father. It was Vito, the son, who signed the Trade Name Certificate along with Mario.

11. Thus, using Mario's own logic with regard to the importance placed behind the naming convention—i.e., whose initial is first, in that the one whose initial appears first was the one who controlled the station—it would appear that Vito was the primary owner or one in control of the subject station, as clearly the station name of "V & M Exxon" referred to Vito and Mario.

12. The Special Master finds that despite Mario's appearance as the designated "key person" with Exxon for the subject station (reflected in the Exxon documentation), this designation

-6-

alone does not resolve the issue. Based upon the testimony obtained, it is clear that Vito operated the subject station on a day-to-day basis, with the assistance of his sister (Filomena or "Mimi"), and that Mario did not operate it.

13.    Indeed, based upon the testimony of witnesses such as Mimi, Vito and Joseph Guiliano (the bank loan officer), Mario made it clear that he was not involved with "Vito's station" and that the subject station was Vito's. While there is significant disagreement about the operation nearer the end of the claim—i.e., before Mario sold it without Vito's knowledge (which raises another question, as discussed below)—the Special Master finds that Vito was the one who actually operated the station on a day-to-day basis. However, that finding, alone, does not indicate that Vito actually "owned" the subject station. He could merely have been a manager for the same, employed by Mario in that capacity, as Mario has argued.[5]

14.    Unfortunately, the Special Master was not provided with any primary documentation to indicate that Vito was simply a paid employee by Mario, nor were any actual tax documents provided by Vito or Mario, from which it could be gleaned who actually reported the profits and/or losses as to the subject station, during the period in question. Such documentation would have been helpful—to say the least—in the determination of ownership of the subject station.[6] Instead of providing the prior tax returns and related documentation, Mario submitted the *Certification of David P. Heller, C.P.A.* dated March 4, 2008 in which Mr. Heller states, at ¶6:

---

[5] Mario pointed out that on several Exxon agreements, Vito's name appears, but that was only to ensure supplies were ordered by authorized parties and delivered to the same.

[6] In the materials submitted by Mario, he stated that "all profits and gains from the operation of the station were included solely in the Federal and State tax returns submitted by Mario DiDonato, a fact which is also not denied." See, ¶3 of *Response to Motion Dated 2-14-2008 Submitted by Bernard Ware, Esq., on Behalf of Vito DiDonato*, dated March 4, 2008. While this statement was not rebutted by Vito, leaving one to believe that Vito did not report any of the station's profits/losses on his own tax returns, Vito can not confirm that Mario did either. Mario did not

> All of the calculations made regarding the station as to any profit or loss for the year or years in question were contained solely in the Schedule C portion of Mr. and Mrs. DiDonato's Joint Tax Return, which I personally prepared each and every year for both the State and Federal Government.

15. The Special Master questions why Mario would not simply produce the tax records for the undersigned's review and consideration. Instead, Mario had his accountant submit a Certification (without any testimony at the hearing) declaring key facts relating to tax returns prepared and filed between 18 and 23 years prior to the Certification. It is doubtful that Mr. Heller can accurately recall these specific facts, to which he put his name in his Certification, without first reviewing the documentation. In this regard, if Mr. Heller had such documentation in order to accurately and truthfully prepare his Certification, then Mario could have simply obtained said records and submitted them as part of this proceeding, as opposed to relying upon hearsay evidence. That said, Vito admitted at the April 10, 2008 hearing that he never filed a tax return incorporating the profit or loss of the station. *See*, pg. 37 of the April 10, 2008 Hearing Transcript.[7]

16. Similarly, Mr. Heller's Certification at ¶7 states that he prepared W-2 forms for Vito and his sister Filomena (Mimi) for each year that Vito and Mimi were employed by Mario at the subject station. Again, it is doubtful that Mr. Heller can accurately recall these facts, with the specificity he provided in his Certification, without a review of the documents themselves. If Mr. Heller had the documents to review prior to submitting his Certification, then Mario could have simply provided them for the Special Master's review and consideration.

---

provide any such returns for the Special Master's review or inspection.
[7] It is noted that Vito did assert, based upon some "printouts" provided at the hearing (of unknown origin and authenticity, though they purport to be from the IRS or the IRS website) wherein it lists the taxpayer as Mario DiDonato, but uses Vito's social security number.

