IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
NO.: 91-0986-CIV-GOLD/SIMONTON
SPECIAL MASTER THOMAS E. SCOTT

ALLAPATTAH SERVICES, INC., et al.,   )
                                      )
        Plaintiffs,                   )
                                      )
v.                                    )
                                      )
EXXON CORPORATION,                    )
                                      )
        Defendant.                    )
_____)
                                      )
RUSSELL A. CLINE,                     )
                                      )        **CONSOLIDATED WITH**
        Plaintiff,                    )        **CASE NO.: 05-21338-CIV-GOLD /**
                                      )        **SIMONTON**
vs.                                   )
                                      )
THE GARDEN CITY GROUP, INC.,          )
                                      )
        Defendant.                    )
_____)

## ORDER REGARDING CONFLICTING CLAIMANT DISPUTE C10.3

THIS CAUSE is before the Special Master pursuant Class Counsel's Tenth Motion for Adjudication of Conflicting Claims (Motion C10) **[D.E. 4909]**, and the materials submitted[1] by or on behalf of claimant Robert Joseph Piccirillo (hereinafter, "Piccirillo"), Claim No. 1028809, and claimant Verc Enterprises, Inc. (hereinafter, "Verc"), Claim No. 102594.

On October 8, 2008, the Special Master conducted an evidentiary hearing to resolve various unsettled conflicting claimant disputes contained in Class Counsel's C10 Motion, specifically

---

[1] Such materials include the original Replies and the responses and documentation attached to the claimants' respective answers to the "Claimants' Questionnaire for the Resolution of Conflicting Claims in the Exxon DFC Class Action," as well as the additional supplements provided by the claimants, and the materials contained within the database maintained by the Claims Administrator.

including dispute C10.3. The parties to this dispute are Robert Joseph Piccirillo, Claim No. 1028809, and claimant Verc Enterprises, Inc., Claim No. 102594. Piccirillo appeared *pro se* at the October 8, 2008 hearing. Verc was represented at the hearing by attorney Christopher Kenney, Esq. Additionally present were Leo Vercollone and Michelle Tessier, Esq.

Having analyzed the materials submitted by the claimants and/or their counsel, and having reviewed the Court file and the file maintained by the Claims Administrator, and having conducted an evidentiary hearing concerning this dispute, and being otherwise fully advised in the premises, the Special Master finds as follows:

## **FINDINGS AND CONCLUSIONS**

1.   It is undisputed that Piccirillo was the dealer of record for the subject station during the time period of this claim, which is from October 1, 1991 up to and ending August 28, 1994.

2.   Piccirillo and Verc entered into an Asset Purchase Agreement, dated August 25, 1999 relating to a sale of assets—namely, Piccirillo's gas station business (hereinafter, the "Agreement").

3.   The Agreement does not specifically identify the subject *Allapattah* claim—which is a "chose in action"—as an asset which was transferred. Verc refers to it as the *Allapattah* **rebate**. This is fundamentally incorrect factual designation, as far as this process is concerned. Certainly, the original agreement between Exxon and their direct-served dealers, as part of the "Discount For Cash" program, was for these dealers to receive a "rebate" or "refund" on the wholesale price of gasoline, to offset the 3% charge Exxon injected for credit-card gas purchases at the pump. However, those "rebates" or "refunds" were not given, and resort to litigation was the remaining

option. The right to seek **damages** against Exxon—for what essentially was a breach of contract (and a multitude of other legal theories) when Exxon did not pay its direct-served dealers any such "rebate" or "refund"—is the fabric of the *Allapattah* claim.[2] Therefore, it no longer became a "refund" or "rebate" which a direct-served dealer could reasonably expect; rather, a "chose in action" or right to sue arose and became the claim. This is a significant distinction because the claims here no longer were just an expectation of income (or rebate) to be received from Exxon, but rather damages that might be realized after a prolonged legal battle.

