IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
NO.: 91-0986-CIV-GOLD/SIMONTON
Special Master Thomas E. Scott

| | |
|---|---|
| ALLAPATTAH SERVICES, INC., et al., ) | |
| ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| EXXON CORPORATION, ) | |
| ) | |
| Defendant. ) | |
| _____) | |
| ) | |
| RUSSELL A. CLINE, ) | |
| ) | **CONSOLIDATED WITH** |
| Plaintiff, ) | **CASE NO.: 05-21338-CIV-GOLD/** |
| ) | **SIMONTON** |
| vs. ) | |
| ) | |
| THE GARDEN CITY GROUP, INC., ) | |
| ) | |
| Defendant. ) | |
| _____) | |

<u>**REPORT AND RECOMMENDATION REGARDING THE FIVE PERCENT RESERVE
AND TWO PERCENT REDUCTION, AND REGARDING THE FORFEITED BOWEN
ATTORNEYS' FEES AND PARTIALLY MCGILLICUDDY INCENTIVE AWARD**</u>

THIS CAUSE is before the Special Master upon the Plaintiffs' *Motion for Authorization
to Distribute 5 Percent Reserve and Interest* [**D.E. 5613**]; the District Court's *Order of Reference
to the Special Master* [**D.E. 5622**]; the undersigned's *Report and Recommendation on Procedure
for Distribution of the 5% (Percent) Reserve and Interest* [**D.E. 5467**]; States' Counsel's *Motion
Relating to Special Master's Report and Recommendation for the Court to Issue a Clarification
of the Disposition of Forfeited Funds, and Agreed Request to Set a Briefing Schedule* [**D.E.
5507**]; *States' Counsel's Position Paper Regarding the Distribution of the Forfeited Funds*

[D.E. 5532]; *Omnibus Order Regarding Distribution of the 5 Percent Reserve and Interest* [D.E. 5541]; Class Counsel's *Position Paper Regarding the Disposition of Forfeited Fees and Award* on March 12, 2009 [D.E. 5634]; *States' Counsel's Supplemental Position Paper Regarding the Distribution of the Forfeited Funds* [D.E. 5641]; *Allied Esquire Group, Inc.'s Memorandum Regarding Disposition of Partially Forfeited Fees Award of Bowen and Forfeited Incentive Award of William McGillicuddy* [D.E. 5639]; *States' Counsel's Response to Allied Esquire Group's Memorandum Regarding Disposition of Partially Forfeited Fee Award of Bowen and Forfeited Incentive Award of William McGillicuddy* [D.E. 5655]; States' Counsel's *Response to Order Regarding Plaintiffs' Motion for Authorization to Distribute Five Percent Reserve and Interest and Regarding the Issue of the Proper Disposition of the Partially Forfeited Attorneys' Fees and Forfeited Incentive Award* [D.E. 5705]; *Class Counsel's Position Paper Regarding the Five Percent Reserve* [D.E. 5741]; States' Counsel's *Response to Special Master's June 23, 2009 "Order Regarding Request for Position Papers Regarding the 5% Reserve and Related Issues"* [D.E. 5751]; and, *Class Counsel's Reply Regarding Payment of 5% Reserve* [D.E. 5766].

## I.      Procedural Background

On or about November 26, 2008, the undersigned entered the *Report and Recommendation on Procedure for Distribution of the 5% (Percent) Reserve and Interest* [D.E. 5467] in which it was recommended, *inter alia*, as follows: (1) implementation of the procedures as soon as practicable; (2) payments to commence upon further order of the Court after separate motion filed by Class Counsel; (3) at a later date, near the end of the process, the Court should review the status of the Fund and determine the proper and available amounts for the 5% Reserve

payment and interest thereon; and, (4) that the Court consider clarifying the proper disposition of the $7,103,092 million in forfeited attorney's fees and incentive award, as previously set forth in the July 6, 2006 Order.

On this later point, which was first raised by the undersigned in the Report and Recommendation, the States' Counsel appropriately sought an opportunity to brief this issue, which opportunity was granted. Thereafter, States' Counsel filed their position paper with respect to the proper disposition of the forfeited fees and award seeking distribution to the States.

On or about February 23, 2009, Class Counsel filed the Plaintiffs' *Motion for Authorization to Distribute 5 Percent Reserve and Interest* **[D.E. 5613]**. Accordingly, the Motion for Authorization was set for hearing on April 14, 2009, whereupon both States' Counsel and Class Counsel were heard with respect to their positions about authorization of the payment of the 5% Reserve plus interest, as well as the States' position with respect to the proper disposition of the forfeited fees and incentive award.

Following the hearing, on April 22, 2009, the undersigned entered the *Order Regarding Plaintiffs' Motion for Authorization to Distribute 5 Percent Reserve and Interest and Regarding Issue of the Proper Disposition of the Partially Forfeited Attorneys' Fees and Forfeited Incentive Award* **[D.E. 5682]**. As reported in this Order, at the hearing both States' Counsel and Class Counsel agreed that before any payment of the 5% Reserve and interest, a decision must first be made with respect to the forfeited fees and award issue. The undersigned agreed and deferred ruling on Plaintiffs' Motion for Authorization, and further stated that once the forfeited fees and award issue was resolved a Report and Recommendation recommending payment of the 5% Reserve, and related interest in the amount of $1,137,000, would be entered immediately. Pursuant to this Order, the States were allowed additional time to provide more detailed

information for the undersigned's consideration of the forfeited fees and award issue, including: (1) a best estimate of the universe of potential non-participating dealers who could possibly share in any Remaining Balance, if the forfeited fees and award were to be distributed to the States; and, (2) preliminary thoughts on procedures which would adequately assure that the non-participating/non-filing dealers[1] would receive the forfeited fees and award, if those additional monies were to be distributed to the States.

Thereafter, on or about May 12, 2009, the States filed their *Response to Order Regarding Plaintiffs' Motion for Authorization to Distribute Five Percent Reserve and Interest and Regarding the Issue of the Proper Disposition of the Partially Forfeited Attorneys' Fees and Forfeited Incentive Award* **[D.E. 5705]**. Following receipt of these materials, the undersigned continued his review and analysis of the 5% Reserve and forfeited fees and award issues, in anticipation of entering a Report and Recommendation on both matters.

However, during this review and analysis, potentially significant issues became apparent and caused concern for the undersigned prior to being able to authorize the immediate payment of the 5% Reserve and Interest. First, the undersigned's review of the relevant materials, which are of record in this matter, revealed that the Fund might bear an obligation to pay a "2% Reduction" amount to the States (approximately $21.2 million) for the benefit of all non-participating dealers, prior to the Fund's payment of the 5% Contingency Reserve and Interest. Secondly, with regard to the forfeited fees and award issue, the undersigned still needed additional information from States' Counsel before making any recommendation to the District Court that the July 6, 2006 Order should be clarified, or otherwise modified due to equitable considerations, regarding the proper disposition of the forfeited fees and award.

---

[1] The term "non-filing dealers" is also used by the undersigned to mean the "non-participating dealers" (those who did not participate, or were not allowed to participate) in the Claims Administration Process for whatever individual reason. These terms are used herein interchangeably.

These issues and concerns were thereafter set forth in the undersigned's *Order Regarding Request for Position Papers Regarding the Five Percent Reserve and Related Issues* **[D.E. 5734]**. This order required Class Counsel and States' Counsel to file, by July 23, 2009, position papers directed to the issues set forth in the Order. Additionally, the Claims Administrator was directed to post the Order in a prominent manner on the Exxon Dealer Class Action website so that any and all interest parties and claimants were put on notice of the issues raised in the Order. Class Counsel filed their *Position Paper Regarding the Five Percent Reserve* **[D.E. 5741]** on July 2, 2009. States' Counsel filed their *Response to Special Master's June 23, 2009 "Order Regarding Request for Position Papers Regarding the 5% Reserve and Related Issues"* **[D.E. 5751]** on July 23, 2009. Thereafter, Class Counsel filed a *Reply Regarding Payment of 5% Reserve* **[D.E. 5766]**.[2]

It is clear that the undersigned's suggestion of a 2% Reduction obligation was met with significant opposition from Class Counsel following angry responses Class Counsel received from Class Members relating to the undersigned's suggestion to possibly delay or deplete the 5% Reserve payment. Indeed, the undersigned has been made aware of certain letters, emails or phone calls which expressed various Class Members' anger at the delay in awarding the 5% Reserve. While it was never the intent of the undersigned to cause such dismay on the part of Class Counsel and the Class Members, the record revealed what the undersigned understood to be an obligation to pay the 2% Reduction which was to be set aside for the benefit of the non-participating dealers.