17. Moreover, neither Vito nor Mario provided any documentation (such as checks, invoices, receipts, etc.) to show that either of them was the one who actually paid for the Exxon motor fuel at issue. This too would have been extremely helpful, if not largely determinative, of the proper ownership of these subject claims. Rather, what was provided was a significant amount of conflicting testimony, much of which was not wholly determinative of the issues.

18. From a strict documentary standpoint, there is not sufficient documentary evidence to *conclusively* establish that Vito was, or was not, indeed the sole owner of the station (or that Mario was, or was not the sole owner). While Vito may have managed the station from day-to-day, and worked there providing the "sweat equity", the leases all have Mario's name on them (with the exception noted for a four month period in 1990). Vito has not provided tax returns for the corporation or partnership which "owned" the station (or his own personal return), to establish that Vito was the one (or one of a couple individuals) who owned the station.

19. The testimony provided, by Vito, and through his sister, Mimi, merely makes reference to Mario's purported statements to various individuals (including Vito and Mimi) that the subject station was Vito's. However, Mario denies that the station was ever given to Vito.

20. Yet, if indeed Mario owned the station and had no intention of giving it to Vito (or if he had not already given it to Vito), this raises a question: why then would Mario assist Vito with Vito obtaining a $50,000 loan to operated the subject station?[8] If Vito did not own, or was not promised ownership of, the subject station, there is no logical reason why Vito would take out a loan

---

[8] At the hearing, Mario testified that everyone, essentially, was lying (all the witnesses) and that he never co-signed any loan for Vito. *See*, pgs. 99 – 101, Hearing Transcript. However, his own attorney argued, in closing, that essentially Mario did co-sign, it was Vito's obligation to pay back the $50,000 bank loan, if Vito failed to do so, then Mario risked foreclosure upon his house. *See*, pg. 113, Hearing Transcript.

to operate the station. Granted, Mario co-signed that loan and put up his own home as collateral. However, though that appears to be a very generous action by Mario to assist his son, the fact remains that the intent was for Vito to take out the loan (and Vito's name was on the loan) to assist Vito with the needed capital to operate the station. If Vito was not the owner (or part owner) of the station, or if Mario did not promise to give Vito the station (and if Vito was merely an employee or manager of the station), Vito would have no reason to put his name to a loan for operating capital for the station.

21. Possibly, the promise to transfer the station to Vito was breached by Mario, or possibly Vito breached his own promise and duties (given by Vito in exchange for Mario's promise to transfer) near the end of the relationship causing the relationship and agreement between Mario and Vito to fall apart. Whatever the case may be, the relationship deteriorated and ended. The penultimate cause of the deterioration is derived from other additional testimony provided by Mario and Mimi DiDonato—specifically, the financial downturn of the station purportedly requiring Mario and his wife to provide additional capital to pay outstanding, unpaid vendors which Vito did not pay.[9] Mario's testimony, and the *Certification of Gerardina DiDonato* dated March 3, 2008, assert that Mario and his wife, Gerardina, had to use their own money to get the station out of debt and to keep it operating (including the purchase of motor fuel), and to loan money on various occasions for things relating to the station, as well as paying roughly $100,000 of the station's debt (purportedly

---

[9] Though Mario testified and asserted that the financial "problems" of the station (nearer the end of the claim) were related to Vito's purported gambling problem, the Special Master has discounted any such testimony as no support was provided to show that Vito: (a) has a "gambling problem; (b) such gambling led to financial problems for the station; and (c) that Vito took money from the station to "gamble", assuming Mario owned, in whole or in part, the station. Even still, if money was "stolen" from the station by Vito (assuming Mario actually owned it), Mario has produced no documentary evidence to show the defalcation, or that Mario ever reported the supposed theft to the proper authorities (and Mario admits that he never reported to purported theft).

caused by Vito taking money) prior to the sale of the station.[10]

22. Mimi, however, testified that she used her own money, obtained through an inheritance, to pay the outstanding bills. *See*, pgs. 82 – 83, Hearing Transcript. She asserts that she did so as Mario refused to contribute, stating that it was Vito's problem to handle.

23. The above notwithstanding, no party has submitted any documentation to establish that there was any debt of the station to the tune of $100,000 or more, or any other amount for that matter, which was later paid by Mario, Gerardina, and/or Mimi.

24. It is further noted that, ultimately, Mario was the one who sold the subject station, without Vito's assistance, knowledge, or authorization, which leads one to question how such a sale could properly be accomplished if Mario was not, indeed, the true owner of the station.