4.  Prior to the hearing, Verc argued that the Agreement provided for Piccirillo to transfer his ownership and all assets, rights and title in the "business" to Verc. In this regard, Verc points to Exhibit B to the Agreement wherein business asset is defined as "all leases, marketing agreements and all other written agreements between the Seller and Exxon," to argue that this provision includes all rights under the Motor Fuel Sales Agreement which gives rise to the Allapattah claim. Consistently, Verc argued, at the hearing, that the Agreement is crafted such that Piccirillo set forth specifically what was **not included** as part of the sale (by way of specific exclusion of certain assets),

---

[2] Accordingly, the undersigned finds Verc's citation of *Our Lady of the Sea Corp. v. Borges*, 40 Mass. App. Ct 484 (1996), for the proposition that "a fuel rebate may be deemed a corporate asset" to be inapposite. Similarly, Verc cites *Olmstead Manor Skilled Nursing Center, Inc., Ltd. v. Olmstead Manor, Ltd.*, 2002 WL 31269815 (Ohio App. 2002), *Prochnow v. Buetow*, 187 Wis.2d 292 (1994), and *International Coal Mining Co. v. Pennsylvania R. Co.*, 15 Pa. D. 225 (1906) all for the proposition that the *right to a rebate* is either an asset subject to a purchase and sale agreement, or an asset which is transferred to a buyer upon the sale of a business. Irrespective of the fact that such a determination would likely be factually-based, dependent upon the individual facts and circumstances and the particular language in any given contract, these cases and their propositions are inapplicable in this matter. At the time of the subject Agreement, the *Allapattah* claim was **not** a **right to a rebate**. The claim was merely in litigation. No right or actionable damage was yet established (other than the "right to sue"—the chose in action discussed in this order). It was in litigation and heavily disputed by Exxon (again, at the time the subject Agreement was executed). Accordingly, there was no **right** to a rebate or refund (that is, there was no established right to a refund or rebate, or even a reasonable expectation), and the case law cited by Verc is inapplicable for this reason, among others.

and all the remaining assets were sold to Verc. For this proposition, Verc highlighted Exhibit B to the Agreement.   Exhibit B states, in pertinent part, as follows:

> **Business Assets**
>
> The Assets of the Exxon gasoline filling station franchise business include (i) all leases, marketing agreements and all other written agreements between Seller and Exxon, whether such agreements are assigned to Buyer or terminated and new Agreements are entered into between Exxon and Buyer...
>
> * * *
>
> The following items are not assets of the business and/or are specifically excluded from the Business Assets of the Sale; (i) all mechanics' hand tools; (ii) fee simple interest to any real estate; (iii) business inventory stocked for retail sale in repair bays that is not prorated under the terms of the Agreement to which this Exhibit is attached; (iv) motor vehicles; (v) automotive parts; and (vi) equipment, contracts, good will or any other asset of the service business for maintenance, inspection and repair of motor vehicles conduct in the service bays.
>
> The following items of retail inventory are to be prorated as of the Time of Closing at Seller's cost with the purchase price to be adjusted in accordance with the terms of the Agreement to which this schedule is attached; (i) gasoline, diesel or other motor vehicle fuel(s) and (ii) items in snack shop, including cigarettes, juices gum and the like. All inventory not prorated shall remain the property of the Seller and be removed from the Station at the Time of Closing.

5. Based upon the language in Exhibit B, the undersigned agrees with Verc that certain specific, *physical* assets (and one intangible asset—namely, good will) were excluded from the definition of "Business Assets" and, thus, were specifically excluded from the sale and transfer pursuant to the Agreement. However, the problem is that the first paragraph of Exhibit B does **not** operate to include and transfer the necessary motor fuel sales agreement from which Piccirillo's

*Allapattah* arose, as it does not refer, or reach, back to **all** prior agreements that Piccirillo entered into with Exxon; rather, the first paragraph of Exhibit B clearly refers to all present (i.e., operative) written agreements between Piccirillo and Exxon whether: (1) they are assigned to Verc; or, alternatively (2) the existing agreements are terminated and new agreements are executed between Verc and Exxon. Exhibit B most certainly does not clearly reach back to all past agreements between Piccirillo and Exxon, which such agreements have already run their course and which were no longer in effect. Exhibit B's language refers to the ongoing, operating agreements between Piccirillo and Exxon, which such agreements Verc simply wanted to take over and run the station.[3]

6. Yet, the subject Agreement itself does not specifically refer to any Motor Fuel Sales Agreement. Rather, the assignment agreement, entered into on March 27, 2000, does, and it refers specifically to the May 7, 1997 Motor Fuels Sales Agreement. Piccirillo's rights under the May 7, 1997 Motor Fuels Sales Agreement with Exxon were those transferred, and none other.