As the undersigned has stated in the Order seeking position papers, and again at the August 11, 2009 hearing, it was of utmost concern to ensure that a significant mistake was not

---

[2] While not solicited or permitted by the Order of June 23, 2009, Class Counsel's Reply is before the undersigned and has been considered in addition to their original position paper.

made prior to payment of the 5% Reserve and Interest. While Class Counsel expressed an understanding of the concern for "getting it right," their concurrence was with the Class that "enough is enough."

After receiving States' Counsel's and Class Counsel's position papers, the undersigned set a hearing for August 11, 2009 on the 5% Reserve, 2% Reduction and forfeited fees and award issues. The Order setting this hearing allowed all interested parties *and claimants* to attend the hearing by telephone at which point their opinions could be expressed in addition to the main legal arguments. *See*, D.E. 5753. Parenthetically, it is noted that no individual claimants attended the hearing, or at the very least none announced their presence despite repeated requests for identification of any and all individuals who were on the conference call.


## II.    Initial Summary of Findings and Primary Recommendations

Having heard the arguments of Class Counsel, States' Counsel and others in attendance at the hearing and in consideration of the papers submitted, the undersigned finds that there is indeed an intention to separately remove (at least, "on paper") 2% of the total settlement value to be set aside for the benefit of the non-participating dealers. This 2% Reduction amount is to be paid to States for the benefit of the non-participating dealers at the conclusion of the process, separate and apart from the "Remaining Balance." Thus, one primary recommendation is for the Court to enter an order to this effect.

Further, while there is a significant concern about whether the 5% Reserve and Interest can be paid now and still allow the 2% Reduction amount to be funded and set aside, it appears that there are sufficient funds available at this point to be able to fund the 2% Reduction from various sources, as described in more specific detail below, while allowing for the **immediate**

payment of the 5% Reserve (approximately $55.1 million).[3]    As set forth below, it is

recommended that the Court authorize the immediate payment of the 5% Reserve.

With regard to the forfeited fees and award, the issue is to whom those amounts should

be distributed – *i.e.,* to the Class Members (however defined) or to the States for the benefit of

the non-participating dealers.    As previously stated in the undersigned's *Report and*

*Recommendation on Procedure for Distribution of the 5% (Percent) Reserve and Interest* **[D.E.**

**5467]**, the undersigned's understanding was that these forfeited fees and award were to be

distributed to the "**Class Members**."[4]  The basis for this understanding appears at page 105 of

Judge Gold's July 6, 2006 Order which held, in pertinent part, as follows:

> Finally, the partial forfeiture by Bowen and McGillicuddy has
> resulted in an additional $6,661,425.00 being available for
> distribution. I have determined that it is in the best interest of the
> Class Members to receive a *pro rata* distribution of this amount at
> the time of final distribution at the conclusion of the Claims
> Administration Process. ***This amount will be distributed to the***
> ***Class Members prior to any distribution to the States***. I select this

---

[3] As set forth *infra*, while the 5% Reserve Interest of $1,137,000 could possibly be paid now, it is recommended that this amount be delayed and possibly be reduced if necessary to provide the Fund with a cushion to ensure all Administrative Expenses (First Priority Obligation) are able to be paid up through the conclusion of the Claims Administration Process. If present projected estimates hold true, then the 5% Reserve Interest will not be touched and a new check can be issued at or near the conclusion of the Claims Administration Process.

[4] The term "Class Members" is not specifically defined within the Court's July 6, 2006 Order. However, the undersigned has interpreted this term to mean those Class Members who are a part of this Claims Administration Process—i.e., those who have availed themselves of this process, by the timely filing of a valid claim—to the exclusion of those who did not timely file a valid claim to be a part of this process. Even if the "Class Members" term is more broadly defined to include those who are not a part of this Claims Administration Process (and who must proceed to assert a claim, at the conclusion of this process, with their applicable States), the vast majority of Bowen's forfeited (partially) fees and McGillicuddy's incentive award must be distributed *pro rata* to those who are a part of this process (in accordance with the Court's July 6, 2006 Order), with the remainder to be distributed to those who later file claims with their applicable States (once, and if, additional amounts remain at the end of the process to be distributed to the States). Approximately 9,000 claims are validly a part of this Claims Administration Process, and there were approximately 11,000 potential members of the Class, in total, at the time of settlement. Thus, approximately 2,000 potential Exxon dealers did not participate in this process and/or did not possess valid claims (though States' Counsel has recently asserted that the number of non-participating dealers is approximately 3,330). In any event, the undersigned believed that the Court's intention was to have the approximately $7,103,092 million of forfeited fees and incentive award be distributed to those Class Members who were a part of this Claims Administration Process. Of course, it is possible that Judge Gold's July 6, 2006 Order was referring to any and all potential "Class Members" and not just those who were a part of this process. *See e.g.,* pg. 4 of the Order where the phrase "unknown Class Members" is used to potentially indicate that the term "Class Members" includes those who are a part of this process, as well as those who did not participate in this process (by purposefully availing themselves of the benefits of the process and/or Class).

option because, under the Settlement Agreement, other final distributions to Class Members are contemplated at that time.

*Order on Petitions for An Award of Attorney's Fees, Costs and Reimbursable Expenses and for*

*Incentive Awards to Named Plaintiffs*, p. 105 (emphasis added) (footnote 65 omitted which

explained the derivation of the $6,661,425.00 figure).[5]

Yet, as argued by both Class Counsel and States' Counsel at the April 14, 2009 hearing,

and by States' Counsel in subsequent filings per the undersigned's follow-up orders, the equities

of the situation dictate that these forfeited fees and awards should be distributed to the States for

the benefit of the non-participating dealers.  The participating claimants have received (or will

soon with payment of the 5% Reserve) 100% or nearly 100% of the total claim to which they are

entitled under the Settlement Agreement (i.e., 98% of the established claim, including

prejudgment interest up to October 31, 2005).   It would be inequitable to provide these

participating claimants with additional money that is over and above what they are entitled to

receive.    Thus, such amounts should go to the States for the benefit of the non-participating

dealers.

How these monies should be distributed to the States remains at issue.   The amount

would normally be considered a "surplus" spilling over into the Remaining Balance, which is to

be distributed to the States at the conclusion of the Claims Administration Process.  However, as

is discussed below, a separate 2% Reduction amount was supposed to be accounted for (but was

not) which was to be paid to the States.  Since that amount was not funded, the Fund must now

utilize additional existing sources of funds to populate the 2% Reduction.  One of those amounts

---

[5] There appears to have been a slight error with this calculation.  The July 6, 2006 Order, at pg. 105, specified $6,661,425 ("comprised of the 25% forfeiture [$5,336,425] taken from Bowen's original attorney's fees [$21,345,699] plus McGillicuddy's entire reduced incentive fee award [$1,325,000] which will be paid by Bowen [as reduced]") being available for distribution to Class Members.  That amount appears to be incorrect.  The amount of the Incentive Awards deducted from the Fund was the full $1,766,667 for McGillicuddy.  As a result, the total forfeited fees and incentive award to be distributed should be $7,103,092 (comprised of Bowen's forfeiture of $5,336,425 plus the incentive award forfeiture of $1,766,667).

could be the forfeited fees and award. Yet, the failure to previously account for the 2% Reduction is not the basis for the recommendation that the forfeited fees and award should be distributed to the States. Rather, the States have sufficiently satisfied the undersigned, based upon the procedures and notices proposed, that all possible best efforts will be made to get these forfeited fees and award (and other amounts to go to the States) to the actual claimants. It is for this reason that the undersigned recommends the States receive distribution of the forfeited fees and award; however, since the 2% Reduction was not funded, this is a source of funds which will be used to populate that entitlement.