25. Whether the station was sold while Vito was away on vacation, the fact is undisputed that Mario alone sold the station, apparently without any problems to the new buyer. As such, it is assumed that Mario was able to sell the station and pass clear title to the new buyer. This assumption is based upon there being no evidence presented to show that: (a) there were any problems with the sale by Mario or the new buyer; and, (b) that Vito, upon learning of the sale, ever challenged it, ever sought money from Mario relating to the sale, either at the time he learned of the sale up until seventeen (17) years later as part of the subject claims in this matter. This latter fact—

---

[10] It is noted, however, that Mario did not provide (nor did any other witness for that matter) any documentary support for this claim, such as invoices, receipts, cancelled checks, etc. Rather, this proposition (that Mario paid out over $100,000 of his own money for this station) is based merely upon Mario's testimony at the hearing and the Certification (affidavit) of Gerardina DiDonato—Mario's wife and Vito's step-mother. Also with regard to these Certifications—that of David Heller and Gerardina DiDonato—the Special Master notes that none of the signatures are notarized. This may or may not be proper under New Jersey law. However, the Special Master has no way of knowing whether the signatures provided upon the various Certifications are of those whom they purport to be, and thus whether the statements set forth in the Certifications are, indeed, made by the specified declarant. What is certain is that neither Mr. Heller, nor Gerardina DiDonato appeared at the April 10, 2008 hearing to testify in

Vito's failure to object to or challenge the sale, and failure to seek recoupment of funds relating to the sale, if indeed Vito was the owner of the station—leads to a conclusion that Mario may actually have been the owner of the subject station.

26. However, while it thus appears Mario may have been the true owner of record of the subject station, the Special Master finds, based upon the testimony elicited and documentary evidence provided, that Mario promised to transfer the station to Vito in exchange for Vito assuming management and responsibility for operating said station (including the loan obtained in furtherance of the promise and in reliance upon it). While it appears that there was a significant falling out between Vito and Mario at the end, unfortunately continuing up through the hearing held by the undersigned, causing Mario to eventually renege on his promise to Vito (culminated by the sale of the station without Vito's knowledge or authorization), Mario should not be allowed to foreclose Vito's right to these subject claims, or at least portions thereof. While it is much too late, and the wrong forum, Mario likely should not have been allowed to sell the station (and keep the proceeds) without Vito's authorization based upon various legal and equitable principles, including the doctrine of promissory estoppel.

27. Yet, this is the proper forum to enforce this equitable consideration, in favor of Vito, as the undersigned finds that, despite the records of Exxon showing Mario to be the "key person" for the subject station (with the exception of January 4, 1990 to April 16, 1990), it was Vito who operated and ran the subject station, and likely was the one who paid for the subject fuel. However, as noted above, no documentary evidence, in this regard, has been provided by Vito (including cancelled checks, financial documents, invoices, receipts, tax returns, etc.), nor by Mario.

---

support of their purported Certifications.

28. Mario's counsel argued that this situation was a "promise of a gift" and not an actual gift, and that there was no legal transfer of the station. *See*, pg. 113, Hearing Transcript. However, Vito argued that the $50,000 loan he took out to support the station was the consideration in exchange for the promise that Mario gave. Mario's response is that it was Mario's house at risk on the loan. *See*, pg. 114, Hearing Transcript. Moreover, Vito's argument is that he reasonably relied on the Mario's promise when he took out the $50,000 loan (and subsequent second loan[11]), as well as devoting his time and efforts (the "sweat equity") to the day-to-day operation of the business.

29. Mario additionally argued that since this is a Court of equity, the doctrine of laches would apply to prevent Vito's claim since seventeen (17) years following the sale of the station have now passed without Vito doing anything to lay claim to the sales proceeds. The Special Master disagrees that the doctrine of laches prevents Vito from asserting a claim over the matter *at issue here*. The claim by Vito (and Mario for that matter) were timely asserted as part of the Claims Administration Process in this matter. Vito is not asserting a claim against Mario for the sale proceeds relating to the sale of the subject station, which such claim the undersigned would not be able to adjudicate and to which the doctrine of laches and/or other defenses, might apply.

30. Mario also requested that the undersigned award Mario reimbursement from Vito for the "money taken by Vito", if Vito is granted any share of the claim.