7. As part of the sale, Verc received from Piccirillo an assignment of rights to the "Dealer Agreements" (the Retail Motor Fuel Store Lease and the Retail Motor Fuel Store Sales

---

[3] Under Massachusetts law,

> ...the expression by the parties in a written instrument of certain things indicates their intention to exclude other unmentioned things, applies where it may reasonably be inferred that if the parties intended to include subjects to which no reference is made in the instrument they would have done so by the addition of appropriate words. This, of course, is not an arbitrary rule to be applied, without consideration of the language of an instrument read as a whole, to bar reasonable inferences of a contrary intention.

*Savris v. Cooper*, 40 Mass.App.Ct. 471, 477 (1996), citing *Hamlen v. Rednalloh Co.*, 291 Mass. 119, 123, 197 N.E. 149 (1935). Furthermore, the terms of the agreement and the definition of assets therein, must be taken in their plain and ordinary meaning, unless otherwise indicated by the contract. *See, Instrument Industries Trust v. Danaher*

Agreement). This assignment is reflected in the "Sale, Transfer or Assignment of Lease/Agreement" dated March 27, 2000 (hereinafter, "Assignment Contract"). Verc argues that the Assignment Contract conveyed Piccirillo's rights to the *Allapattah* claim, as a result of an assignment of the Motor Fuel Store Sales Agreement. Moreover, Verc argues that Article 14 of the Retail Motor Fuel Store Sales Agreement specifically provides that Verc, as the assignee, shall become the "new dealer" under the Retail Motor Fuel Store Sales Agreement, and, as a result, Verc replaced Piccirillo and assumed all of Piccirillo's rights and obligations, including the subject *Allapattah* claim.

8. Verc's analysis is only partially correct. While the Assignment Contract does indeed assign Piccirillo's rights under a Motor Fuel Store Sales Agreement, the Assignment Contract refers **specifically** to the Retail Motor Fuel Store Sales Agreement **dated May 23, 1997**. *See, Assignment Contract* at Recital "A". Accordingly, the assignment received by Verc, from Piccirillo, related to a motor fuels sales agreement that was not operative, and did not pertain to, any fuel sales which occurred during the relevant time period, and thus has no bearing on Piccirillo's *Allapattah* claim. Had the Assignment Contract referred to any motor fuel sales agreement that was operative during the period of time from March 1, 1983 to August 28, 1994, the result would likely be different.

Accordingly, it is hereby:

**ORDERED AND ADJUDGED** as follows:

1. Robert Joseph Piccirillo (Claim No. 1028809) is the rightful claimant as between these two disputing claimants.

---

*Corp.*, 20 Mass. L. Rptr. 250 (Mass. Super. 2005) (citing *Rogans v. Albert*, 431 Mass. 833 (2000)).

*Order Regarding C10.3*
*Page 7 of 7*

2. The claim of Verc Enterprises, Inc. (Claim No. 102594) is hereby dismissed with prejudice. With the resolution of this dispute, Class counsel is permitted to advance the claim of Robert Joseph Piccirillo (Claim No. 1028809), in the Claims Administration Process.

3. The Garden City Group, Inc. is hereby ordered to make the appropriate updates to the claim files and shall distribute the Special Master's Order to: Verc Enterprises, Inc. (Claim No. 102594). The Garden City Group, Inc. is directed to treat the Special Master's Order as denying Verc Enterprises, Inc.'s Claim No. 102594.

**DONE AND ORDERED** in Miami, Florida this 9 day of December 2008.

SPECIAL MASTER THOMAS E. SCOTT

Copies furnished to:
United States District Court Judge Alan S. Gold
All counsel of record