### III.    5% Percent Reserve and 2% Reduction - First Issue[6]

With limited funds remaining as we near the conclusion of the Claims Administration Process, the specific issue is whether the 2% Reduction should be distributed (or allocated for distribution) to the States – for the benefit of non-filing or non-participating dealers – **before** paying, or being able to pay, the full amount of the 5% Reserve (and/or Interest on the 5% Reserve) to the participating claimants. As indicated previously, and discussed below, it is the undersigned's determination that there is a 2% Reduction amount (approximately $21.2 million) to be allocated to the States for the benefit of the non-participating dealers. This determination is based upon: (a) the intent of the Settlement Agreement, as clearly outlined in my *Amended Report and Recommendation on the Class Settlement Agreement* **[D.E. 2607]** (hereinafter, the *Amended Report and Recommendation*); and, (b) additional equitable policy considerations.

---

[6] It is acknowledged, and Class Counsel has made clear in their July 30, 2009 Reply [D.E. 5766], that States' Counsel has never suggested or raised this 2% issue; rather, it was a matter raised *sua sponte* by the Special Master. This point is, however, irrelevant, as the undersigned has his own duty to properly manage this Claims Administration Process and issues related to the Settlement Agreement.

### A.    Background - 5% Contingency Reserve and 2% Reduction

During this Claims Administration Process, the 2% Reduction amount and its importance was been lost. In the parties' discussions about the 5% Contingency Reserve procedures, implementation of the same and eventual payment of the 5% Contingency Reserve at the April 14, 2009 hearing, there was never any direct discussion of the 2% Reduction and whether it should take precedence over the considerations of when and if the 5% Contingency Reserve can be paid.

Following my review of the record relating to the approval of the Settlement Agreement, including the *Amended Report and Recommendation* and the Court's *Order of Final Approval of Class Settlement Agreement* **[D.E. 2773]** (hereinafter, the "Order of Final Approval"), it is clear that the 2% Reduction was absolutely intended to be preserved and specifically set aside for the benefit of the non-filing dealers and the States. Indeed, no party or claimant ever filed any objections to the *Amended Report and Recommendation* or to any of the recitations stated therein. Despite the needed set-aside of the 2% Reduction, as clearly set forth the record, there is no specific amount which was actually set aside for this 2% Reduction to pass to the States at the conclusion of this process.

### B.    Settlement Agreement Language

The Settlement Agreement specifically contemplates that there would be a 2% Reduction of all claims, which amount would not be refunded to the claimants. This 2% Reduction was to pass to the States for the benefit of the non-filing dealers. The 5% Contingency Reserve was set up to ensure that any shortfalls in claims were covered, such that those claimants adjudicated later in the process would not be shortchanged. Then, at the conclusion of the process, if there

were sufficient amounts remaining, the 5% Contingency Reserve would be refunded to the claimants, potentially with interest.

It appears that the idea of "what remains," in the sense of a "Remaining Balance," has been re-defined into something that was not intended. Under the Settlement Agreement, as approved, and as I interpret it, a full 2% Reduction was to be set aside and was not to be touched, as it was to be distributed to the States at the conclusion of the process, for the benefit of the non-filing dealers. *See*, ¶4(g)(ii), (iv) and (vi) of the Settlement Agreement. At least, that was the *intent* behind the Settlement Agreement.

¶4(g)(ii) of the Settlement Agreement states:

> (ii) Reserve for Contingent Circumstances
> Because of uncertainty as to the total of all claims that will be adjudicated in the claims process, a reserve will be established to endeavor to ensure that claims resolved later in the process will not be shortchanged. As final orders directing payment are entered on each claim, the claimant will initially receive 93% of the judgment amount (with prejudgment interest ending on October 31, 2005), less the amount owed (if the fee award process is completed) or estimated by the District Court to be owed (if the fee award process is incomplete) in attorneys' fees, costs, and named plaintiff incentive awards. **Two percent of the claim amount will not be refunded.** The remaining 5% of each claimant's recovery will be held in the Settlement Fund until such time as all claims have been fully adjudicated (the "Contingency Reserve"). After all claims are finally adjudicated, the Contingency Reserve will be distributed to claimants, pro rata, based on the amount of the judgment relative to the total of all other judgments, **until each claimant has received up to 98% of the established claim or until no funds remain in the Contingency Reserve.**

> (emphasis added)

After "removing" the 2% Reduction amount from the total settlement value, which was not to be refunded, there remained 98% of the total available claims to be paid. From this 98%, an additional 5% Reserve was then withheld from the claims adjudicated and paid. Accordingly,

this left the claimants with 93% of their claims being paid during the initial process with the

potential hope to pay them the additional 5% Reserve at the conclusion of the process if

sufficient amounts remained.  If any surplus of funds existed after paying the initial claims and

the 5% Reserve, such that each claimant received *up to 98% of the established claim*[7] the

claimants would possibly receive additional interest on the 5% Reserve as set forth in ¶4(g)(iii)

of the Settlement Agreement.  Again, the Settlement Agreement did not contemplate any refund

or repayment to the participating claimants of the 2% Reduction, as that amount was preserved

for the States for the benefit of the non-filing dealers.

Separately, as discussed in ¶4(g)(vi) of the Settlement Agreement, the Remaining

Balance is defined as the amount that remains after payment of the First, Second and Third

Priority Obligations.  Specifically, ¶4(g)(vi) of the Settlement Agreement states as follows:

> Upon resolution of the final claim postmarked on or before
> December 19, 2005, and distribution of the Contingency Reserve,
> the "Remaining Balance" shall be calculated.  The Remaining
> Balance is that amount remaining in the Settlement Fund and the
> Fee-Shifting Fund, including interest earned during the time
> between the date of Payment until that time after payment of all
> claims, after payment of the following hierarchy of obligations:
>
> (a) First Priority:
>
> (i)     All claims determined to be valid (including the
>         claims of dealers who opted out of the Class but
>         filed claims within the time provided herein);
> (ii)    All awards of attorneys' fees, costs and expenses to
>         Class Counsel;
> (iii)   All incentive awards to Class Representatives;
> (iv)    All taxes and fees paid in connection with operation
>         of the Depository Account;
> (v)     All expenses for the maintenance of the claims
>         process including but not limited to fees for the
>         Claims Administrator, the Special Master and the
>         States' Counsel.

---

[7] The original 93% of the claim to be paid during the initial process plus the potential for another 5% from the Contingency Reserve.

(b) Second Priority: the 5% Contingency Reserve;

(c) Third Priority: Interest on the Contingency Reserve

Thus, if after payment of all the First Priority Obligations there remains an amount to pay the 5% Contingency Reserve (Second Priority) and the Interest on the reserve (Third Priority) those amounts would be paid, and if any additional sum thereafter remains —the Remaining Balance — it would be distributed to the States. *See*, ¶4(g)(vi) of the Settlement Agreement (note: there are two paragraphs in the Settlement Agreement labeled as 4(g)(vi)).

Based upon my reading of the Settlement Agreement, the *Amended Report and Recommendation*, and the Court's *Final Order of Approval* (which adopted and incorporated the *Amended Report and Recommendation*), the 2% Reduction was an entirely separate set-aside from the Remaining Balance. The 2% Reduction was put into place to **ensure** that the non-participating dealers and the States on their behalf receive some funds. The Remaining Balance figure was put into place as an additional potential method of recovery for the non-filing dealers if money remained after paying all obligations. Stated otherwise, the Remaining Balance concept was a potential *supplemental* recovery vehicle for the States and the non-filing dealers;[8] it was not the exclusive method, and it was not guaranteed. The 2% Reduction was set up to be the **absolute minimum recovery** for the States and the non-participating dealers, with the potential chance for supplementation by any Remaining Balance. The reason for this absolute minimum was to alleviate a concern raised by Exxon during the settlement negotiation process and in the process of drafting the Settlement Agreement regarding the States and their claims (as then asserted).

---

[8] It was also a logical, reasonable method for handling a surplus of funds (relating to interest income earned by the Fund during the Claims Administration Process), if they existed (which they did) and in the event the claimants were paid the full amounts to which they were entitled under the Settlement Agreement (which they have been, or soon will be with the payment of the 5% Contingency Reserve).