31. Accordingly, considering the unique and often conflicting testimony and evidence, as a matter of equity, the Special Master finds that both claimants should share equally in the total award, as follows: (a) Vito DiDonato should receive 50% of the total award; and, (b) Mario

---

[11] However, no documentation was submitted to show that any second loan was obtained by Vito. Only Vito's testimony indicated the existence of a second loan.

DiDonato should receive 50% of the total award. The Special Master declines to award Mario DiDonato any amount for "reimbursement" as requested relating to Vito's purported "taking" of money. Mario did not provide **any** documentation to show that Vito took, or stole, money from Mario; rather, Mario relies upon mere statements/claims to this effect by himself and through the Declaration of Gerardina DiDonato.[12] Vito denied stealing money from Mario. The Special Master, for reasons discussed above, does not deem these to be sufficient evidence to establish that Vito stole or "took" any money from Mario and/or Gerardina, such that any reduction of Vito's share of this claim will be given to Mario.[13]

## II.   CONCLUSION

Based upon the foregoing, the Special Master concludes that there is not sufficient documentation or evidence to conclusively establish that either: (1) Mario, or Vito, were the sole owner of the subject station, to the exclusion of the other; or, (2) that Mario did not promise to give the station to Vito (assuming Mario owned it), which promise became enforceable upon certain actions, discussed above, taken by Vito. The evidence and documentation suggests possibly that both had ownership in the subject station for the time period at issue in these claims. Since neither claimant has presented compelling evidence, by any standard (whether clear and convincing or by the

---

[12] Additionally, Mimi's testimony indicates that Vito "took the money" from the gas station when he went on vacation without paying the vendors. *See*, pg. 70 of the Hearing Transcript. However, what was not established was whether that was actually Mario's money. Mimi's testimony was that even Mario referred to the station as Vito's. If the station was actually Vito's, then the money "taken" was not Mario's. Again, the parties have failed to submit documentation to establish what money was taken, who paid it back, in what amount, etc.

[13] Just as Mario takes great pains to argue that Vito failed to make any claim against Mario relating to the sale of the subject station, and the related proceeds from the sale, for a period of seventeen (17) years, Mario (and Gerardina) have likewise failed to take any action (civilly or criminally) against Vito for money that Vito supposedly stole or "took" from Mario and Gerardina. If that logic is good enough for Mario to argue that Vito's failure to object to the sale precludes Vito from now asserting ownership in the station, that same logic is also then equally sufficient by which to deny Mario's claim for an offset against the award in Vito's favor.

greater weight of the evidence) that one was the owner to the exclusion of the other, and, rather, that both likely and arguably have rights to the subject claims, the Special Master finds, as a matter of equity, that both Mario and Vito should split the subject claims equally.

Accordingly, it is hereby:

**ORDERED AND ADJUDGED** as follows:

1. Mario DiDonato (Claim Nos. 1030168A and 1030168B) and Vito Anthony DiDonato (Claim Nos. 1011524A and 1011524B) are to split the total award equally, 50% to Mario DiDonato for said claim numbers and 50% to Vito DiDonato for said claim numbers..

2. With the resolution of this dispute, Class counsel is permitted to advance the claims of Mario DiDonato (Claim Nos. 1030168A and 1030168B) and Vito Anthony DiDonato (Claim Nos. 1011524A and 1011524B), in the manner noted above, in the Claims Administration Process.

3. The Garden City Group is hereby ordered to make the appropriate updates to the claim files and shall distribute the Special Master's Order to: Mario DiDonato (Claim Nos. 1030168A and 1030168B) and claimant Vito Anthony

DiDonato (Claim Nos. 1011524A and 1011524B).

**DONE AND ORDERED** in Miami, Florida this 8th day of October, 2008.[14]

_____
SPECIAL MASTER THOMAS E. SCOTT

Copies furnished to:
United States District Court Judge Alan S. Gold
All counsel of record

Ronald Esposito, Esq. (counsel for Mario DiDonato)
540 North Avenue
Union, New Jersey 07083
Fax: (908) 289-7999

Arthur G. Lesmez, Esq. (counsel for Vito DiDonato)
Law Office of Arthur G. Lesmez, APC
1717 4th Street, 3rd Floor
Santa Monica, CA 90401
Fax: (310) 395-3884

---

[14] Any objections to the Order of the Special Master shall be filed with the District Court within fourteen (14) calendar days from the date of the Special Master's Order. Any responses to objections shall be filed within five (5) business days of the date the objection is filed with the court. The objector shall have three (3) business days to file a reply from the date the response is filed.