C.    **Amended Report and Recommendation of January 30, 2006 – Exxon's Concern Leading to 2% Reduction Amount**

As set forth in the *Amended Report and Recommendation* (wherein the negotiations leading to the execution of the Settlement Agreement and specifically the Second Settlement Conference are discussed), after the First Settlement Conference Exxon had concerns regarding the contingencies set forth in the first draft of the Settlement Agreement. In this regard, the *Amended Report and Recommendation* stated as follows:

> At the Second Settlement Conference, Exxon cautioned that the First Draft's formula for distribution of the Settlement Fund provided no guarantee that non-filing dealers (and the States acting in their stead) would receive anything at the completion of the claims process. In other words, if one hundred percent of all claims presented in the claims administration process proved to be valid, then the states (and their respective non-filing class members) would receive no portion of the Settlement Fund. To Exxon, this contingency created an unacceptable risk that the Settlement Fund would be rejected as unfair by the District Court. **To resolve this problem, Exxon and Class Counsel believe that the best way to ensure that some portion of funds would be available for the benefit of non-filing dealers and the States was to institute a mandatory reduction in all filed claims by two percent. An additional five percent of each claim would still be withheld, as under the First Draft to ensure that claims paid later in the process would not be shortchanged. [FN. 12]**

> [FN.12] - To help offset the two percent reduction in the value of all filed claims, the two primary law firms serving as Class counsel in this matter agreed that they would reduce their fee petition before the District Court by two percent.

*See, Amended Report and Recommendation*, pgs. 14-15 (emphasis added, footnote 11 omitted).

The *Amended Report and Recommendation* also discussed that the above resolution regarding the 2% Reduction and the 5% Contingency Reserve created a new difficulty. That new difficulty was how to adequately inform the Class about what they would receive without a settlement so that the members could make an educated decision about whether they should

accept the settlement with the various reductions. As stated in the *Amended Report and Recommendation*,

> Axiomatically, the parties needed to reach an understanding regarding the aggregate value of all filed claims in order to educate the class regarding any **amounts which would be withheld for the benefit of state claimants under the proposed two percent reduction.**

*Id.* at pg. 16 (emphasis added). Clearly, this 2% Reduction amount was intended to be **withheld** (and not refunded to the participating claimants) for the benefit of the States and the non-participating dealers. As further indication of this intent, the discussion of the settlement negotiations and intent behind the language in the agreement, the *Amended Report and Recommendation* reported that,

> ...the parties needed to determine the precise aggregate value of filed claims to effectively apprise the Class of the amount of real settlement fund dollars **which would be reallocated for the benefit of state claimants. Additionally, the parties needed to agree upon this figure to give proper notice to the class regarding the increased potential for a shortfall in available cash to pay claimants under the Second Draft. [FN. 13]**
>
> > [FN.13] – Since the Settlement Agreement caps the Class recovery at $1.075 billion, Exxon's calculation of the aggregate value of all filed claims ($1.1 billion) creates a shortfall of around $25 million from the outset. However, if Class counsel's aggregate claims figure of $1.05 billion is utilized, then no initial shortfall exists, but rather a surplus of approximately $25 million.

*Id.* at pg. 17 (emphasis added).

It was further indicated that in the event of any potential shortfall in funds available to pay filed claims, such a shortfall would be satisfied out of the residual funds – specifically the 5% Contingency Reserve. *Id.* at pgs. 17 -18 and fn. 14. The States point out that the calculations performed in the Notice to the Class, as adopted in footnote 14 to the *Amended*

*Report and Recommendation*, do not show the 2% Reduction as a preserved fund to be directed to the States. Yet, at the same time, as the States argue, the 2% Reduction amount was clearly implemented to allay Exxon's concerns (about the non-participating dealers and the States) and to guarantee a recovery to the States for the benefit of the non-participating dealers. The States argue that this "guarantee" can be found in the subject calculations "only if the net interest of the Fund was in fact protected for the states; *i.e.,* the 5% reserve could be depleted (which is in fact shown in the subject calculations)." *See, Response to Special Master's June 23, 2009 "Order Regarding Request for Position Papers Regarding the 5% Reserve and Related Issues"* [D.E. 5751], pg. 8.

The States continue by pointing out that the *Amended Report and Recommendation,* in footnote 14 thereto, incorporated Class Counsel's "worst case" scenario figures from the Class Notice, showing an $18 million shortage of the 5% reserve, along with the "purported redirection" of the 2% Reduction to claims overages. These "claims overages" were the amounts claimed in excess of the settlement amount of $1.06 billion. The States argue that

> [t]hese calculations do not explicitly account for any net interest of the Fund, nor do they indicate its final destination (*i.e.,* used to pay claims overages, preserved for the states, etc.). The Settlement Agreement, including any potential reduction of the 2% reduction amount, makes sense *only if* the Fund's net interest was to be preserved for the benefit of the states; simply there is no other source of funds for the states.

*Id.* at pg. 9 (emphasis in original).

Class Counsel has argued that the Notice to the Class did not explicitly state that the 2% Reduction was to go to the States (indeed, Class Counsel believes the 2% Reduction for the States did not exist, and the States assert that Class Counsel reads the Notice as illustrating no explicit payout to the States), and that the failure of the Notice to provide an explicit discussion

about the States receiving a 2% Reduction would be a deprivation of the Class Members' due

process rights (if the 2% Reduction is paid to the States). However, as the States point out in

their response, partially quoting the undersigned's *Amended Report and Recommendation*:

> As noted by the Special Master in the Amended Report, this (and
> every other) Rule 23(e) notice is designed only to be a "summary
> of the litigation and settlement," and Class members thus have the
> right and opportunity to inspect the complete settlement
> documents, papers, and pleadings filed in the litigation. Amended
> Report at 65, n.28 (quoting Newberg on Class Actions §8:32). Put
> simply, the Notice does not trump the Amended Report.

*Id.* at pg. 9, fn. 2.

Class Counsel argues that the language in the *Amended Report and Recommendation* is,

"…in effect legislative history of the settlement and notice of the approval process cannot trump

the language of the Settlement Agreement and Notice themselves." *Class Counsel's Position*

*Paper Regarding the Five Percent Reserve* [D.E. 5741] at pg. 13 and fn. 6.[9] Class Counsel also

argues that "[n]owhere does the Court signal its approval of a guaranteed $22 million payment to

the States." *Id.* at 14. However, Class Counsel overlooks the Court's full adoption and

incorporation (in its own order) of the *Amended Report and Recommendation*, which report does

indeed speak to a guaranteed 2% Reduction to the States (~$21.2 million). As set forth in the

*Final Order of Approval*,

> Special Master Scott issued an Amended Report and
> Recommendation on the Class Settlement Agreement **[DE # 2607,**
> **Exhibit "A"]**. In the Amended Report and Recommendation,
> Special Master Scott recommended that Plaintiff's Motion to
> Preliminary [sic] Approve the Terms of Settlement be granted.

---

[9] Yet, Class Counsel has submitted Mr. Stearns' own affidavit with the Position Paper to provide guidance for the
issues concerning the 2% Reduction in opposition to the undersigned's January 30, 2006 Amended Report and
Recommendation. The January 30, 2006 report is contemporaneous to the actual settlement (and is part of the
original record) setting forth matters contradictory to Mr. Stearns' recent affidavit. Unfortunately, Mr. Stearns did
not file objections to the *Amended Report and Recommendation* until his recent affidavit. Regardless, there is no
need to consider extrinsic evidence as to the intent of the judicial record. It is beyond peradventure that it would be
folly to pit lawyers' recollections against each other as to judicial intention and decisions when the clear record
speaks for itself.

Thereafter, upon review of the Amended Report and Recommendation, I entered my Order Preliminary [sic] Approving Class Settlement **[DE # 2607]**. In that Order, I adopted the Special Master's 76 page Amended Report and Recommendation in its entirety. I now re-adopt the Amended Report and Recommendation in its entirety. I now re-adopt the Amended Report and Recommendations of the Special Master and re-incorporate its [sic] as part of this Final Order. I rely extensively on it in reaching my findings and conclusions.

While it may be arguable that the Notice to the Class did not sufficiently identify that the 2% Reduction was intended to go to the non-participating dealers, through the vehicle of the States, it was the intention behind the Settlement Agreement, as is specifically discussed and set forth in the *Amended Report and Recommendation*.[10]

As discussed above, the Court specifically adopted the *Amended Report and Recommendation* "in its entirety" as well as incorporating it as part of the Court's own *Order of Final Approval*. Yet, Class Counsel argues that no such proposal regarding the 2% Reduction going to the States was "ever advanced by any interested party in the series of hearings leading to the Court's approval of the settlement." *Class Counsel's Position Paper Regarding the Five Percent Reserve* **[D.E. 5741]** at pgs. 1-2. Class Counsel further argues that "[t]here is also not a single word supporting this idea anywhere in the carefully drafted and detailed Settlement Agreement, the Court's preliminary order approving the settlement, the notice provided to the

---

[10] It appears that the only potential reference to a reduction of the 2% reduction is in the Court's July 6, 2006 Order at page 108 wherein the Court orders as follows:

> Lastly, the Court notes that it is impossible to foresee the total amount of funds necessary to complete the Claims Administration Process and to pay all costs and expenses associated with the Settlement Fund at this time. **As a result, the Court reserves the right to consider taking some portion of the funds to be set aside for the States in order to ensure completion of the Claims Administration Process and the full payment of prejudgment interest to the Class.**

(emphasis added).

Class concerning the settlement, or the Court's final order approving the settlement." *Id.*[11] Again, while Class Counsel relegates the undersigned's *Amended Report and Recommendation* to mere legislative history, the Court's *Final Order of Approval*, specifically adopted *and* incorporated the undersigned's *Amended Report and Recommendation* into the Order. Thus, the *Amended Report and Recommendation* is much more than "legislative history." Class Counsel's arguments to the contrary are inconsistent with the judicial record.

The simple fact of the matter is that the undersigned prepared and filed an extremely detailed seventy-six (76) page Amended Report and Recommendation which specifically recounted, *inter alia,* the intent and purpose of the 2% Reduction amount, and Class Counsel *never filed any objection to the Amended Report and Recommendation* (nor did anyone else for that matter), either at the time the *Amended Report and Recommendation* was entered or at the time the *Amended Report and Recommendation* was specifically adopted and incorporated into the Court's own *Final Order of Approval.* [12]

---

[11] In this same Position Paper, Class Counsel also states: "[y]et *nowhere* in any of the documents, orders or transcripts is there any proposal or suggestion that the 2% reduction was anything but a recognition of the reduction of the settlement amount demanded by Exxon in connection with its willingness to settle the litigation." *Id.* at pgs. 4-5 (emphasis in original).

[12] At the hearing on August 11, 2009, Class Counsel argued that

> "[t]here was never, ever any discussion that the States would receive a priority higher than the people who timely filed claims. It was never discussed, it was never raised, it was never mentioned. And, of course, there's nothing contained in the waterfall that would suggest such a thing. There was never a discussion about creating a 2% fund. There is no 2% fund. There was not enough money in the settlement with Exxon to create such a fund."

*Hearing Transcript of August 11, 2009,* pg. 13. Yet, that issue was explicitly discussed as reported, in great detail, in the *Amended Report and Recommendation,* to which no objections were asserted. Only recently when this issue was raised by the undersigned, for which some criticism was mounted, did Class Counsel attempt to restate the intent behind the Settlement Agreement and the negotiations. If the undersigned's recitation of those negotiations, and specifically the intent behind the 2% Reduction, was wrong, it is unclear why Class Counsel did not object in a timely manner (i.e., in February of 2006 following the Amended Report and Recommendation and/or in March or April of 2006 following the Court's Order fully adopting the Amended Report and Recommendation, and approval of the Settlement Agreement).

Class Counsel in their *Reply Regarding Payment of 5% Reserve* **[D.E. 5766]** asserts that the *Amended Report and Recommendation* indicated that the "mandatory discount" was created to give incentive to the States to participate in the claims process. In this regard, Class Counsel argues that "if there was a 2% fund with a higher priority than that owed to timely filing claimants, the States would not have had an 'incentive…to participate in the claims process.' It is only by leaving the States' interest to the end that such an incentive was created." *Reply,* pg. 3. This argument is belayed by Class Counsel's own direct experience with an "incentive" in this matter. Specifically, when Class Counsel was awarded an entitlement to their approximate $247 million in attorneys' fees by virtue of the July 6, 2006 Order, they were not immediately provided full payment. Rather, they were to be paid in different increments, based upon benchmarks achieved, as an *incentive* to Class Counsel. The final payment was to come at the end of the Claims Administration Process, however, Class Counsel received their final $30.9 million payment in mid- to late December 2008, pursuant to their motion requesting payment and following the undersigned's recommendation which the Court approved.

Thus, Class Counsel is fully aware how these "incentives" work and the difference between obtaining an entitlement to the money versus when that money is actually paid. Similarly, while the Settlement Agreement was to provide for a 2% Reduction to the States for the benefit of the non-participating dealers – which was an entitlement – payment was not going to occur until the end of the process. In theory,[13] it was incentive enough for States' Counsel to

---

[13] It is theoretical since States' Counsel seemingly was not aware of the 2% Reduction amount, indeed, it was more recently raised *sua sponte* by the undersigned. It should be noted that States' Counsel entered this process after these negotiations and finalization of the Settlement Agreement. Therefore, States' Counsel was not fully aware of the intent behind the 2% Reduction. Even without full knowledge of the 2% Reduction entitlement, the States performed their duties regardless, and in an admirable fashion even without an appreciation of the carrot (incentive) Class Counsel references in their current argument.

continue performing their required duties with that 2% Reduction entitlement existing from inception until the end of the process.[14]

The point of the above is to explain that the 2% Reduction was supposed to be specifically reserved from the Fund for payment to the non-filing dealers through the States, separate and apart from the Remaining Balance, as was *always the intent.* Class Counsel repeatedly argues that their designed "waterfall provision" (i.e., the provision setting forth the First Priority, Second Priority and Third Priority obligations of the Fund, to be followed by the "Remaining Balance"), leaves no ambiguity and does not provide for any 2% Reduction. Indeed, Class Counsel states that this waterfall provision "...ironically, was intended to eliminated any of the kinds of arguments advanced here." *Class Counsel's Position Paper Regarding the Five Percent Reserve* at pg. 8.[15]

However, as discussed above, this 2% Reduction is separate and apart from the entirety of the Priority obligations in the "waterfall" provision. The terms of the Settlement Agreement plainly demonstrate this fact. The 2% Reduction was removed (on paper, not physically) from

---

[14] Again, this 2% Reduction was not physically separated from the Fund and all the monies were commingled in the same account, which generated significant interest income over the life of the Fund. In all actuality, and practicality, the money that now may represent the 2% Reduction is the interest income of the Fund, since the principal balance has been fully utilized to pay all claims (or soon will be to pay the remaining few claims). These claims exceeded the estimates of the Fund, and indeed there were significant claims overages. Technically, from the reading of the *Amended Report and Recommendation*, those overages should have been paid out of the amounts reserved for the 5% Reserve. However, practically speaking, the amounts were paid from the interest income of the Fund (which would have itself fully funded the 2% Reduction). As will be discussed below, the 5% Reserve can be paid, though interest on the same will be withheld, potentially to be repaid later, and the 2% Reduction can be funded from the certain amounts remaining, all of which are likely interest income of the Fund.

[15] Class Counsel also argues that Section 6.c. of the Notice to the Class, provides that "[t]he settlement creates a *potential* for all states to collect some unclaimed monies through the revised claims process." *See Class Counsel's Position Paper Regarding the Five Percent Reserve*, pg. 9 (emphasis in original). Further, Class Counsel asserts that based upon this provision, "[t]he States' recovery is described as merely a "potential" in some undisclosed amount – no guarantee of a roughly $22 million payment is presented." *Id.* Again, Class Counsel is wrong. This part of the notice discussing the potential for the States to collect some *unclaimed* monies speaks absolutely to the waterfall concept Class Counsel continuously cites. The Settlement Agreement was indeed designed to provide the States with an additional potential recovery of any surplus remaining after payment of the First, Second and Third Priority Obligations of the Fund (which, again, only amount to 98% of the total settlement funds collected from Exxon, as per the Settlement Agreement). The States already were to be guaranteed the 2% Reduction amount as discussed above at length. The waterfall provision, as it concerns the States (i.e., the "potential" collection of *unclaimed* monies) is separate and apart from the 2% Reduction amount.

the 100% of the settlement amounts received. This left 98% of the total Fund to pay to claimants (though 100% of the amount received would be sitting in a bank account generating interest income during the Claims Administration Process). As set forth in the Settlement Agreement (prior to the discussion of the "waterfall" of priorities), 93% of the total claim would be paid to the claimants as part of the initial process and adjudication, with the 5% Reserve being held back until the end, if amounts were available.[16] However, the claimants would be paid until they received up to 98% of their total filed claim.

The 2% Reduction was never to be included in the later "waterfall" provision which provision solely pertained to the payments of the remaining 98% of the Fund value. Class Counsel argues that this 2% Reduction amount was to ensure the ability to pay for any claims overages and/or the 2% amount never truly existed. Class Counsel is wrong. The 5% Reserve was to be used for payment of any claims overages (which clearly meant that the 5% Reserve might never be repaid, or at least not repaid in full) and the 2% Reduction did exist. That reality is spelled out in the *Amended Report and Recommendation* (and indeed is set forth in the Settlement Agreement, by virtue of the way it is structured, as discussed above).

**D.      Funding of the 2% Reduction & Immediate Payment of 5% Reserve**

The issue now is how to properly fund the 2% Reduction while also ensuring that the full 5% Reserve is paid immediately in full. Attached, as **Exhibit "A,"** are the latest updated financial projections of the Fund to illustrate the remaining (projected) funds and certain expenses. At this time, the following remains (after reduction of the amount of additional claims to be paid):

1.      Estimated Class Counsel Expenses – $50,000
2.      Estimated Administrative Expenses – $700,000[17]

---

[16] Notably, the 2% reduction from each award was set forth on the face of every award at the time it was entered.
[17] Includes projected amounts for the July – September 2009 period.

3.  Estimated Class Counsel Interest – $8,248,000[18]
4.  Forfeited Fees and Award – $7,103,092
5.  Estimated 5% Contingency Reserve – $55,081,000 (net of some minor prepayments for back-up withholding)
6.  5% Contingency Reserve Interest – $1,137,000 (as agreed)
7.  Bowen's Remaining Fees – $12,235,110

Based upon the above amounts (net of the minor income earned during the period), if all are paid as estimated, the Remaining Balance is projected to be only $6,188,717 as of the date of this report.[19]  Clearly, this amount is much less than the 2% Reduction amount of $21.2 million. Thus, the question is from what remaining funds will the additional approximate $15,000,000 be derived in order to fully fund the 2% Reduction.

First, there are the forfeited fees and award of $7,103,092; however, at this point, the Court must first approve the distribution of those forfeited fees and award to the States, as recommended below, since doing so requires modification or clarification of the Court's July 6, 2006 Order (see discussion, *infra*).  Even assuming that these fees and awards are distributed to the States, the total funding of the 2% Reduction would only be approximately $13,291,809. Accordingly, the States would still be short by $7,908,191 of the approximate $21.2 million required.  Thus, from what source will the remaining amount(s) be obtained?  The potential interest on Class Counsel's fee award is one remaining source, which, if used, would leave Class Counsel will only $339,809 in available projected interest, based upon current fund projections (however, see the proviso set forth in fn. 23, *infra*).

Another potential source is the recovery the States *may* receive as a result of the pending litigation with the IRS to recover monies the Fund paid in Federal income taxes, and which the

---

[18] This figure was used for projections only, and by reporting this figure I am, in no way, making any determination or recommendation as to the amount of interest which Class Counsel might be awarded.  It was simply used for projection purposes.
[19] This projected Remaining Balance may be higher because of recovery of income taxes due to the carryback of the net operating losses generated in the year 2009, irrespective of the IRS litigation.

Fund argues it should not have been forced to pay. I stress that the amount of this recovery, if any, is unknown at this time. That said, if the States are successful, there could be additional significant monies added to the Fund (after reduction of States' Counsel's contingency fee from the litigation). Such additional funds might alleviate the present issue about ensuring payment of the 2% Reduction to which the States and non-filing dealers are entitled. However, since the 2% Reduction was required to be set aside but was not, this amount must be funded now. Further, to be able to fund the 2% Reduction **and** to pay the 5% Reserve now, adjustments must be made and equity must take precedence.

At present, it is projected that the $21.2 million can be populated from some of the remaining funds which include the projected Remaining Balance, the forfeited fees and award, and the amount set aside for potential, projected Class Counsel interest. In this regard, the most equitable way to ensure that the 2% Reduction is fully funded and paid at the end of the process while also simultaneously ensuring that the 5% Contingency Reserve is paid now,[20] is to fund the 2% Reduction amount as follows:

| | | |
|---|---|---|
| 2% Reduction Amount | | $21,200,000 |
| (minus)  Projected Remaining Balance | | ($6,188,717)[21] |
| | subtotal | $15,011,283 |
| | | |
| (minus)  Forfeited Fees and Award[22] | | ($7,103,092) |

---

[20] This situation requires the 5% Interest of $1,137,000 being held back even though it is a Third Priority Obligation of the Fund. However, the 2% Reduction is an overarching obligation of the Fund. Accordingly, since the 2% Reduction was not properly funded, additional equitable considerations must be made to ensure both payment of the 2% Reduction and the 5% Contingency Reserve. Accordingly, as explained below, the 5% Interest is not recommended to be paid at this time, to provide an additional "cushion" for the Fund until the full conclusion of the process. If that amount remains at the conclusion a new check will be issued for the required amount (minus any administrative expenses for sending out the check to the last known address). Alternatively, if the States are successful in the tax litigation and if the 5% Interest is indeed depleted by the end of the Claims Administration Process, the recovery from the tax litigation will be used to re-fund the 5% Interest amount to be paid to the claimants (following payment of States' Counsel's contingency fee), as is explained in detail below.

[21] This amount may be adjusted upward or downward, as the case may be, but for the present purposes, the figure of $6,000,000 is utilized.

[22] As will be explained below, the undersigned recommends clarification of the July 6, 2006 Order to provide for the distribution of these forfeited fees and award to the States, since the participating Class Members have already

|  | subtotal | $7,908,191 |
|---|---|---|
| (minus)  Class Counsel's est. interest | | (\$7,908,191)[23] |
| | | $0 (2% Reduction is Funded) |

As is obvious from the above, the undersigned recommends utilizing the projected, estimated amount of Class Counsel interest to help fund the 2% Reduction. This recommendation is made for two primary reasons, none of which are based upon any intent to deprive Class Counsel of their interest.[24]

First, doing the above will allow the Fund to meet its obligation to pay the 2% Reduction to the States for the benefit of non-filing dealers, while simultaneously allowing the Fund to immediately pay the participating Class Members their 5% Reserve without any further delay. Accordingly, the participating Class Members can receive their funds now and alleviate some of the problems they have cited as a result of the delay in the payment, which Class Counsel has so clearly described. Secondly, all of the parties including Class Counsel have stated their view that the IRS litigation is likely to be successful in achieving recovery for the States. Based upon their confidence in this position, the undersigned recommends that any interest paid to Class Counsel be paid directly from any recovery that the States achieve through the IRS litigation (following,

---

received the full amount of their claims, to which they are entitled, with interest (and they will further receive payment of the 5% Reserve).

[23] Pursuant to the projections, the Class Counsel interest was estimated to be $8,248,000; however, the Court has not determined this amount with finality. Presuming that Class Counsel is entitled to $8,248,000, the reduction of this amount (by $7,908,191) to assist the funding of the 2% Reduction would leave $339,809 available in interest. This projected interest is based the approximate gross interest earned on the amounts withheld from Class Counsel's fees without regard to any income tax effect (which effect depends upon resolution of the IRS litigation).

[24] It is noted, however, that Class Counsel "interest" is not an obligation of the Fund and is not mentioned in the Settlement Agreement. Rather, the potential interest which Class Counsel may receive was a result of the Court's initiative when it was decided to parcel out payments of Class Counsel's fee to correspond to benchmarks achieved in the Claims Administration Process. Class Counsel interest is not a First, Second, or Third Priority (or any other) obligation of the Fund. The 5% Reserve and Interest takes precedence over Class Counsel interest, as does the 2% Reduction and, for that matter, Claims Administration Expenses. While it might be argued that the "interest" on the Class Counsel fees is a "First Priority Obligation," that simply is not the case. Nor has Class Counsel advanced this argument. Moreover, Class Counsel has consistently and forcefully argued that the 5% Reserve and Interest should be paid "now" (back in April 2009 and before) and they have not yet sought payment of their interest. Accordingly, it would appear that even Class Counsel acknowledges that their "interest" is not a priority above the 5% Reserve and Interest. Therefore, the undersigned makes the recommendation to use part of the estimated interest amount to fund the 2% Reduction and allow the immediate payment of the 5% Reserve.

of course, the States' Counsel's contingency fee from the recovery, and replenishment of the 5%
Reserve Interest, if necessary). Considering that Class Counsel has received $247 million in fees
as a result of the settlement achieved, it is the undersigned's view that the most equitable
procedure is to dip into the projected interest presently "set aside" to allow the funding of the 2%
Reduction and immediate payment of the 5% Reserve.

The one amount that has not been mentioned in detail is the 5% Reserve Interest of
$1,137,000. While it could be paid now as well, the Fund would be left walking a tightrope until
the absolute conclusion of this process. Accordingly, it is the undersigned's recommendation
that this $1,137,000 be withheld at this time to ensure a "cushion" until the conclusion of this
process. If this amount is not necessary to pay for any of the First Priority Obligations of the
Fund, then additional checks can simply be mailed to the address of record for each claimant.[25]
In this regard, it is recommended that the claimants keep the Claims Administrator (The Garden
City Group, Inc.) updated about any address changes (note: new payment instructions will not be
mailed).

Since the 2% reduction is being funded, and the circumstances regarding it were not
brought to the attention of the undersigned by the States, it is recommended that any recovery
from the IRS litigation be reduced to replenish the other amounts presently being used to fund
the 2% Reduction and to pay any additional expenses. At this time, and based upon the
estimates presently known, there are sufficient funds to pay the 5% Reserve now and fund the
2% Reduction. However, if there is any recovery from the IRS litigation (and/or any additional
recovery of income taxes due to the carryback of net operating losses in 2009 – see fn. 19,
*supra*), the breakdown of payment priorities is recommended to be as follows: (1) States'

---

[25] When this $1,137,000 is split, in the manner required, among the 9,000 participating claimants, the amounts to be
received will be relatively small for the vast majority of claimants considering the amount already paid.

Counsel's contingency fee from recovery amount as per agreement; (2) payment of any additional claims administration expenses, if any; (3) refunding or replenishment of the $1,137,000 for the 5% Reserve Interest (to the extent used at all), so that it can be refunded to the claimants; (4) Class Counsel's entitlement to some form of interest; and, (5) the remainder shall go to the States. If the States object to this recommended priority arrangement, then all of the above issues will need to be revisited, including the 2% reduction issue and considerations relating to the same.

## IV.    States' Motion for Distribution of Forfeited Fees and Award – Second Issue

Following the hearing on April 14, 2009, the undersigned issued an order seeking additional information from States' Counsel in support of their request for distribution of the forfeited fees and award. *See*, **D.E. 5682**. On or about May 12, 2009, States' Counsel filed their response. See, **D.E. 5705**.

States' Counsel took some initial steps to identify certain non-filing dealers who might receive these funds, but a more complete identification was requested (to show that a significant portion of these dealers can be identified and money actually distributed to them). The procedures described in States' Counsel's response **[D.E. 5705]** were a good start. In this regard, the States proposed to send notice to the individual or associated entity whom they can identify as a non-filing or non-participating dealer.[26] The undersigned then requested a copy of the form notice(s)[27] that were being proposed, so consideration could be given to the same. Furthermore,

---

[26] The States reported that there are still unclaimed gallons at 2,656 stores involving 3,066 dealer account numbers, and the States propose to send notice to each of these 3,066 dealer account numbers.
[27] Additionally, the undersigned wanted to know whether the draft notice would be the same for all thirty-five (35) states, and if not how exactly those notices would differ by state.

the undersigned wanted to see the proposal of the States when no response is initially received, or if the States are advised of a bad address.

Further, States' Counsel advised that they were "of the belief" that: (a) most if not all of the unclaimed property statutes **mandate** the inclusion of identifying information in connection with the transfer of unclaimed funds to the particular States' unclaimed property department; and, (b) the holder of the unclaimed property (at least under the Florida statutes) is obliged to use due diligence to attempt to locate owners of the unclaimed property **prior to** its transfer to the state.  The undersigned was obligated to inquire what other states have a similar requirement, and whether this identification process is an obligation of the Fund.  If so, and if this expense is to be borne by the Fund, then these additional expenses needed to be considered in the projected financial estimates, before any payment of the 5% Reserve.  States' Counsel indicated that they are best situated to provide the notice required, etc., as opposed to the Claims Administrator.

Based upon the above, further information was requested by the undersigned by virtue of the June 23, 2009 order to be filed by July 23, 2009.  On July 23, 2009, the States filed their *Response to Special Master's June 23, 2009 "Order Regarding Request for Position Papers Regarding the 5% Reserve and Related Issues"* **[D.E. 5751]**.  This filing addresses the concerns of the undersigned and it reveals that States' Counsel undertook a yeoman's effort to develop a proposed set of procedures, for all thirty-five states, to provide due notice to the non-participating dealers of their claims to the balance of funds which the States are to receive (which, at this point, is mostly the 2% Reduction amount and possibly some additional amounts if the IRS litigation is successful).

The States have reviewed the statutory guidelines relating to unclaimed property in each of the thirty-five states, whom they represent, to determine what is required by each state's

statutes. Some statutes do not require as a high a bar to surpass with respect to providing notice to claimants of unclaimed property. However, apparently, the Florida statutory requirements are relatively strict and provide the best possible basis for ensuring that a claimant receives due process and notice. Accordingly, the States have recommended that the more strict and encompassing notice to claimants as required by the Florida Statutes be utilized for each of the other thirty-four (34) states. In that manner, a singular form notice can be used for every state, a form which would provide for the best possible efforts and notice to any particular non-filing claimant (to give the best possible opportunity for that claimant to receive their money), which is preferable. Accordingly, the undersigned recommends the adoption of the notice proposed by the States, following the statutory requirements of the State of Florida for each of the other thirty-five states (unless, specifically prohibited by a particular state's statute or if a particular state's statute actually mandates the use of a very specific notice).

The participating claimants have received all of the monies to which they were absolutely entitled pursuant to the settlement agreement, including interest on their claim. Additionally, if the Court approves these recommendations, the claimants are now set to receive the 5% Reserve payment. With the additional 5% Reserve payment, the claimants will receive 100% of what they were entitled to under the Settlement Agreement (with the possible exception of the $1,137,000 in 5% Reserve Interest, which may still go back to the claimants at the end of the process).[28]

These participating claimants have received more than any other claimants in the history of class actions. Indeed, it is almost unheard of in class actions for the claimants to receive so much of their claim back. At most, the claims were reduced by only 2% pursuant to the

---

[28] The 5% Reserve and 5% Reserve Interest were never guaranteed to be paid. Thus there was not an "absolute" guarantee that such monies would be returned.

Settlement Agreement, and the Fund was still able to fully pay the Claims Administration Expenses, and Class Counsel attorneys' fees.[29] The efforts to achieve this result are highly commendable.

With the above in mind, it would be inequitable to further award the participating claimants the $7,103,092 million in forfeited fees and incentive award, as originally set forth in the Court's July 6, 2006 Order at page 105, which holds, in pertinent part, as follows:

> Finally, the partial forfeiture by Bowen and McGillicuddy has resulted in an additional $6,661,425.00 being available for distribution. I have determined that it is in the best interest of the Class Members to receive a *pro rata* distribution of this amount at the time of final distribution at the conclusion of the Claims Administration Process. ***This amount will be distributed to the Class Members prior to any distribution to the States***. I select this option because, under the Settlement Agreement, other final distributions to Class Members are contemplated at that time.

*Order on Petitions for An Award of Attorney's Fees, Costs and Reimbursable Expenses and for Incentive Awards to Named Plaintiffs*, p. 105 (emphasis added) (footnote 65 omitted which explained the derivation of the $6,661,425.00 figure – *See also*, fn. 5, *supra*).

In July of 2006, it was unknown whether or to what extent there would be sufficient funds to even pay the 5% Reserve back to the claimants at the end of the process, as it was subject to reduction to cover potential claims overages. If the 5% Reserve was unable to be paid back to the claimants, then, of course, the forfeited fees and incentive award should go to ameliorate the shortfall. However, based upon proper planning and timing of the investments, sufficient funds have been generated, or appear to have been generated, to pay significantly all of the obligations of the Fund (with the exception of the discussion above regarding the 2%

---

[29] Attorneys' fees paid directly to Class Counsel totaled approximately $325.4 million (approximately 31.3% of the total settlement fund). Approximately $247.3 million was awarded to Class Counsel (Stearns Weaver), $53.1 million was awarded to Pertnoy Solowsky, $2.6 million was awarded to Grutman, $1 million was award to the McKenna firm and $21.35 million was awarded to Gerald Bowen (though that amount was further reduced by Court-ordered forfeiture and other issues, making up part of the "forfeited fees" discussed in this section).

Reduction). Accordingly, the situation has changed from that which this Court faced in July of 2006, and the equities have now shifted in favor of directing these forfeited fees and incentive award to the States, in order to help fund the 2% Reduction amount.

There are approximately 3,000 non-participating dealers[30] who the States can identify, some of whom will be easier to locate than others, as tax identification numbers exist for less than 50% of the non-participating dealers. The States' plan is to run an AutoTrack search on each of the non-participating dealers for whom tax identification numbers exist (at $5.00 each), which should result in additional, more current information, especially if those people have been reported to one of the three major credit bureaus over the last fifteen years. The cost of locating the non-participating dealers who do not have a tax identification number (or for those whom the States do not have such a number) will start to increase. The States indicate they can run a second AutoTrack search with just the name and address, which may generate a tax identification number, and it may generate people located to the last known address of the non-participating dealer. The States caution, however, that if nothing is revealed after the two AutoTrack searches, then it becomes cost prohibitive to try and track down these non-participating dealers.

The States propose to write to the non-participating dealers (a letter to be approved) explaining that they have rights under their unclaimed property statutes as a result of the *Allapattah* settlement. In this regard, the States mention that Florida's unclaimed property law has the highest level of requirements for due diligence with respect to locating and identifying the potential owner of unclaimed property. The States explain that the benefit of complying with the unclaimed property statutes is that the States' Counsel and the Fund will get a complete

---

[30] In their filings, the States have indicated there are approximately 3,000 identifiable non-participating dealers. At the August 11, 2009 hearing, States' Counsel indicated there are 3,300 such dealers. Whatever the case may end up being, there are a significant number of non-participating dealers.

release, and if the statutes are satisfied and we turn over the funds in accordance with the various states' form and list, then our obligations are complete and any liability is totally released. Thus, the States propose that the Fund make a notification and then each state has different possibilities on how the non-participating dealers would be contacted.

Class Counsel's opinion is different. They believe that once the Fund pays over the money to the States based on the unclaimed property statutes (which the States' Counsel provided explicit and detailed information about in their brief), the Fund's obligations are complete, other than the handful of claims that presently remain. This opinion seems to be contradictory to what is reported by States' Counsel who has spent significant time reviewing and analyzing the unclaimed property statutes and requirements of each of the thirty-five (35) states. Class Counsel's opinion is that it is up to the individual states to go find the dealers based on the state law that exists.[31] In this regard, Class Counsel does not believe the Fund should micromanage the process, as the responsibility and duty rests with the individual states.

Based upon the foregoing, it is the undersigned's recommendation that the States' themselves pay for the required notifications, as discussed above, from the 2% Reduction they are to receive. The expenses for this should not be borne by the Fund directly (as Administrative Expenses). This is only fair and equitable to the Class Members, especially considering that the Settlement Agreement did not contemplate or address the associated costs for compliance with each various states' unclaimed property laws, either with respect to the 2% Reduction entitlement or the "Remaining Balance" concept. Moreover, this recommendation is the most equitable result as the non-participating dealers did not properly or timely (if at all) file a claim

---

[31] In this regard, the undersigned agrees with Class Counsel. If these unclaimed property funds are supposed to be held by the States in perpetuity, until the rightful claimant claims them, there should be no need for a "complete release" as suggested by States' Counsel. If that claimant has the wherewithal to state they have a claim to the money, then they should likewise have the ability to apply to the applicable state and claim their money if that money is to be held in perpetuity for their benefit.

to be a direct part of the Claims Administration Process.

## V.    Conclusion and Recommendations

All of the parties should be commended in their efforts to protect the affected dealers (both filing and non-filing claimants who were injured by Exxon's action). If there is honorable disagreement over the intent of the 2% Reduction between the parties then it is only because of their desire to do the right thing and fully and correctly implement the intent of the Settlement Agreement. In the undersigned's viewpoint, it is a commendable process where issues like this can be aired and decided prior to their implementation. It protects all including the filing and non-filing claimants affect by Exxon's action. Parenthetically, it must be observed that in the entire claims process the 2% Reduction is the first significant dispute between the parties.

In summary, it is the belief of the Special Master that the decision reached herein by the undersigned clearly implements the intent of the Settlement Agreement and provides an equitable result to all parties including both the filing and non-filing claimants, as well as the States and Class Counsel. If I am wrong, the District Court can say so. However, the airing of these issues is essential to protect all involved. Any slight delay in payment of the incremental amount to the filing claimants is warranted to air the issue now and not later after the fact. In this regard, I am sure the District Court is in complete agreement.

Accordingly, based upon the foregoing, it is respectfully recommended as follows:

1.    That the Court adopt and affirm the undersigned's recommendation regarding the 2% Reduction, and specifically holding that the 2% Reduction, as revealed by the timely filed matters of record, was specifically intended to be "set-aside" for the States, for the benefit of the non-participating dealers, to be paid at the conclusion of the process;

2.    That the Court clarify or modify its order of July 6, 2006 to allow the $7,103,092 in forfeited attorneys' fees and incentive award to pass to the States for the

reasons set forth above, and to specifically assist in the proper funding of the 2% Reduction;

3.  That the Court adopt and affirm the undersigned's suggestion of how to populate the 2% Reduction amount, and specifically the suggested sources of those funds, as outlined above;

4.  In this regard, it is further recommended the Court adopt and affirm the undersigned's suggestion that if the States are successful in the IRS Litigation, the amounts received should be utilized and directed as follows until no further funds exists:

    i.   Payment of States' Counsel's contingency fee, per agreement;
    ii.  Payment of any additional Administrative Expenses, if any;
    iii. Replenishment of the 5% Interest amount of $1,137,000 (if at all used during the remaining course of the Claims Administration Process);

        a.  If the 5% Reserve Interest still exists in full, or is able to be replenished in full, at the conclusion of this process, it is further recommended that payment of these amounts be made as originally intended;
        b.  If the 5% Reserve Interest has been depleted and is unable to be replenished in full, at the conclusion of the process, it is then recommended that payment of these amounts be made on a reduced pro-rata basis to the claimants;

    iv.  Payment of Class Counsel interest (amount still to be adjudicated); and,
    v.   Remainder, if any, to be distributed to the States.

5.  That the Court should adopt and affirm the recommendation that the non-participating dealers be provided notice of their potential recovery of the 2% Reduction and/or Remaining Balance, in the form advocated by States' Counsel and set forth above. Specifically, the form of the notice shall be as proposed by the States, following the statutory requirements of the State of Florida for each of the other thirty-five states (unless, specifically prohibited by a particular state's statute or if a particular state's statute actually mandates the use of a very specific notice); and,

6.  The costs associated with: (a) identifying and locating these non-participating dealers; (b) sending them notices; and, (c) other related efforts should be borne by

the States and paid out of the 2% Reduction amount (after the money is distributed to the States at the conclusion of this process).

**RESPECTFULLY SUBMITTED** in Miami, Florida this ___ day of September, 2009.

SPECIAL MASTER THOMAS E. SCOTT

Copies furnished to:
United States District Court Judge Alan S. Gold
The Garden City Group, Inc.
All counsel of record