IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

ALLAPATTAH SERVICES, INC., )
et al., )                              CASE NO. 91-0986-CIV-GOLD/SIMONTON
)
Plaintiffs, )
)                              FOR CONSIDERATION BY
vs. )                              U.S. DISTRICT JUDGE ALAN S. GOLD
)
EXXON CORPORATION, )
)
Defendant. )
)
)

### CLASS COUNSEL'S AMENDED[1] OBJECTIONS TO THE SPECIAL MASTER'S REPORT AND RECOMMENDATION DATED SEPTEMBER 4, 2009

Class Counsel objects to and moves for rejection of the following recommendations of the Special Master's September 4, 2009 Report and Recommendation [D.E. 5793 (hereinafter, "Report" or "R&R")]:[2]

1.    The *sua sponte* recommendation that an order be entered establishing a "2% Reduction Fund" of $21.2 million to the States for the benefit of non-filing claimants;[3]

---

[1] As directed in the Court's October 19, 2009 Order Following Telephonic Briefing Schedule, Class Counsel submits these Amended Objections to incorporate additional arguments previously presented to the Special Master by letter dated September 29, 2009. In addition to adding those additional materials and an additional chart regarding the 20 remaining claims awaiting adjudication, we have shortened the presentation by deleting argument that on reflection appears unnecessary. Our disappointment in our inability to obtain funding of the 5% Reserve over the last year crept into the tone of our earlier argument – but to be sure, is not entirely missing from this one.

[2] In the earlier filed Motion to Bifurcate, Class Counsel also objected to the Special Master's recommendation that the Court defer payment of interest to the Class on the 5% Reserve.

[3] No motion was made with respect to this recommendation nor was an order of reference issued regarding it.

2.      The recommendation that all of the approximately $7 million forfeited from the awards in favor of Gerald Bowen and Bill McGillicuddy should be used to partially fund a "2% Reduction Fund;"

3.      The *sua sponte* recommendation that the Court partially fund a "2% Reduction Fund" from approximately $8 million of interest due to Class Counsel on its deferred attorneys' fees;[4/]

4.      The *sua sponte* recommendation that the Court replace the "hierarchy of obligations" establishing the waterfall of payment priorities from the Settlement Fund as set forth in the Class-noticed, Court-approved, Class Settlement Agreement in favor of a new hierarchy the Special Master deems equitable;[5/]

5.      The *sua sponte* recommendation that the Court should enter an order imposing detailed requirements on the States as to the manner in which they will administer the "Remaining Balance" of unclaimed monies left in the Settlement Fund upon the conclusion of the claims process.[6/]

---

[4/]    This was not the subject of a motion made, referred, briefed or argued to the Special Master.

[5/]    This was not the subject of a motion made, referred, briefed or argued to the Special Master.

[6/]    This was not the subject of a motion made, referred, briefed or argued to the Special Master.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

## MEMORANDUM IN SUPPORT OF OBJECTIONS

1.    **The Court Should Reject the Special Master's Recommendation to Establish a "2% Reduction Fund" ($21.2 Million) as a Separate and "Overarching Obligation" to be Paid to the States on Behalf of Non-filing Claimants**

      a.    **The Special Master's Recent Discovery**

In his September 4 Report, the Special Master asserts discovery of an "overlooked" and "unaccounted for", but "overarching obligation" to establish a separate fund of $21.2 million, that was, he asserts, intended to be a guaranteed set-aside to the States for the benefit of claimants who did not timely file claims. The Report states:

> It is **clear** that the 2% Reduction was **absolutely** intended to be preserved and specifically set aside for the benefit of the non-filing dealers and the States. [R&R at 10 (emphasis added)].
>
> •     •     •
>
> The 2% Reduction was an entirely separate set-aside from the Remaining Balance. The 2% Reduction was put in place to **ensure** that the non-participating dealers and the States on their behalf receive some funds. The Remaining Balance figure was put into place as an additional potential method of recovery for the non-filing dealers; it was not the exclusive method and it was not guaranteed. The 2% Reduction was set up to be the **absolute minimum recovery** for the States and the non-participating dealers, with the potential chance for supplementation by any Remaining Balance. [R&R at 13 (emphasis added)].
>
> •     •     •
>
> **Clearly**, this 2% Reduction amount was intended to be withheld (and not refunded to the participating claimants) for the benefit of the States and the non-participating dealers. [R&R at 15 (emphasis added)].
>
> •     •     •
>
> Similarly, while the Settlement Agreement was to provide for a 2% Reduction to the States for the benefit of the non-participating dealers - **which was an entitlement** - payment was not going to occur until the end of the process. [R&R at 20 (emphasis added)].
>
> •     •     •
>
> The 2% Reduction is an **overarching obligation** of the Fund. Accordingly, since the 2% Reduction was not properly funded, additional equitable considerations must be made to ensure both payment of the 2% Reduction and the 5% Reserve. [R&R at 24 n. 20 (emphasis added)].

-3-

According to the Special Master's Report, the "clear" language establishing this "overarching" obligation for an "absolute minimum recovery" of $21.2 million to be paid to the States at the end of the claims process can be found in the Settlement Agreement itself.  The Report states:

> The Settlement Agreement **specifically contemplates** that there would be a 2% Reduction of all claims, which amount would not be refunded to the claimants.  This 2% Reduction was to pass to the States for the benefit of the non-filing dealers. [R&R at 10 (emphasis added)].

> • • •

> Under the Settlement Agreement, as approved and as I interpret it, a full 2% Reduction was to be set aside and was not to be touched, as it was to be distributed to the States at the conclusion of the process, for the benefit of the non-filing dealers.  See, ¶4(g)(ii), (iv) and (vi) of the Settlement Agreement.  At least that was the intent behind the Settlement Agreement. [R&R at 11].

> • • •

> Again, the Settlement Agreement did not contemplate any refund or repayment to the participating claimant of the 2% Reduction, as that amount was preserved for the States for the benefit of the non-filing dealers. [R&R at 12].

> • • •

> This 2% reduction is separate and apart from the entirety of the Priority obligations in the "waterfall" provision.  **The terms of the Settlement Agreement plainly demonstrate this fact.** [R&R at 21 (emphasis added)].

The Special Master's conclusions are simply and plainly erroneous.  No such obligation was intended.  No such obligation was created.

### b.   The Express Provisions of the Settlement Agreement Preclude the Existence of the Claimed Fund

The Special Master cites to only three subsections of the Agreement as authority for his position, all of which preclude his conclusion. [A copy of the Settlement Agreement

-4-

is attached as Exhibit "A"].   The three cited subsections, 4.g. (ii) (iv) and (vi),[7/] provide as follows:

**4.g.  Allocation of Settlement Fund**

The Payment [Exxon's settlement payment of $1.075 billion], and any interest or investment earned from it that remains after payment of taxes and claims expenses until the sums are fully disbursed, shall constitute the Settlement Fund[8/] and shall be allocated after the Effective Date as follows:

**(I)     Claims by Class Members Filed on or Before December 19, 2005**

[omitted text]

**(ii)    Reserve for Contingent Circumstances**

Because of uncertainty as to the total of all claims that will be adjudicated in the claims process, a reserve will be established to endeavor to ensure that claims resolved later in the process will not be shortchanged. As final orders directing payment are entered on each claim, the claimant will initially receive 93% of the judgment amount (with prejudgment interest ending on October 31, 2005), less the amount owed (if the fee award process is completed) or estimated by the District Court to be owed (if the fee award process is incomplete) in attorneys' fees, costs and named plaintiffs' incentive awards.  Two percent of the claim amount will not be refunded.  The remaining 5% of each claimants' recovery will be held in the Settlement Fund until all such claims have been finally adjudicated (the "Contingency Reserve").  After all claims have been finally adjudicated, the Contingency Reserve will be distributed to claimants, pro rata, based on the amount of the judgment relative to the total of all judgments, until each clamant has received up to 98% of the established claim or until no funds remain in the Contingency Reserve.

**(iii)   Interest on Contingency Reserve**

[Omitted text]

---

[7/]Through a typographical error in the Settlement Agreement, two paragraphs of 4.g. are labeled "(vi)".  We include both.

[8/]Note that the Settlement Fund is defined as all income from all sources without subtraction for any other "fund."

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON. P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

(iv)    **Early Termination of Contingency Reserve**

If at any time during the claims adjudication process it appears that the amount held in reserve exceeds the total value of all remaining claims and there are sufficient funds available to complete the claims adjudication process, a motion can be made to accelerate disbursement of all or part of the funds held in reserve. Upon recommendation of the Special Master, the District Court may under such circumstances accelerate payment of all or part of the reserve pro rata among the claimants from which those funds were withheld.

(v)    **Award of Additional Sums for Fee Shifting for Texas, Arizona and Arkansas Class Members**

The sum of $15,000,000, will be allocated to a fee shifting fund to be applied against the obligation of Class Members in Arkansas, Arizona and Texas for Class Counsel's attorneys' fees (each such class members pro rata share based on the amount of each award to a Class Member in one of the three states in relation to the total of all potential awards to all Class Members in all three of those states, whether filed or unfiled).[9]

(vi)    **Calculation of the Remaining Balance After All Claims are Finally Adjudicated and Paid**

Upon resolution of the final claim postmarked on or before December 19, 2005, and distribution of the Contingency Reserve, the "Remaining Balance" shall be calculated. **The Remaining Balance is that amount remaining in the Settlement Fund and the Fee Shifting Fund, including interest earned during the time between the date of Payment until that time after payment of all claims, after payment of the following hierarchy of obligations:[10]**

(a) First Priority:

(I) All claims determined to be valid (including the claims of dealers who opted out of the Class but filed claims within the time provided herein;

---

[9] Had there been a 2% Reduction Fund it would have looked something like this one.

[10] Note that there is not included in the "hierarchy of obligations" any so called 2% Reduction Fund. Every penny coming in is accounted for and the priority of every penny going out is established, and there is no 2% Reduction Fund.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

(ii) All awards of attorneys' fees, costs and expenses to Class Counsel;

(iii) All incentive awards to Class Representatives;

(iv) All taxes and fees paid in connection with operation of the Depository Account;

(vii) All expenses for the maintenance of the claims process including but not limited to fees for the Claims Administrator, the Special Master and the States' Counsel.

(b) Second Priority: the 5% Contingency Reserve;

(c) Third Priority: Interest on the Contingency Reserve as provided herein.[11]

**(vi)     Distribution of the Remaining Balance**

The Remaining Balance will be divided among the thirty-five states pro rata based on the magnitude of unasserted claims within each state in relation to the total of all unasserted claims in all states.

[Settlement Agreement at 9-11(emphasis added)].

As should be clear, not only do the foregoing paragraphs not "plainly" establish the existence of a "2% Reduction Fund" with a priority equal to that of timely filed claims, they establish exactly the opposite. Much less an "overarching obligation" mandating the States an "absolute minimum recovery" with a first priority equal to that of the timely filed claims

_____

[11]The Settlement Agreement was approved by the Court [D.E. 2773] in advance of the Court's consideration of an award of attorneys' fees. In July 2006, the Court entered its order on attorneys' fees and, among other things, determined that half of Stearns Weaver's fee would be paid "forthwith" and the remainder would be paid over the course of the claims process to incentivize Stearns Weaver's continued involvement. In the fee order the Court in effect added a Fourth Priority to the Settlement Fund with respect to the interest on Class Counsel's deferred fee: **"This [interest] amount will be paid to Stearns Weaver before any distribution to the States."** 454 F. Supp. 2d at 1241(emphasis added)].

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON. P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

of bona fide class members, the States' interest is unambiguously relegated to the last place of a remainderman, entitled to receive only the left over "Remaining Balance."

Additional sections of the Settlement Agreement the Special Master fails to reference further contradict the creation of a 2% Reduction Fund in favor of the States. For example, the Settlement Agreement unambiguously specifies that the benefits that might be obtained from the States by class members who had failed to timely file claims in the claims process was limited to whatever was available in the Remaining Balance:

> Class Members who fail to file claims postmarked on or before December 19, 2005 will be required to seek payment, if at all, solely from the states pursuant to the states' unclaimed property laws upon the conclusion of the claims process. The likelihood that the Remaining Balance in the Settlement Fund will not be sufficient to pay all late filed claims in full is specifically recognized as a bargained-for risk of this Agreement.[12]

> The States, which recover a proportional part of the Remaining Balance as provided herein pursuant to each state's respective unclaimed property law, have an interest in protecting the true owners of the claims.

[Settlement Agreement at 12, ¶4.h].

Furthermore, the Settlement Agreement plainly demonstrates how a specific set-aside for a "2% Reduction Fund" would have been described and accounted for had one existed. That is because there was a fund – the $15 million three State fee-shifting fund – that was specifically defined and set aside from the Settlement Fund. [Settlement Agreement at 10, ¶4.g.v]. No such fund in favor of the States was set aside or can otherwise be found in the words used in the Settlement Agreement.

It is important to recognize that although Exxon was unsuccessful in its effort to obtain a direct set aside for the States, the States still derived a significant benefit from the

---

[12]Of course, if there was a "guarantee" of $21.2 million, representing over 20% of the total value of all unasserted claims, this language would have been written quite differently.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

mandatory 2% reduction. The reduction in payment of each class member's claim by 2% reduced by $22 million one of the priorities ahead of the States' residual interest in the "Remaining Balance." This reduction in the dollar value of claims ahead of the States increased the probability that a "Remaining Balance" would exist and that the monies it would contain would be more than *de minimis*. Additionally, the Settlement Agreement provided for appointment of States' Counsel to protect their right to the remainder interest, with counsel's cost paid for by the interest income from the Settlement Fund.

The Special Master's conclusion that the Settlement Agreement established a guaranteed $21.2 million fund for the States which was a "supplement" to the Remaining Balance lacks any support in the Settlement Agreement itself. This is also demonstrated by the Class Notice approved by the Court after a careful drafting and editing process in which the Special Master participated.

**c.     The Class Notice Unambiguously Rejects the Suggestion of a 2% Reduction Fund for the States**

In advance of the preparation of the Notice to the Class, this Court gave clear marching orders:

> I have significant concerns about the notice. I think the notice has to be drafted in a very concise way that really advises each class member as to what is being proposed and the effect on that class member.
>
> •     •     •
>
> Very careful attention has to be given to the contents of the notice in order to make clear what is going on. . . and what I would like to have done here is to have Special Master very much involved in the preparation of the recommended notice.
> . . .

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

[11/9/2005 Transcript of Hearing (re: parties' initial announcement of settlement agreement in principle) D.E. 2495 at 21, 23].  We followed those orders carefully.  At the time, we believed that the Special Master had done so too.

Subsequently, in his report recommending approval of the form of notice and preliminary approval of the proposed settlement, the Special Master noted that, "While the Court's instructions asked the Special Master to oversee the development of the Notice to be provided to the Class, the terms of the Settlement Agreement largely dictate the substance of the Notice." [D.E. 2607, January 30, 2006 Report and Recommendation at 6 n.4].  Indeed, they did.

There is, in fact, no mention in the Class Notice of anything remotely resembling an "overarching," "guaranteed," "set-aside," of a 2% Reduction Fund to States for the benefit of non-filing claimants. [A copy of the Class Notice is attached as Exhibit "B"].  And as was also true with respect to the Settlement Agreement, the Class Notice, in simple terms, rejects the suggestion that such a fund existed, making it quite clear that a 2% reduction in claims was not followed by a 2% cash set aside from the Settlement Fund for anyone's benefit, much less for claimants who failed to timely appear.

The Class Notice's simple explanation as to why each approved claim payment was to be reduced by 2% serves to completely reject the Special Master's position.  Section 7 of the Notice entitled, "Cash Available from the Settlement Fund and Interest Income to Satisfy Claims and Support Claims Administration", plainly states:

> As summarized in the table below, reducing each claim by 2% reduces the total potential value of all claims by approximately $22 million.  That reduces the maximum shortfall to approximately $18 million.

-10-

[Class Notice at 18]. Little more need be said. Had there been a corresponding reduction in the Settlement Fund for the benefit of non-filing claimants, the $40 million potential shortfall in monies necessary to pay validated claims of participating class members would not have been reduced a penny because the "total potential value of all claims" would remain the same. There was no money created by this reduction. It was a reduction compelled by a settlement in which Exxon obtained a very small discount of $40 million on its total liability of $1.1 billion.

The table that followed those words showed how the potential $40 million shortfall in monies available to pay valid claims against the Settlement Fund came to exist. The total potential value of all filed claims was estimated to be $1.1 billion. [*Id.*]. The Settlement Fund available to satisfy those claims was $1.060 billion. [*Id.*].[13] The table also showed how the creation of a 5% (potentially refundable) reserve of $55 million, combined with the permanent 2% reduction of $22 million, turned the potential $40 million shortfall into a potential "surplus" of $37 million available for payment of validated claims. [*Id.*]. This potential surplus is shown as the amount that would be available to return to claimants from the 5% reserve if the $18 million shortfall in fact transpired, although that would result only if the dollar amount of denied claims, or the availability of excess investment income, did not otherwise make up the shortfall. The Notice further advised claimants that there would likely be no shortfall, and instead there would be full payment on the 5% reserve, because of disallowed claims and interest income on the Fund. [*Id.* at 18-19].

---

[13]$1.075 billion less $15 million for the Three State Fund.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

Additionally, consistent with the specifications of the Settlement Agreement, Paragraph 5.i.(iii) of the Notice plainly described the circumstances that would lead to monies flowing to the States:

> **5.i.   Appointment of States' Counsel; Residual Funds Go to the States as Unclaimed Property**
>
> (iii) **Any money remaining** in the Settlement Fund or the Three State Fund after adjudication and payment of all claims including payment in full of the 5% reserve together with interest earned thereon, taxes and Claims Adjudication Costs will be disbursed pro rata to the 35 state governments in which Class member stations were located.  Any class member who did not submit a Proof of Claim on or before December 19, 2005 will be able to make a claim directly to the appropriate state government pursuant to that state's applicable unclaimed property statute or law.  The value of such a claim will be derived from the difference between the amount of the residual fund and the total of all claims that were not timely asserted.

[*Id.* at 13 (emphasis added)].

Furthermore, the verbiage of this section, which specifically addresses the disposition of "Residual Funds," repeatedly and consistently describes the availability of left over funds to be paid to the States as a "maybe."  For example, paragraph 5.i.iii, above, describes the payment of "any money remaining" to the States *after* payment of the claims with higher priority.  [*Id.*].  Likewise, paragraph 6.c. of the Notice plainly discloses that "the settlement creates the **potential** for all states to collect **some** unclaimed monies through the revised claims process."   [*Id.* at 16 (emphasis added)].  Paragraph 6.b. of the Notice states, "***Whether there will be excess funds to distribute to state governments and the magnitude thereof will be uncertain until all filed claims are adjudicated and paid.***" [*Id.*(emphasis added)].  Paragraph 6.e., entitled, "The Beneficiary of Failed Claims Will Not be Exxon", states that, "to the extent claims were not brought by persons entitled

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON. P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

to collect the sums due, these funds would add to the Settlement Fund **and increase the probability of a surplus after all are adjudicated**." [*Id.*].

As noted in his January 30, 2006 Report and Recommendation, the Special Master was required by the Court to make certain that the Class Notice fully disclosed the terms and conditions of the Settlement Agreement.  The Notice did so.  It not only failed to disclose a 2% Reduction Fund, by its express terms it establishes the parties intended that no such fund exist.

If the Special Master's current view was correct, it would establish that the Notice was materially false and misleading.  It was not because it is the Special Master's conclusion that is erroneous.

> **d.    The Special Master's Pre-Contract, Pre-Notice Meeting Minutes Do Not Establish the Existence of a 2% Reduction Fund**

Absent support for the existence of a 2% Reduction Fund anywhere in the Settlement Agreement or the Class Notice, the Special Master maintains that their content is trumped by several sentences regarding the settlement negotiations which may be found in his 76 page January 30, 2006 Report recommending approval of the settlement and notice. [Attachment "A" to D.E. 2607 (the "2006 Report")].  Not only can these sentences not legally supercede the legal instruments constituting the Class Settlement, the words cannot be interpreted to achieve the conclusion now advanced.

The provisions of the 2006 Report upon which the Special Master relies resulted from notes taken by his staff in the course of some of the parties' negotiation sessions. This is classic "parol evidence" which reflects just a small portion of the lengthy settlement negotiations that led to final written documents approved by the Court.  Although the 2006 Report refers to the meetings attended by the Special Master as the "First Settlement

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

Conference" and so on, the notes reveal the Special Master personally attended only a fraction of the settlement negotiations among Exxon, Class Counsel, certain of the Class Representatives (who had retained separate counsel) and the States (represented by the both certain state attorney's general and by attorneys later appointed by the Court as States' Counsel).

In the narrative describing events at what the Special Master calls the "First Settlement Conference," the Special Master discusses the draft brought to the meeting by counsel for the Class and Exxon. In essence, the minutes reflect that everyone agreed that a substantial reserve needed to be taken from approved claims to ensure there would be monies available at the end for the last claims adjudicated. [*Id.* at 9-10, 13]. The Special Master's notes reflected a then unresolved disagreement as to whether any part of the reserve would be permanently abandoned and whether a specified sum would be allocated directly to the States for unfiled claims. [*Id.* at 13]. To support a bar order, Exxon wanted to make certain the States got enough to show that late filed claimants received some benefit from the agreement. [*See id.* at 15]. Class Counsel opposed both the mandatory reduction and any direct allocation to the States, arguing that the claimants should recover whatever was available from the reserve. [*Id.* at 13].

The notes of what the Special Master called "The Second Settlement Conference" reflect that Exxon and Class Counsel had met in advance of the meeting, and agreed on and prepared a revised draft that compromised the two positions. [*Id.* at 13-14]. The 2006 Report summarizes that part of the conversation as follows:

> At the Second Settlement Conference on November 29, 2005, Exxon and Class Counsel presented for consideration their Second Draft Settlement Agreement ("Second Draft") and Notice ("Second Notice"). The Second

-14-

Draft significantly altered the terms of the Settlement by instituting the mandatory reduction of all claims discussed in the prior conference.

•      •      •

At the Second Settlement Conference, Exxon cautioned that the First Draft's formula for distribution of the Settlement Fund provided no guarantee that non-filing dealers (and the States acting in their stead) would receive anything at the completion of the claims process. In other words, if one hundred percent of all claims presented in the claims administration process proved to be valid, then the states (and their respective non-filing class members) would receive no portion of the Settlement Fund. To Exxon, this contingency created an unacceptable risk that the Settlement Fund would be rejected as unfair by the District Court. To resolve this problem, Exxon and Class Counsel believe that the best way to ensure that **some portion** of funds would be available for the benefit of non-filing dealers and the States was to institute a mandatory reduction in all filed claims by two percent.

[*Id.* at 15].

The foregoing summary is correct and is fully consistent with and embodied in the Settlement Agreement and Class Notice. The "First Draft" of the agreement provided no mandatory reduction in claims. The "Second Draft" did. The compromise embodied in the "Second Draft" is the one that made it to the Settlement Agreement. Exxon successfully negotiated for and obtained part of what it wanted – the mandatory 2% reduction. Exxon was unsuccessful, however, in obtaining a specific fund for the States. It accepted a compromise that would make it likely that "some portion" of funds would go to the Remaining Balance, a possibility substantially enhanced by the $22 million reduction in claim payments with priority ahead of the States.

Further, the extensive discussion in the 2006 Report which summarizes the events that *followed* those early conversations, conclusively demonstrate that no bargain was struck to create any fund in favor of the States. For example, the 2006 Report describes the interests of non-filing claimants as follows:

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

In addition, the Settlement Agreement takes into account Class members who have not timely filed claims before the new December 19, 2005 deadline. **These Class members <u>may potentially</u> be able to recover a percentage of their damage award through their respective states' unclaimed property laws upon the conclusion of the claims administration process. The Settlement Agreement contemplates that a Remaining Balance, based on the amount remaining in the Settlement Fund and the Fee-Shifting (including interest earned during the time between the date of payment until that time after payment of all claims) after payment of all claims and obligations, will be divided amount the thirty-five (35) states, pro rata, based on the magnitude of unasserted claims within each state in relation to the total of all unasserted claims in all states.[ft.]** As such, the Settlement in this case affords an overwhelming percentage of recovery to all of the Class members who timely filed claims in light of the risks that each individual Class member may encounter in pursuing his individual claim in the claims administration process. Given these considerations, and the fact that the Settlement gives the Class members the more immediate and concrete opportunity to share in the extremely large Settlement Fund, the proposed Settlement Fund of $1.060 billion appears to fall well within the range of what is fair, adequate, and reasonable. Accordingly, this factor weighs in favor of approving the proposed Settlement.

---

[ft.] If the Settlement Agreement is rejected and the claims administration process were to continue, the Class members who failed to file timely claims, with the potential exception of those few that would be allowed to demonstrate excusable neglect, would not be allowed to participate in the claims administrative process. Therefore, the ability of these Class members to recover even a percentage of their claims under the Settlement Agreement represents a substantial improvement of these Class members' position.

[2006 Report at 44 (emphasis added)]. The foregoing language stating that non-filing claimants *may, potentially,* obtain recovery through the Remaining Balance simply cannot be reconciled with a conclusion requiring a guaranteed cash obligation to the States.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

The 2006 Report's ensuing determination that all reasonable efforts to notify non-filing Class members had been exhausted and that the Settlement Fund should not expend any further resources on locating them emphasizes the least priority status of these claimants:[14]

> By delivering notice to the state attorneys general, the States become recipients of notice on behalf of potential Claimants who might never be located.
>
> . . . The parties have already expended several million dollars attempting to contact Claimants and apprise them of their rights in this class action. . . . With these monumental costs already having been spent to locate Claimants, it is reasonable to conclude that the small percentage of remaining Class members could only be located at considerable expense to the Class. [ft.]
>
> _____
>
> [ft.] The Class would be forced to bear the cost of any additional publication efforts to locate absent Class members. While Exxon paid for prior publication costs, pursuant to the Settlement Agreement, all remaining costs of litigation have been assumed by the Class. If the Court were to order further publication in newspapers, periodicals, and with radio spots, these costs would have to be paid out of the interest earned on the depository account of the Settlement Fund. *See* Settlement Agreement at 4.f. If the interest earned on the depository account of the Settlement Fund is insufficient to cover these costs, then the costs would be paid directly from the principal of the depository account. *Id.*

[2006 Report at 73-74].

Furthermore, other passages of the 2006 Report repeatedly describe a Settlement Fund of $1.060 billion for the benefit of timely filed claimants, a cash sum which similarly negates the possibility of an overarching obligation to the States of $21.2 million:

_____

[14]This finding also demonstrates the imprudence of the recently announced intention to expend Fund resources in a renewed effort to locate these missing claimants.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

- 2006 Report at 18 n.14, discussing the Class Notice and derivation of the "worst case" $18 million shortfall in the Settlement Fund, which shortfall would have been $40 million if the agreement imposed an additional 2% fund guaranteed to the States:

> It should be noted that in an abundance of caution, the current version of the Notice before the Court utilizes Exxon's figure for the aggregate value of filed claims. As such, the class is on notice of the "worst case scenario," in which a potential shortfall could result, amounting to approximately $18 million;

- 2006 Report at 24, discussing an objection to the inclusion of opt outs in the Settlement raised by counsel representing some of the Class representatives:

> Mr. Reiser further argued that since **the value of settlement funds set aside for payment of claims has now been capped at $1.060 billion,** every dollar that is paid to an individual that opted out of the Class causes a reduction in value of a Class claimant's recovery;

- 2006 Report at 27, describing the amount paid by Exxon to satisfy claims in the context of Class Notice regarding petitions for attorneys' fees:

> That is, if the District Court were to approve the fee petitions collectively seeking recovery of one-third of **the $1.060 billion that Exxon is paying to satisfy claims** . . . .;

- 2006 Report at 28 n. 18, calculating the amount available for distribution to the Class after deducting the fee-shifting fund:

> The total Settlement payment to be paid by Exxon is $1.075 billion. Fifteen million dollars ($15 million) has been allocated under the Settlement Agreement to payment of Exxon's liability for attorneys' fees in three (3) fee-shifting states, **resulting in a Settlement Fund for distribution to the Class of $1.060 billion;**

-18-

- 2006 Report at 42 - 43, which first concludes that the fairness analysis for the Settlement should *not* extend to non-filing class members, discussing the fairness of the creation of a $1.060 billion common fund for the benefit of filing claimants:

> Therefore, the focus of the fairness inquiry should be solely on the value of the viable claims asserted in the claims administration process.
>
> .           .           .
>
> **On the other hand, the Settlement Agreement creates a common fund, with a total consideration of $1.060 billion, for the benefit of all Class members.** Class counsel and Exxon believe that $1.060 billion is within the range of possible recovery if the claims administration process were to continue with Exxon contesting claims until the end. The Special Master agrees. **The Settlement Agreement will allow Class members who filed claims on or before December 19, 2005 (the Effective Date of the Settlement Agreement) to recover not less than 93% of the total amount of their respective damages award (with prejudgment interest calculated through October 31, 2005), together with the substantial probability to recover 98% of the total amount of each claim.**

Quite obviously, there would not have been a fund of $1.060 billion for the benefit of filed claimants had there been an agreement to reduce the fund by $21.2 million for unfiled claimants. No one made a mistake by failing to account for a $21.2 million obligation at the time of the Settlement, or in the ensuing three plus years. There is no such obligation.

Finally, the 2006 Report devotes over 15 pages to address the form, content and manner of the Class Notice, including provision for notice to be made directly to the affected states attorneys' general, all of which emphasizes the effort and care that went into carefully documenting and describing for the benefit of the Class and the States each and every aspect of the Settlement Agreement. [2006 Report at 61- 75]. It is literally

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ♦ 150 West Flagler Street, Suite 2200 ♦ Miami, FL 33130 ♦ (305) 789-3200

impossible under these circumstances that the Notice failed to include any reference to a $21.2 million Settlement Fund liability to the States, and instead, limited the States' recovery to the residuary.

The terms of the Settlement Agreement and the Class Notice are perfectly clear. A fair bargain was struck by sophisticated people. It was carefully documented and then carefully explained in a detailed Class Notice. The 2006 Report recommending approval of the Settlement and the Class Notice fully supports the correct interpretation of these documents.

Contemporaneous evidence demonstrating the divide between the Special Master's current reading of the meeting notes reflected in the 2006 Report and what the words actually say, is provided by contemporaneous e-mail communications that occurred with one of the other lawyers involved in the settlement negotiations, David Reiser, a Washington D.C. lawyer who represented some of the Class representatives, including Bill McGillicuddy. The day following the meeting discussed in the Special Master's notes, Mr. Reiser inquired why we had agreed to accept a mandatory discount on claims of 2%:[15]

> >>> "Reiser, David A." <Dreiser@zuckerman.com> 11/30 1:15 PM >>>
> Gene: thank you for setting up the call. Wondering if you can answer or investigate the following:
>
> . . .
>
> 2. What is the rationale for the 2% deduction?

---

[15] The persons principally participating in all of these settlement discussions were Stearns for the Class, Bob Wallis for Exxon, Jim Cecchi for the States, and David Reiser for some of the Class representatives including Bill McGillicuddy (who employed separate counsel to take a very aggressive role in the settlement negotiations). Stearns Weaver created each new draft of the Settlement Agreement and the Class Notice as the compromises evolved.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ■ 150 West Flagler Street, Suite 2200 ■ Miami, FL 33130 ■ (305) 789-3200

. . .

> (response) **The 2% reduction reduces the overall total dollars sought in all claims by roughly $22 million. That reduces the potential shortfall if every claim is paid and Exxon's math is correct as to the total and enhances the prospects that there will be a balance for the states. I have resisted Wallis' suggestion that 2% be directly allocated to the states as that would reduce the probability of full recovery of the 5% holdback. . .**

[A copy of the e-mail is attached as Exhibit "C" (emphasis in original)].[16]

The foregoing e-mail messages contemporaneously exchanged by attorneys involved in negotiating the Settlement Agreement is entirely consistent with the passage relied on by the Special Master which, read using its actual words and an understanding of the issues, is entirely consistent with the final wording of the Settlement Agreement and the Class Notice. The meeting notes simply reflect that Exxon's attorney and Class Counsel were attempting to explain to the Special Master the positions that had been compromised and the agreement they had achieved. [17]

_____

[16]An ensuing e-mail exchange between Stearns and Reiser further confirms that only left over monies would flow to the States: Stearns to Reiser, 11/30/05 ("Similarly, the proposed reduction in all claims, coupled with a reduction in the petition for attorneys' fees, *is important to be able to show states an opportunity to recover something* for their effort without costing the class a dime. It is again a delicate balance. **Exxon wanted more for the states to limit its exposure to the states.** Wallis proposed a flat 7% across the board reduction in all claims and we said no."). [Copy attached at Exhibit "D"(emphasis added)].

[17]The undersigned has no recollection that Exxon had even raised the subject of a fixed payment to the States. Indeed, when this subject first arose, the undersigned filed an affidavit that there was no such conversation. A review of the email traffic, however, demonstrates that Exxon did raise it as a proposal, that it was immediately rejected and that that was the end of it. No draft of a settlement agreement ever included such a proposal and it would never have been accepted for the very reasons articulated in the communication to Mr. Reiser. Although the undersigned now knows the conversation happened by virtue of documents reviewed, the proposal was so inconsequential in light of everything else then going on, and, as evidenced by the documents, went nowhere.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

The Special Master justifies his reliance on the passage in the 2006 Report by noting that no one objected to it at the time. [R&R at 17 n.9, 19, 19 n.12]. But no objection was warranted. The meeting minutes are not inconsistent with the Settlement Agreement or the Class Notice. Each claim was agreed to be reduced by 2%. A proposal to set aside monies for the States and reduce the fund was dropped. Instead of a fixed sum going to the States, the agreement created an opportunity for "some" money to flow to the States, which was enhanced by reducing higher priority claims by $22 million. Thus, there was no reason to object to the Report, nor reason to be fearful that anyone would misinterpret the innocuous words used in the passage, which are perfectly consistent with the unambiguous, express terms of the Settlement Agreement and Class Notice.

Indeed, the argument that we did not object cannot be reconciled with the failure of others to object to voluminous contrary findings that were embodied in the orders of this Court. If it is significant that no objection was made to the innocuous recitation of the course of negotiations buried in a voluminous report, that failure, if any, must be compared to the lack of objection to the actual words in the Settlement Agreement, the Class Notice, several subsequent orders of this Court and countless Fund financial reports which have all failed to recognize the existence of the 2% Reduction Fund the Special Master only recently discovered. The "no one complained" argument runs against the Special Master's belated interpretation of the Class Settlement.

---

Which is why, even still, there is no recollection of the conversation at all.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON. P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

   e.   **The Special Master Erroneously Asserts that States' Counsel's Failure to Ever Raise Such an Issue was Because They Were Appointed After the Settlement Agreement was Approved**

In further attempting to justify the conclusions of his Report, the Special Master states that the reason States' Counsel have never complained about the failure to create a $21.2 million fund in their favor is because States' Counsel were unaware of it because they were not involved in the Class Settlement negotiations because they entered the process later:

> State's counsel seemingly was not aware of the 2% Reduction amount, indeed, it was more recently raised *sua sponte* by the undersigned. It should be noted that States' Counsel entered this process after these negotiations and finalization of the Settlement Agreement. Therefore, States' Counsel was not fully aware of the intent behind the 2% Reduction.

[R&R at 20 n. 13].

The Special Master is mistaken. In fact, attorneys general for 21 states filed claims in the claims process on behalf of non-filing class members in November 2004, immediately before expiration of the initial claims deadline. Ten months prior to the onset of settlement negotiations, Exxon moved to dismiss those claims with prejudice. [D.E. 1804, 1821]. After briefing and argument by the attorneys who had appeared for the 21 states, the Special Master repeatedly advised the parties that his recommended order would be issued "soon." But it never arrived. Based on various comments made by the Special Master at several other hearings, it was widely believed by the lawyers involved at the time that the Special Master's ruling, when it came, would be adverse to the States.[18]

---

[18] Indeed the previously quoted footnote at page 44 of the Special Master's 2006 Report (see *supra* p. 16) states that but for the settlement, non-filing claimants would not recover anything.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

The attorneys for the twenty-one state governments were actively engaged in the settlement process but, of course, had to play the cards they were dealt. Did they hold out for a possible recognition of their standing after six months waiting for a ruling? Or did they make the best deal they could make through the settlement and move on? They chose the best deal they could make and, when it was made, never complained about the failure to segregate over $21.2 million out of the Settlement Fund for their clients – because no such agreement ever existed.

These same attorneys who had represented the 21 states and who were involved in the settlement discussions were later formally appointed States' Counsel by this Court.[19]

### e.    The Special Master's Recommended Order Would Potentially Impair an Essential Element of the Agreement Regarding the Tax Treatment of the Fund Investment Income

In connection with the settlement negotiations, Exxon insisted as a non-negotiable position that the Settlement Agreement establish a Qualified Settlement Fund (or "QSF"). [*See* Settlement Agreement at 8, ¶ 4.a (mandating QSF treatment)]. A QSF is a creature of the Internal Revenue Code that allowed Exxon to deduct the entire settlement payment of $1.075 billion as an expense when the payment was made (rather than when claims were actually paid to dealers). *See* Internal Revenue Code §468B. QSF treatment also

---

[19]The Special Master's sudden recollection of a fund for the States that was never intended places States' Counsel in a difficult position. They were part of the negotiations and are quite aware that there was no intention to create such a fund and quite aware that both the Settlement Agreement and the Class Notice squarely provide otherwise. A response within the bounds of fair advocacy would be to say so. On the other hand, the States are desperate for money and this could be money, however it is obtained. Thus, we have been presented with a curious circumstance where the States cite the Special Master's conclusions to support the Special Master's conclusions; that is then followed by the Special Master's citation of the States' citation of his own conclusions back to us. [See R&R at 15-17].

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ■ 150 West Flagler Street, Suite 2200 ■ Miami, FL 33130 ■ (305) 789-3200

allowed Exxon to avoid reporting to the IRS, as taxable income, interest on the monies it no longer controlled (absent QSF treatment, Exxon would be required to report even if the Fund was the beneficiary of the interest income).  The countervailing aspect of QSF treatment is that the Settlement Fund itself would ordinarily be obligated to pay income taxes on investment income.[20]

The Settlement Agreement in this case was specifically structured so that the Remaining Balance would be entirely funded by investment income from the Fund after payment of all claims adjudication costs.  The process of claims administration was structured as a state purpose activity to protect the Remaining Balance, thus creating, based on prior Revenue Rulings, a reasonable opportunity to avoid income taxes at the QSF level. After the IRS ruled that income taxes were due from investment income, the Fund authorized suit to be brought to challenge the ruling.  That action is presently set for trial before District Court Judge Jordan on a November 2009 trial calendar.

**f.    The Incentives Created by the Settlement Agreement for the States to Protect the Remaining Balance Would Have Been Defeated Had There Been a Guaranteed $21.2 million Fund for the States' Benefit**

Any time a fund of this magnitude is created, there is always risk of the abuses vividly described by Charles Dickens in *Bleak House*.  To avoid the risk that the benefit to

---

[20]The IRS treats a QSF as a corporate entity that must report and pay taxes on its income. In this case, the Settlement Agreement was structured to entitle the States to the "Remaining Balance," which would be derived completely from interest on the Fund and would constitute "unclaimed property" under State law.  Because State governments do not pay income taxes on income derived from abandoned property, the Settlement Agreement was structured  to create an opportunity to avoid double taxes.  If the fundamental agreement is re-written as recommended by the Special Master to give the States a guaranteed part of the *principal*, eliminating near exclusive recovery of the interest, less costs, it would serve to potentially undermine the Settlement Fund's pending IRS litigation seeking to avoid the $20 million tax obligation.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON. P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

the lawyers would exceed the benefit to the client, this Fund was intentionally structured so that the party last in line for benefits, the States, whose residual interest was solely to the Remaining Balance, would be incentivized to resist improper claims, control costs, expedite the case to keep fees down and bring to the attention of the Court any excesses. Failure to do so would visit the pain on the beneficiaries who failed to do their job. On the other hand, if the risks allocated in the Settlement Agreement and fully discussed in the Class Notice came to pass, it would not matter what the States did to protect the Remaining Balance. After all, it was clearly disclosed that, if every dollar allocated for claims was awarded, there would be, even after the 2% reduction in all claims, an $18 million shortfall and claims expense.

Had the Settlement Agreement provided the States a $21.2 million fixed recovery, it would have destroyed one of the critical structural elements of the entire Agreement – the remainderman would have less incentive if not no incentive to protect the remainder. Whether that is good or bad policy is not the question. The Agreement provides that the beneficiary of the Remaining Balance would be incentivized to maximize the remainder, just as Exxon was incentivized to do so by fighting every claim. Because the States were the remaindermen, Class Counsel was given no role in reviewing the costs of the claims process including fees of the Special Master and States' Counsel.

The Remaining Balance is not as large as the States had hoped. But this cannot justify rewriting the bargain struck. Nor is it a basis for unhappiness by this Court. That is because the primary reason the Remaining Balance is millions, but not more millions, is the spectacular and unanticipated success of the claims process.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ■ 150 West Flagler Street, Suite 2200 ■ Miami, FL 33130 ■ (305) 789-3200

As it turned out, no one could have anticipated that we would be able to prove entitlement by timely filing claimants to 100% of the funds set aside for their benefit. The estimates of forfeitures advanced by everyone involved in the claims process proved wrong. We succeeded in working through thousands of issues involving estates, bankruptcies, corporate dissolutions, partnership break ups, divorces, competing claims and so on. We helped thousands of families, all over this country, open estates, gain the approval of bankruptcy trustees and meet state requirements to reopen the existence of long defunct corporations. The task was beyond enormous. That the rate of success was essentially 100% is no longer debatable.

Although Class Counsel clearly had by far the greatest burden in this exercise, it was the system created by the Settlement Agreement, and the substantial contributions of States' Counsel that allowed it to work. As intended, States' Counsel played a large role in making certain that the right people got paid, advancing critical review of every claim that Class Counsel could not do, and, in the process, facilitating the thousands of steps taken to make sure the right people were paid.

While we recognize the States' disappointment in not realizing a larger remainder, we do not regret for a moment the principal reason for that outcome.

A lesser but not unimportant reason for a smaller than expected remainder is that the cost of claims administration was greater than it would have been had it ended, as intended, over a year ago. Time is money. It has taken an inordinately long time to obtain critical orders from the Special Master. The fact that the Special Master did not promptly resolve issues required both Class Counsel and States' Counsel to do considerably more

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

work over a longer time than should have been necessary. With respect to this fact, however, some additional points should be made.

First, this Court, with its predilection to promptly resolve matters, spoiled us. The delays in rulings by the Special Master are, unfortunately, not that unusual in the court system.

We did complain. Indeed, with our clients complaining to us, and with no understandable explanation to pass on, we felt we had no choice. And, as the Special Master observes, over the last year, our complaints have become louder and more frequent.

We began the claims process with over 12,000 claims. After key rulings by the Special Master on a number of critical legal issues, all but approximately 120 claims were resolved by a process where Class Counsel would advance motions for summary judgment, States' Counsel would point out defects and bad claims, and, armed with those objections, Class Counsel would work directly with each claimant to address each and every defect identified. By mid 2008, that process was essentially concluded, leaving only a small number of claims requiring adjudication of certain issues of fact. The following table summarizes the few claims left to be adjudicated as of 12 months ago, the pace of resolution and the professional costs bourne by the Fund for the same period:

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

| Date | # Claims pending for adjudication |
|------|-----------------------------------|
| 8/28/08 | 124 |
| 10/14/08 | 63 |
| 11/19/08 | 50 |
| 12/10/08 | 36 |
| 1/28/09 | 32 |
| 6/30/09 | 20 |

During this same time period the following amounts were paid:

| States Counsel | Special Master | Kip Rabin | Total |
|----------------|----------------|-----------|-------|
| $1,155,923.58 | $904,476.25 | $237,300.00 | $2,297,699.83[21] |

Additionally, only 12 claims have been resolved since February 2009, and none of the final 20 claims remaining for adjudication as of the end of June 2009 have been decided.  As shown in the following chart, each of these last 20 claims have been pending for adjudication on a motion before the Special Master for at least one year, and in some cases, for over 2 years:

---

[21]The total costs of claims administration is presently over $18 million.  Of that, States Counsel has been paid $8.5 million, and, Kip Rabin, the Special Master's financial consultant, $800,000.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ■ 150 West Flagler Street, Suite 2200 ■ Miami, FL 33130 ■ (305) 789-3200

### Pendency of 20 Remaining Claims
(as of 10/23/09)

| # Claims | Motion | Days Pending | Days since Hearing |
|---|---|---|---|
| 8 | 5/1/07 Third Motion for Adjudication of Conflicting Claims | 906 | 753 |
| 4 | 3/04/08 Ninth Motion for Adjudication of Conflicting Claims | 598 | 254 |
| 4 | 6/04/08 Fourth Motion for Adjudication of Disputed Claims | 506 | 276 |
| 4 | 8/15/08 Eleventh Motion for Adjudication of Conflicting Claims | 434 | 276 |

The third reason that the Remaining Balance is not as large as some had hoped stemmed from the decision of the IRS to impose income tax liability on the interest earned by the Fund, despite the fact that the States were the intended beneficiary of the remainder. That issue remains pending.

The simple fact is that the Settlement Agreement provided the States, as last out, with the opportunity for a potential and substantial windfall – or a substantial disappointment.

### g.   Conclusion with Respect to the Alleged 2% Reduction Fund

The Special Master's recommendation that the Court create what he calls a 2% Reduction Fund for the benefit of States should be rejected. The Settlement Agreement clearly and unambiguously provides a "waterfall" or "hierarchy" of payment priorities from the Fund. The waterfall should be allowed to flow in the manner it was designed.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

2.    **The Court Should Independently Consider the Special Master's Recommendation that an Order be Entered Allocating to the States the Monies Forfeited by Bowen and McGillicuddy**

The Court's July 6, 2006 order awarding attorneys' fees specifically provided for the disposition of the approximately $7 million in fees and awards forfeited by Gerald Bowen and Bill McGillicuddy. The Court stated:

> Finally, the partial forfeiture by Bowen and McGillicuddy has resulted in an additional $6,661,425 being available for distribution. I have determined that it is in the best interest of the Class Members to receive a pro rata distribution of this amount at the time of final distribution at the conclusion of the Claims Administration Process. **This amount will be distributed to the Class Members prior to any distribution to the States.**

454 F.Supp. 2d at 1241 (emphasis added).

Notwithstanding the Court's order, States' Counsel filed a motion to have the forfeited monies flow to the States, arguing that it is now established that every claimant who timely filed a claim, and whose claim was not rejected, will receive everything contemplated in the Settlement Agreement, including the 5% Reserve and interest thereon. [D.E. 5507]. This Court referred that motion to the Special Master who has now recommended that these forfeited monies be used to partially fund the supposed "2% Reduction Fund." [R&R at 23].

The suggestion that the forfeitures should go to the States instead of the Class because there is a $21.2 million obligation to the States with parity to the claims of timely filing claimants is addressed above. There is no 2% Reduction Fund. The "hierarchy of obligations" places the States last except with regard to payment to their attorneys. That was the bargain they struck. Thus, this Court should reject the recommendation of the Special Master that the forfeited monies partially fund the non-existent 2% Reduction Fund.

-31-

The Special Master's Report otherwise recommends, however, that even in the absence of a 2% Fund, the forfeitures be paid to the States. [R&R at 7-9]. Obviously, this is contrary to the Court's prior, express Order providing that the monies to go to the Class and not the States. There is certainly justification of the Court's prior order and, indeed, as time passes without payment of the 5% Reserve, that justification grows larger. And in any event, these forfeitures simply represent a reduction in the cost of litigation borne by the Class.

In an effort to acknowledge the important role the States played in the claims process and to remove the roadblock to funding the 5% Reserve, we previously indicated support for the notion that the additional money should flow into the Remaining Balance. However, the States' support for the effort to rewrite the Settlement Agreement, coupled with the failure to fund the 5% Reserve in a timely manner, causes us to withdraw our support for that proposal. The Court should abide by its decision at the outset and return the forfeited monies to the Class for distribution.

**3.    The Court Should Reject the Special Master's Recommendation for Entry of an Order Diverting Interest Owed to Class Counsel on Deferred Attorneys' Fees to Fund a New 2% Reduction**

The Special Master's recommendation to divert interest awarded to Class Counsel to fund a 2% Reduction Fund for the States is indefensible for a host of reasons.

**a.    Due Process**

No motion was filed to divest interest awarded to Class Counsel for someone else's benefit. No order of reference with respect to such an issue was entered. No notice that such a proposal was being considered was given. The issue was neither briefed nor argued. The Special Master reached a decision of what he deemed equitable, without

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

evidence and without affording Class Counsel the opportunity to show the inequity of such an outcome. Had such a proposal been advanced, we would have demonstrated how totally inequitable it is.

In addition, had Class Counsel been apprised that the Special Master was going to undertake review of Class Counsel's substantive rights with respect to attorneys' fees, we would have brought an objection asserting that the Special Master has a disqualifying conflict precluding his consideration of the issue.[22]

### b.  The Basis for an Award of Interest and How it has Been "Booked"

In July 2006, this Court ordered that one half of the attorneys' fees awarded to Stearns Weaver would be held by the Settlement Fund as "an incentive to expeditiously proceed with the claims administration process in order to obtain their remaining attorneys' fee." 454 F.Supp. 2d at 1241. The Court further ordered that: "In the meantime, the outstanding balance of their attorneys' fee will earn interest at the Florida Statutory judgment rate. **This amount will be paid to Stearns Weaver before any distribution**

---

[22]Prior to his appointment, the Special Master undertook the representation of and accepted a retainer from Pertnoy Solowsky and Allen to pursue their claims adverse to Stearns Weaver with respect to the allocation of the award of attorneys' fees in this case. When appointed to his current position it was agreed that the Special Master was precluded from considering issues involving attorneys' fees. Although we have not objected to his consideration of issues involving the timing of payment (except when the Special Master initially declined to authorize disbursement of our initial fee payment "forthwith"), we did object with respect to any substantive disputes. Thus, one can imagine our surprise when we received this Report which, without notice or an opportunity to be heard or present evidence, concludes that we have been paid enough already and the Court's specific award of priority to our interest should be ignored.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON. P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

**to the States**." [*Id.* (emphasis added)][23/]  In a footnote, the Court addressed the interest rate issue somewhat differently:

> The Court notes that it is its intent to pay a reasonable amount of judgment interest on the second half of attorneys' fees which it is withholding from the initial payment to Stearns Weaver for its attorneys' fee award in this matter. The Court will determine the appropriate amount of interest at the conclusion of the Claims Administration Process in the event that funds remain to pay such interest award.

[*Id.* at 1241-42 n. 66].

During the course of the financial planning for the Fund, the issue arose as to how to account for the interest payable to Stearns Weaver on its deferred fees.  The interest rate used in the Projections for that purpose was the actual rate earned by the Fund over time on its investments, or approximately $8.3 million.  Whatever interest rate the Court chooses to use, whether the Florida statutory rate (which would result in interest significantly higher than $8.3 million) or otherwise, an award of interest in this amount is not, in economic reality, an additional fee.  It simply reflects the time value of money and, without it, the awarded fee would actually be reduced by that amount.

###### c.    There is no Basis for What Amounts to an Economic Fee Reduction

The results of what Class Counsel did in this case should speak for themselves. Working claim by claim on over 12,000 files, we achieved nearly 100% recovery by rightful owners.   The substantial number of lawyers, paralegals and staff lawyers we employed — a veritable law firm unto itself — have analyzed thousands of individual issues involving bankruptcies, estates, divorces, corporate dissolutions, partnership disputes and the lack

---

[23/]The Special Master states that Stearns Weaver failed to prove that its entitlement to interest enjoyed a priority higher than the States. That is an odd argument considering that he did not tell us he was addressing the issue nor seek our comment. If he had, we would have had the opportunity to bring this ruling to his attention.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ■ 150 West Flagler Street, Suite 2200 ■ Miami, FL 33130 ■ (305) 789-3200

of records to cure problems besetting otherwise legitimate claims.  The cost of providing those services has been substantial.

And our task turned out to be far more involved than anyone could ever have anticipated.  For example, after almost 2,000 claimants were tricked into fee agreements with certain third party claims services, we successfully advanced an unlicensed practice of law claim that resulted in a global settlement invalidating the contracts.

In addition, various of our specialized business law resources were throughout the claims process to address unique issues affecting the Fund.  For example, but for our recommendation that the Fund's investment maturities should be laddered to match expected cash flows, the Fund would have taken huge interest rate risk that, as it turned out, would have been catastrophic in the market disruptions of the last several years.  Our corporate lawyers dealt with the Wall Street banking relationships.  Our bankruptcy lawyers helped over a thousand dealers work through problems caused by innocently non-disclosed claims.  Our tax lawyers provided assistance on the Fund's tax protest.

This brief narrative cannot begin to explain the contribution made by this firm to the Class and to the claims process over the last three years, which is far above and far beyond what, we believe, the Court contemplated when setting us out on this task.  The proposition that our fee should effectively be reduced by denying our entitlement to awarded interest after having shouldered this load is bewildering.

### d.    Class Counsel Reasonably Relied on an Award of Interest

While the Special Master apparently concludes that Class Counsel has been paid enough, he neglects to consider that no matter what the amount, we were entitled to rely upon the expectation that, if we performed, we would not see our compensation reduced.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

Since we have performed, it was reasonable for us to be able to plan our business, make long term charitable commitments, and compensate lawyers and staff with reliance on the anticipated payment.

The Special Master's belief that he has made a $21 million mistake is not reason to deprive this firm of the compensation we have earned for our efforts.

### e.   Class Counsel Should Not Be Penalized for Doing a Good Job

As reflected in his Report, the Special Master's sentiment appears to be that the Remaining Balance is too small, and he wants the States to get more.  But under the Report, more for the States means less for Class Counsel, despite the overwhelming success we have unexpectedly achieved for our constituent Class.

Because we were able to establish entitlement to payment for the maximum estimated value of all claims, no forfeitures flowed into the Settlement Fund.  The improbable shortfall in Fund principal became a reality, and was funded by part of the investment income.  Of course, had the Settlement not provided for a 2% reduction on every claim, the shortfall would have been larger.  But the notion that our compensation for providing excellent work, and achieving excellent outcomes, would be a fee reduction is a difficult to accept and unjust result.

In due course we will bring a motion for payment of our awarded interest.  Our opposition to the Special Master's Report and Recommendation should not be construed as such a motion.  The Special Master's recommendation to divert the interest on Class Counsel's fee award to the States should be rejected.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ■ 150 West Flagler Street, Suite 2200 ■ Miami, FL 33130 ■ (305) 789-3200

4.    **The Court Should Reject the Special Master's Attempt to Create a New Hierarchy of Obligations**

Having undertaken to rewrite the delicate balance of the Settlement Agreement and potentially undermine the effort to avoid double taxation, the Special Master has fashioned a complex proposal to re-allocate the possible benefit of a tax refund that may not exist if his recommended order was adopted.  The Settlement Agreement and the subsequent orders of this Court provide for the order of priorities.  There is no basis presented for changing that order.

5.    **The Court Should Reject the Special Master's *sua sponte* Conclusion that an Order Should be Entered Requiring States to Adopt Certain Procedures for the Administration of the Remaining Balance Remitted to Them**

The purpose of the States' recovery of the Remaining Balance was to end the Court's involvement in dealing with any straggling claims and prevent Exxon from keeping money it wrongfully took from others.  The Special Master, however, has concluded that the Fund should bear the cost and burden of policing how the States do their job under their various unclaimed property statutes and regulations.

The complex matrix of orders and the review process contemplated to be performed by States' Counsel and the Special Master is completely unnecessary.  The cost of the micro-management serves no useful purpose and would also further reduce the Remaining Balance paid  to the States.

The Court approved Settlement Agreement already specifies how the money constituting the Remaining Balance should be allocated among the States.  It is for the States, not this Court or the Special Master, to administer the funds received by them in accordance with their respective state laws.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

**6.     Conclusion**

We urge the Court to reject the Report and its recommendations in their entirety, and convene a status conference at the Court's earliest convenience to identify the requirements and establish a firm timetable for closure of the administrative claims process and this case.

Respectfully submitted,

STEARNS WEAVER MILLER WEISSLER
    ALHADEFF & SITTERSON, P.A.
150 West Flagler Street
Suite 2200, Museum Tower
Miami, Florida  33130
Telephone: (305) 789-3437
Facsimile:  (305) 789-3395

By: _____
        EUGENE E. STEARNS
        Florida Bar No. 149335


**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on counsel of record via CM/ECF on this 23rd day of October, 2009.

By: _____
        EUGENE E. STEARNS

STEARNS WEAVER MILLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

# EXHIBIT A

## SETTLEMENT AGREEMENT
## SUBJECT TO NOTICE TO THE CLASS
## AND DISTRICT COURT APPROVAL

This Settlement Agreement, subject to notice to the Class and final District Court Approval (the "Agreement"), is made and entered into this 19th day of December, 2005, by and between Plaintiffs Allapattah Services Inc. et al. on behalf of themselves and on behalf of all class members (including those who have opted out and have filed a claim by the final claim deadline established in this Agreement and excluding those who have opted out and have not filed a claim by the final claim deadline established in this Agreement), and all claimants, including any person, entity, state or political subdivision claiming through a class member (the "Class"), and Defendant Exxon Mobil Corporation ("Exxon"), collectively referred to herein as the "Parties." If, after notice to the Class and consideration by the Court, this Agreement is approved, it shall fully and finally resolve, discharge and settle all claims that have, could have been, or could in the future be asserted in the above-captioned matter according to the terms and conditions set forth below.

### RECITALS:

### a.      The Action and Class Covered By This Agreement

This Settlement Agreement sets forth the terms of an Agreement to resolve with finality all claims and issues between Exxon and the Class with respect to the matter of *Allapattah Services, Inc. v. Exxon Corporation,* Case No. 91-0986-CIV-GOLD and the Class (the "Settled Claims").

### b.      The Action and Exxon's Opposition

This class action was brought by Exxon direct served dealers who sought recovery for alleged motor fuel overcharges arising under Exxon's Discount for Cash program. Under the program, Exxon began charging dealers a separate 3% fee for processing credit transactions. The dealers alleged that Exxon promised that it would reduce the wholesale price of motor fuel by an amount that, on average, would offset the fee, but failed to do so. Exxon maintained, among other things, that it did provide the offset despite believing that it had no legal obligation to do so. Exxon maintained that at all times it set its wholesale prices in good faith.

### c.      The Discount for Cash Jury Verdict

A jury rendered a verdict against Exxon awarding money damages measured in cents per gallon for each gallon of motor fuel purchased by a Class Member from Exxon during the period March 1, 1983 until August 28, 1994 (the "Class Period") as follows:

1

E

| Year | Damages<br>(cents per gallon) | Year | Damages<br>(cents per gallon) |
|------|---------|------|---------|
| 1983 | 1.40 | 1989 | 1.18 |
| 1984 | 1.40 | 1990 | 1.33 |
| 1985 | 1.34 | 1991 | 1.24 |
| 1986 | 1.03 | 1992 | 1.32 |
| 1987 | 1.04 | 1993 | 1.35 |
| 1988 | 1.07 | 1994 | 1.33 |

**d.    Gallons of Motor Fuel Sold to the Class During the Class Period**

The number of gallons of motor fuel sold to each Exxon direct served dealership during the Class Period has been established by Exxon's Dealer Volume Database.

**e.    Prejudgment Interest**

Following the jury's verdict, the District Court awarded prejudgment interest based on the applicable laws of the various jurisdictions in which Exxon's direct-served dealers purchased motor fuel from Exxon. Exxon disputed and continues to dispute entitlement to prejudgment interest. Exxon also disputed and continues to dispute the manner in which prejudgment interest was applied.

**f.    The Order on Procedure**

Following the jury's verdict, in August 2001 the District Court denied Plaintiffs' motion to enter a single aggregate final judgment in favor of the Class for all claims, less opt outs and those dealers in Ohio whose claims were found to be barred by Ohio's statute of limitations. Instead, the District Court established a claims procedure in which each Exxon direct-served dealer during the class period was afforded an opportunity to file and pursue claims against Exxon to recover the sums awarded by the jury together with prejudgment interest. Under the procedure established by the District Court, Exxon would retain any monies for which it would have been liable based on the jury's verdict had they been claimed but were not claimed in the claims process. Had the District Court entered an aggregate final judgment for the full amount then due every Class Member, post judgment interest would then have been earned at the federal rate uniform for every claimant, a rate of interest considerably lower than the prejudgment rate applicable in every state. Instead, prejudgment interest continued to accrue at the higher prejudgment rate.

**g.    Appointment of the Claims Administrator**

Pursuant to the Order on Procedure, the District Court appointed the Garden City Group ("GCG") as the Claims Administrator.

### h.    Appointment of the Special Master

Subsequent to the Order on Procedure, the District Court appointed former U.S. District Judge Thomas Scott as the Special Master.

### i.    Appellate Review

Exxon's appeal of the jury verdict to the Eleventh Circuit was denied. Plaintiffs' appeal to the Eleventh Circuit challenging the District Court's refusal to enter a single money judgment for the Class was denied. The Supreme Court granted review of one issue in Exxon's petition for certiorari, but then affirmed the Eleventh Circuit's ruling on that issue.

### j.    Claims Filed After the Claims Filing Deadline

The District Court established a claims filing deadline and, on the motion of the Class, extended that date on two occasions. The final claims filing deadline, December 1, 2004, came and passed without further motion for extension. A number of claims were filed after December 1, 2004. Exxon moved to dismiss all claims filed after December 1, 2004 on the ground that they were untimely. Over Plaintiffs' objection, the Special Master entered a Report and Recommendation that limits the allowance of certain late filed claims. Plaintiffs have appealed this Report and Recommendation to the District Court, and that appeal remains pending.

### k.    Calculation of Damages Due Each Class Member Timely Asserting a Claim

Based on the jury's verdict and the District Court's post-trial orders, the calculation of money damages due each Class Member is derived by multiplying the cents per gallon damage figure by the number of gallons sold to each station during the Class Period. Prejudgment interest is calculated from the damage entitlement based on the method of calculation in each state as determined by the District Court.

### l.    Claims by State Governments for Unasserted Claims

Prior to December 1, 2004, twenty-one (21) states, through their authorized representatives, filed claims on behalf of Class Members who failed to file claims to recover the monies owed by Exxon. (These states are identified in Exhibit 1.) Exxon has moved to dismiss these claims. The motion has been argued to the Special Master and remains pending. At least one other state, Texas, has asserted (and other states may assert) a right to collect these sums directly from Exxon, asserting that it need not do so formally in the claims process. The right of these and other state governments to pursue unfiled claims is disputed and unresolved.

3

**m.**     **Attorneys' Fees in Texas, Arizona and Arkansas**

The District Court granted the Class' motion to award attorneys' fees in Arkansas, Arizona and Texas (the "fee-shifting" states) based on the law in those states granting a successful party in a contract action part or all of any attorneys' fees incurred. Exxon disputes entitlement to fee-shifting in each of these States and, but for this Agreement, has announced an intention to appeal the District Court's order.  Remaining at issue is the measure of calculating an award of attorneys' fees and the extent to which Class Members in those States would be obligated to pay an award of attorneys' fees in excess of that which would be paid by Exxon.

**n.**     **The Total of Potential Damages and Prejudgment Interest if All Claims Had Been Brought**

The Claims Administrator has determined that applying the jury's award of money damages to the total volume of motor fuel sold to the Class during the Class Period, and calculating prejudgment interest based on the District Court's determination of the appropriate methodology, establishes a total damage award for all potential claims of all potential Class Members of approximately $1.19 billion through October 31, 2005.

**o.**     **The Total Damages for All Claims Filed to Date (Including Prejudgment Interest but Excluding Claims by State Governments)**

Class counsel estimates, based on the claims filed with the Claims Administrator, that applying the jury's award of money damages to the total volume of motor fuel sold to Class Members who have filed claims net of conflicts, and calculating prejudgment interest based on the District Court's determination of the appropriate methodology, establishes a total damage award for all asserted claims of approximately $1.05 billion through October 31, 2005. Exxon estimates that the total damage award for all asserted claims is approximately $1.1 billion.  The absence of precision in the two estimates is derived from differing judgments about a number of matters arising from the claims of individual dealers including start and stop dates for station operators.

**p.**     **The Claims Procedure**

The Special Master has adopted a claims procedure, pursuant to which Class Counsel has undertaken and will undertake to advance claims sequentially, with the least contentious claims proceeding to resolution first followed by the most contentious claims.  Through November 10, 2005, Class Counsel has filed 18 motions for summary judgment on behalf of 986 claimants, all of which were opposed by Exxon in whole or in part.  To date, the Special Master has considered the first thirteen motions for summary judgment, orally recommending entry of final judgment for approximately 680 claimants, with claims totaling approximately $195 million.  The parties were in the process of negotiating the form of

4

recommended orders and the method of satisfying final judgments when this Agreement was achieved which, if ultimately approved, would obviate entry of final judgments in the fashion contemplated in the Order on Procedure.

### q. Exxon's Opposition in the Claims Process

Exxon has vigorously participated in the claims process, objecting to every claim. Additionally, Exxon has asserted set-off claims directed to approximately 650 claimants seeking to offset its liability for the jury's verdict with claims of its own for unpaid fuel bills, unpaid rent and other claimed debts. Exxon's defenses include objections based on corporate dissolutions, the effect of assignments, bankruptcies, estate issues and others. Exxon's continued participation in the claims process permitted by the Order on Procedure would require a substantial period of time to complete consideration of all claims, and Exxon believes that there are hundreds of millions of dollars of claims that should be disallowed. Moreover, Exxon has asserted the right to additional appeals of issues related to the classwide determination of damages. Exxon still maintains its litigation position summarized in (b) above and is not admitting any wrongdoing by entering into this settlement, but does so to (1) avoid the continued expense of the litigation; (2) provide a substantial benefit to all class members, claimants and the states where class members are located; and (3) finally and comprehensively terminate all claims that were or could have been asserted related to this litigation. Exxon maintains that the judgment, jury verdict and order of procedure, do not create a common fund. Therefore, Exxon maintains that if it prevails on any claim in the claims process, the dollars attributable to that claim are not owed to anyone, and do not escheat to any state.

### r. The Desirability of Settlement of the Remaining Issues

The parties have vigorously litigated for over fourteen years, consuming a considerable magnitude of judicial labor. Although the most significant issues of contractual duty, breach and damages have been resolved (the Class believes with finality), Exxon has challenged the finality of these issues and has objected to all claims, and new issues have arisen which have not yet been decided by the District Court or reviewed on appeal. These remaining issues would, without settlement, consume still more years of judicial labor. The length of time required to navigate through the claims process until its conclusion and to overcome each of Exxon's objections would be substantial and represents risk to claimants. A compromise of the remaining issues on the terms provided herein represents a reasonable evaluation of the remaining risk of loss. The outcome of the claims Exxon disputes, the entitlement of state governments to unasserted claims, and the rights of claimants to shift to Exxon all or part of their obligation to attorneys' fees in Texas, Arizona and Arkansas remain in doubt. This Agreement represents the best efforts of Class Counsel to evaluate those risks and consider the advantages achieved by simplifying the claims process without Exxon's opposition, and recognizes that notice to the Class and approval by the District Court will be required before it is effective.

**s.    A Compromise Will Require a Distribution of the Benefit Achieved**

Since the total of all potential claims is greater than the total compromise amount provided by this Agreement, the reduction in potential recovery must be allocated among the several categories of interests in this class action. This Agreement includes that allocation agreed to by Class counsel on the assumption that the allocation and the reasons for them will be fully and fairly described to the Court and the Class (if the Court provides preliminary approval), and that the Class will have the opportunity to object and be heard before the Court considers giving final approval.

**t.    Reference to Prior Court Orders**

The purpose of the foregoing recitals is to provide an abbreviated explanation to any who might view this Agreement in the context of a voluminous record. Any inconsistency between what is summarized in these recitals and the record of this litigated proceeding is resolved by reference to the record.

## AGREEMENT

After careful consideration of the foregoing and the many other circumstances arising from the lengthy history of this proceeding, it is hereby **AGREED** as follows:

**1.    Commitment to Effectuate Settlement**

Counsel for the Class and Exxon agree to cooperate with each other and to take all actions reasonably necessary to provide appropriate notice to the Class of this Agreement, and to seek and obtain Court approval of this Agreement and entry of the orders of the Court that are required to implement its provisions.

**2.    Preliminary Approval by the District Court and Notice to the Class**

The parties will submit this Agreement to the District Court for Preliminary Approval and for approval of the form of notice to the Class. If the Court will not preliminarily approve this settlement, each of Class counsel and Exxon shall have the right to terminate this Agreement by delivering notice of termination to the other party. The parties shall be restored to their pre-settlement positions, without prejudice, and the claims process shall continue in its entirety, including any objections to entry of final judgments, entry of final judgments where appropriate and payment of claims.

3.     **Requirement of District Court Approval and Exxon's Option to Terminate Following Successful Appeal**

If this Agreement is not finally approved by the District Court it shall be null, void and terminated. If this Agreement is approved with terms that materially vary from the terms of this Agreement, Class counsel or Exxon, in their sole discretion, shall have the right to terminate the Agreement by delivering written notice of termination to the other Party within ten (10) days of the date the order of approval is entered. If approval is granted by the District Court but subsequently reversed or modified in any respect through an appeal taken by any interested party, Exxon, in its sole discretion, may elect to treat the Agreement as effective as to anyone who did not appeal, or may declare the Agreement null, void and terminated in its entirety and the balance of the settlement funds maintained in the trust account identified in paragraph 4(a) below, with interest (less expenses taxed against the trust account as provided herein), shall be returned to Exxon within ten (10) days, the parties shall be restored to their pre-settlement positions, without prejudice, the claims process shall continue and the Special Master shall recommend entry of judgments as appropriate.

In the event that the Settlement is not finally approved by the district and appellate courts or is terminated in accordance with the terms of this Agreement, interest will be calculated on those claims for which the Special Master has previously issued a report recommending entry of judgment as follows: a) prejudgment interest will be calculated through 30 days after the date of issuance of the report recommending entry of judgment; and b) postjudgment interest will be calculated from that date until the date of actual payment on the claim. Unless specifically reversed on appeal, this paragraph will apply to the calculation of interest in the event final approval of the Agreement is reversed on appeal. In the event that this Agreement is terminated or the Court refuses to approve of this settlement, the Parties nevertheless stipulate that the computation of prejudgment interest as set forth above shall apply to all judgments recommended prior to such termination or disapproval and such stipulation shall be binding upon the Class.

4.     **Terms of the Settlement**

4.a.     **Settlement Fund**

Within thirty-five (35) business days of entry of an order of final approval of the Settlement by the District Court, Exxon shall wire payment in the amount of $1.075 billion ($1,075,000,000) in full and final payment of all claims made or which could be made, attorneys' fees, court costs, non-taxable costs, pre- and post-judgment interest, incentive fees, sanctions or other expenses in the class proceeding styled *Allapattah Services, Inc. v. Exxon Corporation*, Case No. 91-0986-CIV-GOLD in the United States District Court, Southern District of Florida (the "Payment"). Payment shall be made into a trust account administered by the Garden City Group (GCG) in accordance with procedures to be approved by the District Court at a depository institution approved by the Court (the "Exxon DFC Class Action Depository Institution"). The account shall bear interest as permitted by the Local

7

Rules of the Southern District of Florida or as otherwise approved by the Court. The Payment and interest accrued thereon is collectively referred to as the "Depository Account." The Depository Account will be treated for tax purposes as a Qualified Settlement Fund ("QSF") and the Claims Administrator will be responsible for income tax reporting.

### 4.b.    Exxon's Obligation to Pay Expenses Ceases on Payment

Exxon shall be responsible for compensating the Special Master and Garden City Group for all administrative expenses incurred prior to Payment. After Payment is made, Exxon shall not be responsible for any further expenses except as otherwise provided herein. Upon Payment, the claims process, including Exxon's reasonable attorneys' fees and costs after Payment and during the pendency of any appeal, will be funded as more fully described in paragraph 6 below from interest or investment income from the Settlement Fund.

### 4.c.    Release, Bar Order and Final Judgment

Upon Payment, Exxon will be granted a release and bar order substantially in the form attached hereto with respect to the claims that were asserted or could have been asserted in this action for all class members and all gallons sold, including all claimants and any person, entity, state or political subdivision that has claimed or may claim through a class member, with the exception of claims for gallons owned by those class members who opted out and who do not file a claim under this Agreement; provided, however, that any class member who previously opted out but nonetheless filed a claim postmarked on or before the date of execution of this Agreement will be treated as a dealer who did not opt out of the Class. Upon final approval of the Settlement after notice and hearing, the Court shall enter a final judgment dismissing this action with prejudice. Attached hereto as Exhibit 2 is a form of proposed order finally approving settlement, and a proposed final judgment dismissing this action against Exxon with prejudice. If the Court materially alters the terms of the final order approving settlement or the final judgment dismissing the action with prejudice, either party shall have the right, in their sole discretion, to terminate this Agreement by delivering notice of termination to the other party within ten (10) days of the event. In that event, except as otherwise provided herein, the parties shall be restored to their pre-settlement positions, without prejudice, and the claims administration process shall resume.

### 4.d.    Creation of Common Fund; Claims Included

The Payment shall create a common fund for all Class Members who have or could have claimed money based on gallons sold during the Discount for Cash Program. All claims postmarked through the date of final approval shall be allowed to go forward as part of the claims process. Any class member who has not asserted a claim postmarked on or before the date of the final hearing shall be barred from the claims process but shall be permitted to assert a claim against the appropriate State government pursuant to that State's unclaimed property statute. Upon Payment, no claims of any sort related to the Settled Claims may be brought against Exxon in any other court or jurisdiction.

8

The claim of any member of the Class who opted out but subsequently filed a claim postmarked on or before the date of execution of this Agreement will be considered as part of the Class and treated as a dealer who did not opt out. Opt-outs who have not filed a proof of claim will be permitted but not required to assert a claim against the appropriate State government pursuant to that state's unclaimed property laws.

### 4.e.    Set-off claims

Upon the Effective Date of the Agreement, all set-off claims previously asserted by Exxon in the claims process will be dismissed with prejudice.

### 4.f.    Funding Expenses of Claims Administration Following Approval of this Agreement

Pursuant to procedures that will be hereafter adopted by the District Court, upon approval of this Agreement all expenses and fees of the Claims Administrator, the Special Master and State Counsel (as provided herein) will be paid first from interest earned on the depository account or, in the event that interest income after taxes is insufficient to pay said costs, then from the principal in the depository account.

### 4.g.    Allocation of the Settlement Fund

The Payment, and any interest or investment income earned from it that remains after payment of taxes and claims expenses until the sums are fully disbursed, shall constitute the Settlement Fund and shall be allocated after the Effective Date as follows:

#### (i)    Claims by Class Members Filed On or Before December 19, 2005.

All claims postmarked on or before December 19, 2005 that are determined to be owned by the claimant or claimants shall be paid in the manner discussed below upon final adjudication of entitlement by the District Court following reports and recommendations of the Special Master, with prejudgment interest calculated through but ending on October 31, 2005. As of October 31, 2005, all sums due to every Class Member on every claim will be fixed and interest thereon will no longer accrue.

#### (ii)    Reserve for Contingent Circumstances

Because of uncertainty as to the total of all claims that will be adjudicated in the claims process, a reserve will be established to endeavor to ensure that claims resolved later in the process will not be shortchanged. As final orders directing payment are entered on each claim, the claimant will initially receive 93% of the judgment amount (with prejudgment interest ending on October 31, 2005), less the amount owed (if the fee award

process is completed) or estimated by the District Court to be owed (if the fee award process is incomplete) in attorneys' fees, costs, and named plaintiff incentive awards. Two percent of the claim amount will not be refunded. The remaining 5% of each claimant's recovery will be held in the Settlement Fund until such time as all claims have been finally adjudicated (the "Contingency Reserve"). After all claims are finally adjudicated, the Contingency Reserve will be distributed to claimants, pro rata, based on the amount of the judgment relative to the total of all other judgments, until each claimant has received up to 98% of the established claim or until no funds remain in the Contingency Reserve.

### (iii)      Interest on Contingency Reserve

If there is a surplus in the Settlement Fund after the last claim is adjudicated and paid (or sooner as otherwise provided in the Agreement) and after the five percent (5%) reserve has been paid in full to each claimant, to the extent funds are available in the Settlement Fund, an additional amount will be paid to each claimant equal to a pro rata share of five percent (5%) of the net interest earned on the Settlement Fund not to exceed three percent (3%) per annum, non-compounded. Net interest is the sum of all interest earned on the Settlement Fund less the Claims Adjudication Costs and any taxes or fees. The pro rata distribution will be based on the amount of each award as compared to the sum of all awards to all claimants. The three percent (3%) maximum rate of interest will be calculated on five percent (5%) of every claim from the period November 1, 2005 until the date that the five percent (5%) reserve is paid.

### (iv)      Early Termination of Contingency Reserve

If at any time during the claims adjudication process it appears that the amount held in reserve exceeds the total value of all remaining claims and there are sufficient funds available to complete the claims adjudication process, a motion can be made to accelerate disbursement of all or part of the funds held in reserve. Upon recommendation of the Special Master, the District Court may under such circumstances accelerate payment of all or part of the reserve pro rata among the claimants from which those funds were withheld.

### (v)      Award of Additional Sums for Fee Shifting for Texas, Arizona and Arkansas Class Members

The sum of $15,000,000, will be allocated to a fee-shifting fund to be applied against the obligation of Class Members in Arkansas, Arizona and Texas for Class Counsels' attorneys' fees (each such class member's pro rata share based on the amount of each award to a Class Member in one of the three states in relation to the total of all potential awards to all Class Members in all three of those states, whether filed or unfiled).

10

(vi)   **Calculation of the Remaining Balance After All Claims are Finally Adjudicated and Paid**

Upon resolution of the final claim postmarked on or before December 19, 2005, and distribution of the Contingency Reserve, the "Remaining Balance" shall be calculated. The Remaining Balance is that amount remaining in the Settlement Fund and the Fee-Shifting Fund, including interest earned during the time between the date of Payment until that time after payment of all claims, after payment of the following hierarchy of obligations:

(a)   First Priority:

(i) All claims determined to be valid (including the claims of dealers who opted out of the Class but filed claims within the time provided herein);

(ii). All awards of attorneys' fees, costs and expenses to Class Counsel;

(iii). All incentive awards to Class Representatives;

(iv). All taxes and fees paid in connection with operation of the Depository Account;

(v). All expenses for the maintenance of the claims process including but not limited to fees for the Claims Administrator, the Special Master and the States' Counsel.

(b)   Second Priority:  the 5% Contingency Reserve;

(c)   Third Priority:  Interest on the Contingency Reserve, as provided herein;

(vi)   **Distribution of the Remaining Balance**

The Remaining Balance will be divided among the thirty-five states pro rata based on the magnitude of unasserted claims within each state in relation to the total of all unasserted claims in all states.

11

**4.h.   Class Members Who Fail to File Claims By the Final Approval Hearing Date Limited to Rights Established by Abandoned Property Law**

Class Members who fail to file claims postmarked on or before December 19, 2005 will be required to seek payment, if at all, solely from the states pursuant to the states' unclaimed property laws upon the conclusion of the claims process. The likelihood that the Remaining Balance in the Settlement Fund will not be sufficient to pay all late filed claims in full is specifically recognized as a bargained-for risk of this Agreement.

**4.i.   States' Counsel**

The States, which will recover a proportional part of the Remaining Balance as provided herein pursuant to each state's respective unclaimed property law, have an interest in protecting the rights of true owners to the claims. To protect those rights, upon the Effective Date of this Agreement (as defined in Paragraph 5 below) and in consideration of the provisions of Fed. R. Civ.P. 23 (g)(1), upon the application of the States of New Jersey, Virginia, and Florida (the "Lead States") designating a law firm or firms for appointment, the District Court shall appoint States counsel to participate in the claims process on behalf of the collective interests of the States, to ensure that only those claimants entitled to recover do recover and to facilitate settlement of conflicting claims or disputed claims. The law firm or firms designated for appointment by the Lead States shall enter into an appropriate retainer agreement with the Lead States to carry out the purpose of this provision. Reasonable attorneys' fees may be charged to the Depository Account for the States' counsel which fees must be submitted to and approved by the District Court following the recommendation of the Special Master. The Depository Account shall be the exclusive source of funds for payment of States' counsels' fees and costs; in no event shall the States be liable for payment of the States' counsels' fees and costs. To facilitate participation in the claims process, Exxon will provide to the designated States' counsel the information it has compiled regarding each claim in connection with its preparation of answers to each claim. With respect to disputed claims, States' counsel will be entitled to recommend settlements of amounts due on any reasonable basis subject to approval of the District Court following recommendation of the Special Master. Such settlements may bar any further claims against the Settlement Fund for a particular Exxon station for a particular period of time, thus adding funds to the Remaining Balance.

**4.j.   Procedure for Awards from the Depository Account**

The District Court will establish the procedures and form of orders required to resolve disputes and establish entitlements arising from the claims process and to direct disbursements from the Depository Account. The procedure will include appropriate deductions for awards to Class Counsel for attorneys' fees, costs, and expenses, and incentive awards for the Class Representatives.

12

**4.k.     Disputes to be Resolved Before Special Master**

All disputes regarding payment of claims will be resolved by the Special Master such that no claims will be interplead in other courts, with the following two exceptions:

1)    On the motion of all claimants who seek recovery of damages on the same gallons purchased during the Class Period, the Special Master may enter an interim recommendation on the claim as against Exxon, and order interpleader of the ownership dispute. Any reference of a dispute to a state court shall provide that the movants have agreed that (a) no discovery shall be directed to Exxon but instead shall be directed to Class counsel who will coordinate the production of dealer records from Exxon's files as otherwise provided in the Agreement as if the dispute was being resolved by the Special Master; (b) the Special Master will address and resolve any discovery disputes directed to Class counsel for dealer records; and (c) the monies involved in such disputes shall be retained in the Depository Account until a final judgment is entered in favor of one or more of the competing claimants and either the time for appeal has passed without an appeal being brought or, if an appeal is brought, upon disposition of that appeal affirming the final judgment; and (d) no interpleader action shall establish greater rights to recovery by any claimant than otherwise would exist in the claims process.

2)    Jurisdiction and venue for the resolution of any disputes between claims filing services or attorneys providing claims services (other than Class counsel) and any claimants that have contracted with them is a matter of disagreement that is neither addressed nor resolved in connection with the Agreement.

Class counsel will continue to represent the Class, will designate claims for adjudication during the claims process, and will provide documents to claimants and the Special Master that are germane to the dispute over particular gallons and the ownership of claims. Exxon will not be subject to discovery except that brought by Class Counsel solely to obtain non-privileged documents available only from Exxon's business records to assist in the resolution of disputed issues or to answer Class counsel inquiries regarding station ownership. Exxon will retain all of its dealer records at least until such time as the Settlement Fund is entirely depleted and the claims process is terminated. Exxon will make personnel available to Class counsel only to respond to requests for documentation not already in the possession of Class counsel or to make needed corrections to answers previously provided during the claims process. The intent of this provision is to expedite the claims process (recognizing that this Court and the Special Master has a background and expertise in this matter far exceeding that of a new tribunal) and to relieve Exxon of the burden of responding to discovery from attorneys and tribunals unfamiliar with the long history of this litigation and the events leading to the claims process.

13

**4.I.    Appeals from the Special Master to the District Court Regarding the Ownership of Claims Final**

To facilitate the claims process and preserve judicial labor, any appeals from decisions by the Special Master regarding the ownership of claims shall be limited to review by the District Court. Decisions by the District Court resolving such appeals shall be final.

**5.    Effective Date of the Agreement**

If a Final Order and Judgment materially similar to the forms attached as Exhibit 2 are entered by the Court and neither party has terminated as otherwise provided in this Agreement, the time for appeal from such order and judgment has elapsed (including without limitation any extension of time for the filing of any appeal that may result by operation of law or order of the Court) with no notice of appeal having been filed, the "Effective Date" shall be the next business day after the last date on which notice of appeal could have been timely filed. If the Final Order and Judgment is entered and an appeal is filed as to any of them, the "Effective Date" shall be the next business day after the Final Order and Judgment is affirmed, all appeals are dismissed, and no further appeal to, or discretionary review in, any Court remains.

**6.    Operation of the Claims Process During Pendency of Approval Process and Any Appeal**

During the period in which this Agreement is awaiting final approval, including any appeal, claims will continue to be processed through entry of reports and recommendations of the Special Master for entry of judgments against Exxon on behalf of Class Members. However, upon execution of this Agreement the time to object to reports and recommendations will be extended, final judgments will not be entered and payments will not be made until any appeal is exhausted and the order approving the Agreement is affirmed. Upon Payment, fees for the Claims Administrator, the Special Master, and Exxon's counsels' fees and costs will be paid out of the interest or investment income earned on the Settlement Fund, which fees and costs shall be submitted to and approved by the Special Master for reasonableness, subject to review by the District Court. If approval of the settlement is not affirmed on appeal or either party terminates this Agreement as otherwise provided in this Agreement, the entire then-existing balance of the settlement fund shall be returned to Exxon in accordance with Exxon's instructions, the claims process will continue and the Special Master will forward pending reports, and recommendations to the district court.

14

### 7.    Counterparts

This Agreement may be executed in counterparts, each of which shall constitute an original.  Facsimile signatures shall be considered valid signatures as of the date thereof, although the original signature pages shall thereafter be appended.

### 8.    No Admission

Neither this Agreement nor any provisions contained in this Agreement shall be deemed to be or construed as an admission in any action or proceeding of any kind whatsoever, civil, criminal or otherwise, before any court, administrative agency, regulatory body or any other body or authority present or future, by Defendants.  Neither this Agreement, nor any of its provisions, nor any statement or document made or filed in connection herewith, shall be filed, offered, received in evidence or otherwise used in any action or proceeding or any arbitration, except in connection with the parties' application for approval or enforcement of this Agreement and all proceedings incident thereto, including requests for attorneys' fees, costs and disbursements and compensation to the Class and Class representatives.

### 9.    Consent to Jurisdiction

The Court shall retain jurisdiction to enforce this Agreement and the parties, and their respective counsel, hereby irrevocably submit to the exclusive jurisdiction of the Court only for the specific purpose of any suit, action, proceeding or dispute arising out of or relating to this Agreement, the applicability of this Agreement or any issue related to fees and costs.

### 10.    Enforcement of Settlement Agreement

Notwithstanding Paragraph 8 above, this Agreement may be pleaded as a full and complete defense to any action, suit or other proceeding that has been or may be instituted, prosecuted or attempted by a class member, including any claimant or any person, entity, state or political subdivision that has claimed or may claim through a class member, with respect to any of the Released Claims and may be filed, offered and received into evidence and otherwise used for such defense.

### 11.    Binding Effect

This Agreement shall be binding upon, and inure to the benefit of, the successors and assigns of the parties hereto.

### 12.    No Party Is the Drafter

None of the parties shall be considered to be the drafter of this Agreement or any provision hereof for the purpose of any statute, case law or rule of construction that would or

might cause any provision to be construed against the drafter hereof.

### 13.    Choice of Law

All terms of this Agreement shall be governed by and interpreted according to the substantive laws of the State of Florida without regard to its choice of law or conflict of laws principles.

### 14.    Amendment; Waiver

This Agreement shall not be modified in any respect except by a writing executed by all the parties hereto, and the waiver of any rights conferred hereunder shall be effective only if made by written instrument of the waiving party. The waiver by any party of any breach of this Agreement shall not be deemed or construed as a waiver of any other breach, whether prior, subsequent or contemporaneous, of this Agreement.

### 15.    Integrated Agreement

This Agreement, contains an entire, complete, and integrated statement of each and every term and provision agreed to by and between the parties.

### 16.    Construction

This Settlement Agreement shall be construed and interpreted to effectuate the intent of the parties, which is to provide, through this Settlement Agreement, for a complete resolution of the Released Claims.

STEARNS WEAVER MILLER                     EXXON MOBIL CORPORATION
WEISSLER ALHADEFF & SITTERSON, P.A.       P. O. Box 2180
Attorneys for Plaintiffs                  800 Bell Street
150 West Flagler Street                   Suite 1859-N
Suite 2200                                Houston, TX 77252-2180
Miami, FL 33130
Tel.: 305 789-3200

By: _____              By: _____
      EUGENE STEARNS                            ROBERT WALLIS

December _19_, 2005                       December _19_, 2005

16

PERTNOY SOLOWSKY & ALLEN, P.A.
Attorneys for Plaintiffs
150 West Flagler Street
20th Floor
Miami, FL   33130
Tel.: 305 371-2223

By: _____
        SIDNEY PERTNOY

December _19_, 2005

BURLINGTON, WEIL, SCHWIEP,
    KAPLAN & BLONSKY, P.A.
Attorneys for Exxon Mobil Corp.
Office in the Grove, Penthouse A
2699 South Bayshore Drive
Miami, Florida 33133
Tel: 305-858-2900

By: _____
        PAUL SCHWIEP

December _1N_, 2005


List of Exhibits
1.      List of States that have filed claims
2.      Draft Order Finally Approving Settlement and Final Judgment


                                17

## EXHIBIT 1

The following states have filed claims as part of the claims process in *Allapattah v. Exxon Corp.*:

New Jersey
Virginia
Florida (which filed on behalf of itself and the following additional states)
    Arizona
    Arkansas
    California
    Connecticut
    Delaware
    Georgia
    Indiana
    Maryland
    Massachusetts
    New Hampshire
    Nevada
    New Mexico
    New York
    North Carolina
    South Carolina
    Tennessee
    Vermont
    Washington

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 91-0986-CIV-Gold/Simonton
Consolidated with Case No. 05-21338-CIV-Gold/Simonton

Special Master Thomas E. Scott

ALLAPATTAH SERVICES, INC., et al.

     Plaintiffs,

vs.

EXXON CORPORATION,

     Defendant.

_____/

**FINAL ORDER APPROVING SETTLEMENT AMONG EXXON CORPORATION AND THE CLASS, ALL CLAIMANTS AND ALL PERSONS AND ENTITIES CLAIMING THROUGH CLASS MEMBERS; AND <u>DIRECTING ENTRY OF FINAL JUDGMENT, RELEASE AND BAR ORDER</u>**

THIS CAUSE came before the Court for hearing on _____, 2006 on Plaintiff Allapattah Services, Inc., et al. and Defendant Exxon Corporation ("Exxon")'s Joint Motion for Final Approval of Settlement in this action.  The Court has (1) reviewed and considered the terms and conditions of the proposed settlement agreement dated December 19, 2005 (the "Settlement Agreement") between Exxon and Plaintiffs Allapattah Services Inc. et al. on behalf of themselves and on behalf of the Class and all Releasing Parties (as defined herein), (2) preliminarily approved the Settlement Agreement on _____, 2006 (the "Preliminary Approval Order"), (3) held a final settlement hearing after being satisfied that notice to the Class and the Releasing Parties has been provided in accordance with requirements of the Preliminary Approval Order, (4) reviewed and considered all timely objections filed by any person or entity to the Settlement Agreement and (5) presided over this matter for the past seven years

1

and thus is fully advised and familiar with this case.  Based on the foregoing, the Court makes the following findings:

1.      This Court has jurisdiction over the subject matter of this litigation and over all parties to this litigation, including all Class Members as defined below and including all Releasing Parties.

2.      This class action was commenced by Exxon dealers against Exxon, alleging that, in connection with a program called Discount for Cash, Exxon was contractually obligated to reduce wholesale prices to its direct served dealers, on average, by an amount sufficient to offset a credit cost recovery fee.  The Class alleged that Exxon failed to provide the on average wholesale price offset to its dealers doing business in 35 states and the District of Columbia during the Class Period.

3.      Prior to trial, this cause was the subject of numerous reported decisions of the District Court including orders denying summary judgment, 61 F. Supp. 2d 1308, denying *Daubert* motions,  61 F. Supp. 2d 1335, denying a motion in limine to exclude extrinsic evidence to establish the alleged obligation under the written contract, 61 F. Supp. 2d 1300, and awarding pre-judgment interest and ruling on Exxon's affirmative defenses, 188 F.R.D. 667.

4.      After the second trial of this matter, the jury returned a special verdict finding in favor of the Class, and the District Court entered its Order on Procedure, 157 F.Supp. 2d 1291, that, among other things, created a claim administration process for the adjudication of claims of ownership by persons claiming to be Class Members entitled to recovery based on the jury's verdict and the District Court's orders.  On appeal, the District Court's rulings and the jury verdict were affirmed.  *See* 333 F.3d

2

1248 (11th Cir. 2003), *rehearing en banc denied* 362 F.3d 739 (11th Cir. 2004), *affirmed,* 125 S. Ct. 2611, 545 U.S. ___ (June 23, 2005).

5.    Exxon and Class counsel jointly proposed settlement of this cause on the terms provided in the Settlement Agreement (subject to notice to the Class and approval by this Court) after the December 1, 2004 deadline for filing claims had passed. The Claims Administrator has return addresses for each and every claimant who has asserted claims, including a number of claimants who filed claims after December 1, 2004. The proposed Settlement Agreement followed commencement of consideration by the Special Master of individual claims but before any of those claims had achieved entry of final judgment for a claimant Class Member.

6.    Class counsel and the Class Representative Plaintiffs have fairly and adequately represented the Class for all purposes.

7.    Because this settlement was proposed after the time for filing claims in the claims process established by the Order on Procedure had passed and during consideration by the Special Master of the thousands of claims that were filed, the Court provided that notice to the Class would be by US Mail to each and every person or entity filing a claim prior to the execution of the Settlement Agreement. In addition, because twenty-one (21) state governments have asserted entitlement to recover sums due to Class Members who did not assert Timely Filed Claims (as defined herein), and because the Settlement Agreement includes those states and other state governments as Releasing Parties, the Court provided that additional notice be provided to each state in which Exxon sold motor fuel to direct served dealers, regardless of whether the state or governmental entity asserted entitlement in the claims process. Notice was also

3

provided via websites maintained by (i) the Claims Administrator, The Garden City Group, (ii) Class counsel, and (iii) the Special Master.

8.      Notice to members of the Class and other potentially interested parties of the settlement and the final settlement hearing has been provided in accordance with the notice requirements specified by the Court in the Preliminary Approval Order. The notice provided constitutes reasonable and the best practicable notice. The notice was reasonably calculated, under the circumstances, to apprise the Class and the Releasing Parties of (i) the pendency of the action, (ii) the terms, nature and reasonably anticipated impact of the settlement, (iii) Class Members' and the Releasing Parties right to object to the settlement (other than opt outs who did not choose to participate in the claims process and do not have a right of objection); and, (iv) the binding effect of the settlement, this order, and the release and bar order contained herein. The notice satisfied the requirements of Federal Rule of Civil Procedure 23(e)(1)(B) and the requirements of due process.

9.      At the final fairness hearing this Court considered all arguments in favor and against approval of the settlement in addition to the pleadings, objections and all motions timely filed with Court. There is an overriding public interest in favor of settlement, particularly in class actions. *See Association for Disabled Americans, Inc. v. Amoco Oil Co.,* 211 F.R.D. 457, 466 (S.D. Fla. 2002); *Cotton v. Hinton,* 559 F.2d 1326, 1331 (5th Cir.1977); *Patterson v. Newspaper & Mail Deliverers' Union,* 514 F.2d 767, 771 (2d Cir.1975) (citations omitted) (holding that in analyzing any settlement, "the clear policy in favor of encouraging settlements must ... be taken into account."). A class action settlement should be approved so long as it is "fair, adequate and reasonable

and is not the product of collusion between the parties." *Bennett v. Behring Corp.,* 737 F.2d 982, 986 (11th Cir.1984); *Cotton,* 559 F.2d at 1330; *Behrens v. Wometco Enters., Inc.,* 118 F.R.D. 534, 537 (S.D.Fla.1988); *see also* Fed. R. Civ. P. 23(e)(1)(C)("The court may approve a settlement ... that would bind class members only after a hearing and after a finding that the settlement is ... fair, reasonable, and adequate.").

10.    In determining whether the settlement is fair, reasonable, and adequate, the Court has considered the six *Bennett* factors including (1) the likelihood of success by the Class and the Releasing Parties through the remaining litigation over individual claims through the claims process, and the likelihood that Exxon could bring further appeals; (2) the range of possible recovery on the claims as a whole (including the claims by the states on behalf of Class Members who did not assert Timely Filed Claims); (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable;   (4) the complexity, expense and duration of the litigation; (5) the substance and amount of opposition to the settlement; and (6) the state of proceedings at which the settlement was achieved. *Bennett,* 737 F.2d at 986; *see also Sterling v. Stewart,* 158 F.3d 1199, 1204 n.6 (11th Cir. 1998); *Cotton,* 559 F.2d at 1330-31.

11.    In evaluating these considerations, the Court did not undertake to try the remaining issues on their merits. *Cotton,* 559 F.2d at 1330. Indeed, the very nature of the remaining issues requires an evaluation of the probable outcome of thousands of individual claims, each of which is opposed by Exxon and which involve myriad factual and legal issues under the laws of thirty-five (35) states. Rather, the Court relied upon the judgment of experienced counsel and, absent fraud, which is plainly not present

5

here, was "hesitant to substitute its own judgment for that of counsel." *Id.* (citation omitted).   In evaluating a settlement's fairness, "it should [not] be forgotten that compromise is the essence of a settlement.   The trial court should not make a proponent of a proposed settlement 'justify each term of settlement against a hypothetical or speculative measure of what concessions might [be] gained.'" *Cotton,* 559 F.2d at 1330 (quotation omitted).   "Above all, the court must be mindful that 'inherent in compromise is a yielding of absolutes and an abandoning of highest hopes.'" *Ruiz v. McKaskle,* 724 F.2d 1149, 1152 (5th Cir.1984) (quoting *Cotton,* 559 F.2d at 1330).

12.   After giving due consideration to all arguments, the Court concludes that the Settlement Agreement is in all respects fair, reasonable, adequate, proper and in the best interests of the Class, the Releasing Parties, and all persons, entities and governments potentially interested in the settlement.   In reaching this conclusion, the Court has considered the *Bennett* factors and finds: (1) The first factor (*i.e.*, the likelihood of success at trial) is partially irrelevant because classwide liability has already been resolved at trial.   However, the likelihood of success of individual claimants in the claims adjudication process is uncertain.   The settlement provides a common fund for the benefit of all Class Members and those claiming through Class Members thus providing a defined benefit to all legitimate claimants; (2) The settlement provides for total consideration (One Billion, Seventy-Five Million Dollars ($1,075,000,000)) which is within the range of possible recovery if the claims adjudication process were to continue with Exxon contesting claims until the end; (3) The common fund established by this settlement will allow Class Members who timely

6

filed claims to recover not less than 93% of the total amount they are each entitled to recover (with prejudgment interest calculated through October 31, 2005), together with the substantial probability of recovery of 98% of the total amount of each claim; this recovery is above the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) If the claims adjudication process were to continue, the complexity, expense and duration of the process with Exxon's involvement would likely delay payment to Class Members far beyond that contemplated by the settlement; (5) The lack of substance of opposition to the settlement demonstrates the fairness and reasonableness of the settlement; and (6) The settlement will achieve a more streamlined process accelerating the distribution of claim proceeds to Class Members and their representatives.

13.    A list of persons or entities who timely elected to opt-out of this action and who did not subsequently present a claim for payment in the claims adjudication process is attached to this order as Exhibit 1 and made a part hereof for all purposes. This Order and the Settlement Agreement shall not alter, either by impairing or improving upon, any rights held by the persons or entities on Exhibit 1 to the extent such rights exist.

14.    The Class Members (collectively the "Class"), the Releasing Parties, and the Released Parties shall be subject to all of the provisions of the settlement, the Settlement Agreement, this Order and the Judgment to be entered by the clerk of the Court pursuant to this Order.

15.    Exxon has asserted set off claims against hundreds of claimants, which it has agreed will be dismissed with prejudice in connection with this Settlement.

7

16.     The Bar order provision of this Order, which prohibits the assertion of claims against Exxon and the other Released Parties, as set forth below, is a condition of the settlement and a significant component of the consideration afforded to Exxon in the settlement, and that provision is reasonable under the circumstances.

17.     The dismissal with prejudice and entry of judgment contemplated by the settlement and directed pursuant to the terms of this Order will dispose of this action except as to the continuation of the claims adjudication process as provided in the Settlement Agreement and except for consideration of petitions by Class counsel for attorneys' fees, costs and expenses, and by the Class Representatives for incentive awards.   This Court finds that there is no just reason for delay in entering judgment in the form attached hereto dismissing this action with prejudice as to Exxon, which judgment shall be entered by the clerk of the Court at the same time as the entry of this order.  The entry of judgment is warranted under Federal Rule of Civil Procedure 54(b).

18.     As used in this Order:

a.   "Class Member" shall mean an Exxon direct served dealer who purchased motor fuel from Exxon during the Class Period, and who did not opt out of the Class by timely filing an opt out notice.

b.   "Class Period" shall mean the period between March 1, 1983 to August 29, 1994 (the claim of damage from August 1982 to February 28, 1983 was abandoned prior to trial).

c.   "Timely Filed Claim" shall mean a claim filed in the claims process prior to the date of execution of the Settlement Agreement, excluding claims filed by state governments pursuant to state unclaimed property statutes.

d.  "Releasing Parties" shall mean the Class Members and their executors, representatives, spouses, heirs, successors and assigns, and any person or entity claiming through them, whether directly or indirectly, including but not limited to the state governments and the District of Columbia where the Exxon direct served dealers did business, regardless of whether those governmental entities asserted claims in the claims process on behalf of Class Members who did not assert a Timely Filed Claim.  Releasing Parties shall also include those Exxon direct served dealers who purchased motor fuel from Exxon during the Class Period and who opted out of the Class but asserted a Timely Filed Claim in the claims process to recover as a Class Member notwithstanding the opt out.

e.  "Released Parties" as used herein includes Exxon and each of its present and former parents, present and former wholly-owned subsidiaries, present and former divisions and affiliates and each of their respective current or former officers, directors, employees, agents, insurers and attorneys (and the predecessors, heirs, executors, administrators, legal representatives, successors and assigns of each of the foregoing).

f.  "Released Party" shall mean either one of the Released Parties or all Released Parties.

g.  "Released Claims" as used herein means all claims, including any and all demands, charges, complaints, actions, causes of action, damages, attorneys' fees, obligations or liabilities of any and every kind, known or unknown, that were asserted or could have been asserted in this class

9

action by reason of, arising out of, or in any way related to any of the facts, acts, events, transactions, occurrences, courses of conduct, representations, omissions, circumstances or other matters actually brought as claims of the Class in this action, including, without limitation, any and all claims, demands, charges, complaints, actions, causes of action, damages, attorneys' fees, obligations or liabilities of any and every kind, known or unknown that were or could have been asserted in this class action arising out of Exxon's alleged failure to reduce the wholesale price of motor fuel, on average, to offset credit fees pursuant to its Discount for Cash program during the Class Period, whether any such claim was or must have been asserted by any Releasing Party on its own behalf or on behalf of other persons.

## II.   <u>CONCLUSIONS</u>

Based upon the foregoing findings, the submissions reviewed by the Court, the hearings and proceedings referred to above, it is hereby

ORDERED, ADJUDGED, AND DECREED:

19.   The settlement and the Settlement Agreement, including its terms and conditions relating to the continuation of the claims adjudication process, are hereby approved as fair, reasonable, adequate and in the best interests of the Class and the Releasing Parties, and the requirements of due process and Rule 23 of the Federal Rules of Civil Procedure have been satisfied. The objections to the Settlement and the Settlement Agreement are overruled and denied in all respects.

20.    The persons identified on the list attached hereto as Exhibit 1, having timely and properly elected to opt-out from the Class and not having filed a claim in the claims adjudication process, are hereby excluded from the Class and shall not be entitled to any of the monetary or other benefits afforded to the Class under the Settlement Agreement.

21.    The Court concludes that Class counsel and Representative Plaintiffs have fairly and adequately represented the Class with respect to the Settlement and the Settlement Agreement.

22.    The state governments appearing in the claims process on behalf of Class Members who did not timely file claims have raised complex and novel issues arising under state unclaimed property statutes which are yet undecided and, without settlement, could require years of extensive appellate review.

23.    Pursuant to the Settlement Agreement, and by operation of this Final Order Approving Settlement, the Released Parties shall be released and forever discharged by the Releasing Parties from the Released Claims.

24.    The Releasing Parties are permanently enjoined and barred from filing, commencing, prosecuting, intervening in, participating in (as Class Members or otherwise) or receiving any benefits from any lawsuit, arbitration, administrative or regulatory proceeding related to any or all Released Claims.

25.    The Releasing Parties and each of them are deemed to have agreed and covenanted not to sue or prosecute, institute or participate in the institution, commencement, filing, or prosecution of any suit or proceeding in any forum based upon or related to any Released Claim against any Released Party.

11

26.    Notwithstanding any other provision of this Order or the Settlement Agreement (including, without limitation, ¶ 12 above), nothing in this Order or the Settlement Agreement shall be deemed to in any way impair, limit, or preclude the Releasing Parties' rights to enforce any provision of the Settlement Agreement, or any court order implementing the Settlement Agreement, in a manner consistent with the terms of the Settlement Agreement, including through the continuation of the claims adjudication procedure as set forth in the Settlement Agreement.

27.    With respect to all Released Claims, the Releasing Parties and each of them agree that they are expressly waiving and relinquishing to the fullest extent permitted by law (a) the provisions, rights, and benefits conferred by Section 1542 of the California Civil Code, which provides: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR." and (b) any law of any state or territory of the United States, federal law or principle of common law, or of international or foreign law, which is similar, comparable or equivalent to Section 1542 of the California Civil Code.

28.    Each Releasing Party may hereafter discover facts other than or different from those which he, she or it knows or believes to be true with respect to the claim which are the subject matter of this action, but each such Releasing Party is hereby deemed to have expressly waived and fully, finally and forever agreed to settle the Released Claims and the absence of knowledge of such claims, whether or not

12

concealed or hidden, shall not affect the binding nature of such settlement and release without regard to the discovery or existence of such different or additional facts.

29.     In accordance with the terms of the Settlement Agreement, the Releasing Parties are barred from pursuing discovery against the Released Parties in the claims adjudication process except that Exxon will be subject to limited discovery only by Class counsel solely to obtain non-privileged documents available only from Exxon's business records in order to assist in the resolution of disputed issues or to answer Class counsel inquiries regarding station ownership.

30.     Neither the Settlement Agreement nor any provision therein, nor any negotiations, statements or proceedings in connection therewith shall be construed as, or be deemed to be evidence of, an admission or concession on the part of any of Exxon or any other person of any liability or wrongdoing by them, or that the claims and defenses that have been, or could have been, asserted in the action are or are not meritorious and in good faith.   Neither the Settlement Agreement nor any settlement communications shall be offered or received in evidence in any action or proceeding, or be used in any way as an admission or concession or evidence of any liability or wrongdoing of any nature; provided, however, that the Settlement Agreement, this Order and the Judgment to be entered thereon may be filed in any action by Exxon or any Released Party seeking to enforce the Settlement Agreement or the Judgment by injunctive or other relief, or to assert defenses including, but not limited to, *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction or any theory of claim preclusion or issue preclusion or similar defense or counterclaim.

13

31.    The claims asserted by Exxon, characterized by Exxon as set offs, against hundreds of Class Members are dismissed with prejudice.

32.    The terms of the Settlement Agreement and of this Order and the Judgment shall be forever binding on, and shall have *res judicata* and preclusive effect in, all pending and future lawsuits or other proceedings that are subject to this Order that are maintained by, or on behalf of, the Releasing Parties subject to those provisions of this Order.

33.    In the event that the Effective Date cannot occur, or the Settlement Agreement is canceled or terminated in accordance with the terms and provisions of the Settlement Agreement, then this Order and the Judgment shall be rendered null and void and be vacated and all orders entered in connection therewith by this Court shall be null and void.    Notwithstanding the foregoing, the Parties have stipulated and agreed, and the Court orders, that the provision regarding the computation of prejudgment interest set forth in ¶ 3 of the Settlement Agreement shall nevertheless apply to all judgments recommended prior to such cancellation or termination unless such provision is specifically reversed on appeal.

34.    The Clerk of the Court is directed to enter the Judgment in the form attached to this Order dismissing all Released Claims with prejudice as to Exxon pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.

35.    Without in any way affecting the finality of this Order and the Judgment, for the purpose of enforcing and administrating the Settlement Agreement, this Court hereby retains jurisdiction as to (a) all matters relating to the interpretation, administration, and consummation of the Settlement Agreement; (b) the petitions of

14

Class counsel for an award of attorneys' fees, costs and expenses; (c) the petitions of the Class Representatives for incentive awards; and (d) concluding the claims process on behalf of the Class and its Members, including the claims of any person asserting rights through a Class Member (such as, for example, any and all third-party liens, garnishments, attachments).

SO DONE AND ORDERED in Chambers at Miami, Miami-Dade County, Florida, this _____ day of _____, 2006.


HONORABLE ALAN GOLD
UNITED STATES DISTRICT COURT

Opt-Outs Who Did Not File Claims

| Claim Number | Station Number | Opt-Out Card Number | Dealer Name | Claimant Name |
|---|---|---|---|---|
| None | 99999 | 900002 | Not Found | None |
| None | 31819 | 900003 | John N Sakran | None |
| None | 99999 | 900004 | Not Found | None |
| None | 30805 | 900005 | George C Lindsay | None |
| None | 50096 | 900007 | JW Sullivan | None |
| None | 59255 | 900011 | Robert Witcher | None |
| None | 32838 | 900014 | Louis A Marrone | None |
| None | 23547 | 900016 | Charles Conrad | None |
| None | 34437 | 900017 | Ralph Orlando | None |
| None | 23345 | 900019 | Bruno Lucchino | None |
| None | 99999 | 900020 | Not Found | None |
| None | 66925 | 900022 | Walter R Hoffman | None |
| None | 63830 | 900023 | Conrad Ziegler | None |
| None | 32332 | 900025 | John Byrne | None |
| None | 99999 | 900027 | Not Found | None |
| None | 46602 | 900028 | Schoolmeester Inc | None |
| None | 99999 | 900031 | Not Found | None |
| None | 99999 | 900035 | Not Found | None |
| None | 65857 | 900036 | RW Reed | None |
| None | 25741 | 900038 | James Cathcart III | None |
| None | 77001 | 900039 | Lloyd D Coates | None |
| None | 29703 | 900041 | Doyle Starcher | None |
| None | 38168 | 900042 | David Swyden | None |
| None | 99999 | 900043 | Not Found | None |
| None | 66409 | 900044 | AO Growbowsky | None |
| None | 99999 | 900045 | Not Found | None |
| None | 51242 | 900046 | Dalton Rogers Gro | None |
| None | 24680 | 900047 | Stanley T Anderson | None |
| None | 35534 | 900048 | Ken Dickson | None |
| None | 74917 | 900049 | Houshang Jamshidpoor | None |
| None | 99999 | 900051 | Not Found | None |
| None | 25281 | 900055 | R Warren Gross | None |
| None | 38205 | 900056 | Harold E Shonio | None |
| None | 20013 | 900057 | Royce Cheeseman | None |
| None | 57966 | 900058 | Elmer Collett Jr | None |
| None | 69324 | 900059 | Ricky L Talbert | None |
| None | 23298 | 900060 | JL Ellis | None |
| None | 99999 | 900061 | William H Bell | None |

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| ALLAPATTAH SERVICES, INC., | ) CASE NO. 91-0986-CIV-GOLD/SIMONTON |
| et al., | ) |
| Plaintiffs, | ) |
| vs. | ) |
| EXXON CORPORATION, | ) |
| Defendant. | ) |

**RULE 54(b) FINAL JUDGMENT**

This cause came on for consideration before the Court, Honorable Alan S.
Gold, District Judge Presiding, pursuant to the Final Order Approving Settlement
Among Exxon Corporation and the Class, All Claimants and all Persons and Entities
Claiming Through Class Members, and Directing Entry of Final Judgement, Release
and Bar Order (the "Order") and IT IS HEREBY,

ORDERED AND ADJUDGED that pursuant to the settlement as approved by
the Order, the following claims are hereby dismissed with prejudice: (1) all claims,
including any and all demands, charges, complaints, actions, causes of action,
damages, attorneys' fees, obligations or liabilities of any and every kind, known or
unknown, that were asserted or could have been asserted in this class action by reason

of, arising out of, or in any way related to any of the facts, acts, events, transactions, occurrences, courses of conduct, representations, omissions, circumstances or other matters actually brought as claims of the Class in this action, including, without limitation, any and all claims, demands, charges, complaints, actions, causes of action, damages, attorneys' fees, obligations or liabilities of any and every kind, known or unknown that were or could have been asserted in this class action arising out of Exxon's alleged failure to reduce the wholesale price of motor fuel, on average, to offset credit fees pursuant to its Discount for Cash program during the Class Period, whether any such claim was or must have been asserted by any Releasing Party (as defined in the Order) on its own behalf or on behalf of other persons; and (2) all claims of set off asserted in this action by Exxon Corporation against any Class member.

Because this Judgment is entered in connection with the settlement of this class action pursuant to the Order and the adjudication of individual class members remain pending for determination in the administrative claims process, the District Court expressly determines, pursuant to Fed. R. Civ. P. 54(b), that there is no just reason for delay in entering this final judgment.

Without in any way affecting the finality of this Order and the Judgment, for the purpose of enforcing and administrating the Settlement Agreement, this Court hereby retains jurisdiction as to (a) all matters relating to the interpretation,

administration, and consummation of the Settlement Agreement; (b) the petitions of Class counsel for an award of attorneys' fees, costs and expenses; (c) the petitions of the Class Representatives for incentive awards; and (d) concluding the claims process on behalf of the Class and its Members, including the claims of any person asserting rights through a Class Member (such as, for example, any and all third-party liens, garnishments, and/or attachments).

Dated at Miami, Miami-Dade County, Florida this _____ day of _____, 2006.

_____
Clerk of the Court

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

——————————————x
                         :

ALLAPATTAH SERVICES, INC.,      :    **CASE NO. 91-0986-CIV-GOLD/SIMONTON**
et al.,                           :

           Plaintiffs,      :

vs.                           :

EXXON CORPORATION,         :

           Defendant.      :
——————————————x

**NOTICE OF:**
**PROPOSED SETTLEMENT WITH EXXON CORPORATION;**
**HEARING TO CONSIDER THE MOTION TO APPROVE**
**THE PROPOSED SETTLEMENT AND TIME TO OBJECT TO SETTLEMENT; AND**
**TIME FOR INTERESTED PARTIES TO OBJECT TO PETITIONS FOR ATTORNEYS' FEES,**
**COSTS AND INCENTIVE AWARDS**

IF YOU ARE A MEMBER OF THE CLASS IN THE MATTER OF ALLAPATTAH SERVICES INC., ET AL. V. EXXON CORPORATION, ALSO KNOWN AS THE EXXON DISCOUNT FOR CASH ("DFC") CLASS ACTION LITIGATION, OR IF YOU HAVE ANY INTEREST IN THE PROCEEDS OF CLAIMS MADE IN THIS LITIGATION, PLEASE READ THIS NOTICE CAREFULLY. THE PROPOSED SETTLEMENT DISCUSSED IN THIS NOTICE AFFECTS THE RIGHTS OF ALL PARTIES WITH AN INTEREST IN THIS LITIGATION.

THE COURT HAS SCHEDULED A HEARING TO BEGIN AT 3:00 P.M. ON APRIL 5, 2006, TO CONSIDER THE MOTION TO APPROVE THE SETTLEMENT BASED ON THE TERMS DESCRIBED IN THIS NOTICE. AN INTERESTED PARTY WHO SEEKS TO OPPOSE THE SETTLEMENT MUST FILE OBJECTIONS TO IT WITH THE COURT POSTMARKED NO LATER THAN MARCH 24, 2006 AND MUST SIMULTANEOUSLY SEND A COPY TO THE ATTORNEYS OF RECORD IDENTIFIED IN THIS NOTICE.

THE COURT HAS ALSO EXTENDED THE TIME FOR CLASS MEMBERS TO OBJECT TO PETITIONS BY CLASS COUNSEL FOR AN AWARD OF ATTORNEYS' FEES AND COSTS AND THE TIME TO OBJECT TO THE PETITIONS BY THE CLASS REPRESENTATIVES FOR INCENTIVE AWARDS. SUCH OBJECTIONS MUST BE FILED WITH THE COURT NO LATER THAN MARCH 24, 2006. AT THE HEARING ON APRIL 5, 2006, THE COURT WILL ALSO HEAR ARGUMENT ON BOTH THE PROCEDURE AND SCHEDULE TO RESOLVE THE PETITIONS FOR ATTORNEYS' FEES, COSTS AND INCENTIVE AWARDS.

## TABLE OF CONTENTS

                                                                                                    Page

1.   Introduction ..................................................................................................................... 3

2.   A Brief Summary of the DFC Case From Trial Through Appeals ..................................... 6

3.   The Claims Process........................................................................................................ 7

4.   The District Court's Rulings on Class Members' Obligation
     for Payment of Attorneys' Fees................................................................................... 10

5.   Terms of the Proposed Settlement .............................................................................. 10

6.   Effect of Adoption of the Settlement Proposed ............................................................ 15

7.   Cash Available from the Settlement Fund and Interest
     Income to Satisfy Claims and Support Claims Administration ...................................... 17

8.   Class Counsel Recommends Approval of the Settlement Proposal .............................. 19

9.   Class Representatives Recommend Approval of the Settlement ................................... 21

10.  Examples of Application of Settlement ......................................................................... 21

11.  Procedure for Consideration of the Settlement............................................................. 24

12.  Procedure for Consideration of Attorneys' Fees, Costs, and
     Named Plaintiff Incentive Awards. .............................................................................. 24

13.  Additional Information. ................................................................................................. 25

1.    Introduction

   a.    A Proposed Settlement of the DFC Class Action
          Will Be Considered by the Court

      The attorneys who represent the Class of Exxon dealers in the Discount For Cash ("DFC") class action litigation against Exxon Corporation ("Class counsel") have agreed on behalf of the Class, subject to notice to the Class and final approval by the Court, to settle all claims against Exxon arising in this action in exchange for the payment by Exxon of $1.075 billion ($1,075,000,000) to establish a settlement fund to be disbursed as provided in this Notice. This settlement must first be approved by the Court.

      The cash sum which Exxon proposes to pay and which Class counsel recommends accepting is less than all of the money Exxon could be required to pay if the Class were to prevail on every contested issue remaining unresolved through years more of litigation. Thus, acceptance of the proposal would require an allocation to interested parties of something less than one hundred percent of every asserted and unasserted claim. The reasons Class counsel recommends approval of the settlement is discussed in this Notice in an effort to allow interested parties to make an informed decision as to whether to support or oppose the proposed settlement.

      Although the District Court has reviewed the form of this Notice and has strived to make certain that the disclosure herein is both complete and understandable, the form and content of this Notice was prepared by Class counsel as part of the process of obtaining approval from the District Court.

   b.    Preliminary Approval of the Proposed Settlement Has Been
          Given But Does Not Require Final Approval

      In addition to approving the form of this Notice, the District Court also has given preliminary approval to the terms of the proposed settlement described in this Notice. This preliminary approval was given because the agreement appears on its face to be fair, reasonable and adequate. However, the Court will make an independent determination at the final fairness hearing. In determining whether the proposed settlement is fair, reasonable and adequate, the Court will consider support for the proposal and opposition to the proposal from those affected by its terms. Ultimately, however, the Court will make its own decision as to fairness of the proposal regardless of the existence of or magnitude of any support or opposition.

   c.    Petitions by Class Counsel for an Award of Attorneys' Fees and Costs and the
          Class Representatives' Petitions for Incentive Awards; the Opportunity to Object
          to These Petitions Has Been Reopened

      Prior to announcement of the proposed settlement, Class Counsel had filed petitions for an award of attorneys' fees (not to exceed one-third of the recovery) and an award of litigation costs and expenses (not to exceed .5% of any recovery). The Class Representatives had also filed petitions seeking incentive awards of 1.5% (in the aggregate to be divided among them) of any recovery. No Class Member filed an objection to the petitions for attorneys' fees and costs or objected to the petitions by the Class Representatives for incentive awards.

3

At the time the petitions were filed, it was not possible to determine the magnitude of the total recovery to the Class because that total could only be derived from completion of the claims process. A percentage of an uncertain number would not allow calculation of the request for attorneys' fees or incentive awards in dollars as well as a percentage of each claim. If the proposed settlement is approved, Exxon will deposit $1.075 billion in the Settlement Fund, thereby eliminating uncertainty as to collection and permitting precise calculation of the amount sought by Class counsel and the Class Representatives in both percentages and dollars.

Because the circumstances that will exist if the settlement proposal is approved by the District Court are different than the circumstances known to exist when the petitions were originally filed, the District Court has determined that the opportunity to object to the petitions for an award of attorneys' fees and costs and the petitions for incentive awards will be extended as discussed more fully herein.

Five separate law firms with varying degrees of involvement in the case have filed petitions seeking recovery of attorneys' fees and costs. Although there are disagreements among the law firms as to their respective entitlements to recover attorneys' fees, they do agree that in no event should the total legal fees exceed one third of the total recovery in the case, or one-third of every claim (including the claims of the states). That is, if the District Court were to approve the fee petitions collectively seeking recovery of one-third of the $1.060 billion that Exxon is paying to satisfy claims,[1] the total of attorneys' fees to be divided among the five law firms would be $353.33 million. The fee petitions previously filed, in which the law firms sought to justify their requests for an award of attorneys' fees of this magnitude, can be found on the internet at www.exxondealerattorneys.com. Those petitions may be supplemented and posted on the same internet address as otherwise discussed in this Notice.

The five law firms also seek recovery of expenses in addition to attorneys' fees. The total of all of the requests for reimbursement of those expenses by all of the law firms is $4.2 million, and an estimated $1.5 million of expenses anticipated for continuing the claims process. The detailed requests from each firm for reimbursement of those expenses can be found with the petitions of class counsel at www.exxondealerattorneys.com. If all of these expenses were awarded to the petitioning law firms, it would reduce each recovery by .53% and the entire Settlement Fund by a similar percentage.

The nine Class Representatives have also filed petitions seeking recovery of incentive awards to be shared among them of 1.5% of the total Settlement Fund or 1.5% of each awarded claim. The sum total of the requested incentive awards totals $15.9 million. The Class Representatives include their claim for out of pocket costs or expenses in the 1.5% incentive award they are seeking. The petitions previously filed by the Class Representatives can be found on the internet at www.exxondealerattorneys.com. Those petitions may be supplemented and posted on the same internet address as otherwise discussed in this Notice.

The total of all the pending requests for awards of attorneys' fees, litigation expenses and incentive awards both in dollars and percentages is summarized below:

---

[1] Of the $1.075 billion payment Exxon is making in settlement of this case, $15 million has been allocated to offset the fee obligation of claimants with stations in Texas, Arizona, and Arkansas. Accordingly, Class counsel seek to recover their percentage award against only $1.060 billion of the amount Exxon is paying.

| | Expressed as Percentage of $1.060 billion | Expressed in Dollars |
|---|---|---|
| Attorneys' Fees | 33.33% | $353.333 million |
| Expense Reimbursement | .53% | $5.65 million |
| Incentive Awards | 1.5% | $15.9 million |
| Total | 35.37% | $374.88 million |

Thus, if every requested petition were approved by the District Court, the total reduction of the Settlement Fund and thus the total reduction to each claim would be 35.37% and the total awarded to all attorneys and Class Representatives as a group would be $374.88 million.

The District Court will consider objections from Class Members in the manner and within the time frame provided in this Notice as to each of these petitions prior to making a decision as to the amounts to be awarded to the attorneys and Class representatives. The District Court could award the amounts requested or lesser amounts or make other decisions as to entitlement as are established at the hearing to resolve those issues. The percentage awarded will not be higher than the amounts requested that are summarized above.

The District Court will also determine the manner in which the attorneys and Class Representatives will be paid. The Court could:

- Order that the attorneys and Class Representatives be paid as a percentage of each claim as each claim is adjudicated and paid; or

- Determine that the attorneys and Class Representatives be paid from the Settlement Fund when it is deposited and after approval of the settlement is final; or

- Adopt a combination of both methods with some funds paid upon finality of the Agreement and others paid as claims are adjudicated and paid.

Whichever method of payment the Court adopts should not alter the percentage charged to each claimant. However, retaining monies for the fees until claims are processed and paid would increase the interest income earned by the Settlement Fund.

The District Court has allowed Class counsel and the Class Representatives to supplement their petitions, which supplements shall be filed with the Court no later than February 14, 2006 and posted at www.exxondealerattorneys.com.

The District Court encourages Class Members to carefully consider these petitions for fees, expenses and incentive awards and to lodge any objection or support that they might have. To be considered by the District Court, any objections to the petitions or objections to supplements to the petitions or support of the same must be filed with the Court on or before March 24, 2006. The manner of asserting objections is discussed more fully in this Notice.

If the District Court finally approves the settlement, it will at that same hearing consider and decide both the procedure and the schedule for resolution of any objections and any other issues relating to the petitions for attorneys' fees, costs and incentive awards.

### d.   Fairness Hearing Scheduled for April 5, 2006

The District Court will commence a hearing to consider the fairness of the proposed settlement at 3:00 p.m. on April 5, 2006.  Any interested party who seeks to support or oppose the proposed settlement must file a notice of support or opposition with the Court and counsel of record on or before March 24, 2006.  The manner of asserting objections is discussed more fully in this Notice.

### e.   If Approved, the Proposed Settlement Will Be Binding on All

The proposed settlement is either applied to all or applied to none. That is, if the District Court determines that the proposed settlement is fair, reasonable and adequate and enters an order approving its terms, and the approval is not appealed or is affirmed on appeal, it will be binding on all parties to the proceeding, including all Class Members (except those who opted out and have not filed a claim) and those claiming rights through them (including, without limitation, the states and the District of Columbia) and Exxon, regardless of whether or not a Class Member or party claiming through a Class Member opposed the proposed settlement.

## 2.   A Brief Summary of the DFC Case From Trial Through Appeals

### a.   An Allegation that Exxon Overcharged its Dealers Through its Discount for Cash Program

This class action was brought by several Exxon dealers (the "Plaintiffs") in May 1991 on behalf of themselves and on behalf of all other Exxon direct served dealers who purchased motor fuel from Exxon during the period March 1, 1983 until August 28, 1994.  The Plaintiffs alleged that Exxon was contractually obligated to reduce the wholesale price of motor fuel by an amount that, on average, offset the credit cost recovery fees charged by Exxon in connection with its DFC program.  They further alleged that Exxon had breached that obligation, causing its dealers damages in an amount equal to the credit cost recovery fees collected during the Class period.  Plaintiffs also sought the recovery of prejudgment interest based on the laws of the 35 states in which Exxon marketed motor fuel through direct served dealer service stations.

Exxon vigorously defended the claim. Exxon maintained (and continues to maintain) among other things, that it did provide the offset despite believing that it had no legal obligation to do so. Exxon maintained (and continues to maintain) that at all times it set its wholesale prices in good faith. Exxon also sought to limit or bar individual class member claims through the application of statutes of limitation, thousands of form releases signed by terminated dealers, and by the superceding contract clause of the standard form sales agreement.

### b.   The Jury Finds Liability and Breach and Awards Damages On a Cents Per Gallon Basis

The case was first tried in 1999, but the jury deadlocked and was unable to reach a verdict.  At the second trial in 2001, the jury found for the Class on every disputed issue.  The jury found that Exxon had a contractual obligation to offset credit fees with wholesale price reductions, that Exxon breached that obligation, and that the Class of dealers suffered money damages measured on a cents per gallon basis (on average, 1.3 cents per gallon).  The jury found that Exxon could not enforce the statutes of limitation because it had fraudulently concealed its breach.  The District Court rejected Exxon's attempt to limit or deny claims through the superceding contracts clause or releases.

The District Court also found that Exxon was liable for prejudgment interest based on the laws in each of the 35 states in which Exxon direct served dealer stores were located.

Following the jury's verdict, the Class requested entry of an aggregate final judgment for the full amount of money owed to the Class. The District Court denied the request, finding instead that each class member would be required to establish individual damages based on gallons purchased by filing a claim establishing ownership of a particular station during a particular time period during the Class period. By virtue of this ruling, Exxon would not be obligated to pay Class Members who failed to file a timely claim in the claims process.

### c.     The Jury's Verdict and District Court Rulings are Affirmed on Appeal

Exxon appealed to the United States Eleventh Circuit Court of Appeals, challenging the jury's verdict and the District Court's orders certifying the Class, rejecting the release and superseding contract defenses, awarding prejudgment interest, and exercising jurisdiction over claims less than $50,000. The Class appealed the District Court's order denying entry of an aggregate judgment for the Class.

After briefing and oral argument, a three judge panel of the Eleventh Circuit Court of Appeals rejected both sides' appeals, thereby affirming the jury verdict and the entitlement of each Class Member to damages in the claims process. Exxon's and the Class' requests for rehearing before the entire Eleventh Circuit were denied.

Exxon then sought review by the United States Supreme Court on two issues. The first was federal jurisdiction over claims less than $50,000, and the second was the District Court's decision to certify the Class. The Supreme Court rejected review of Class certification but agreed to review the extent of the District Court's jurisdiction, an issue that had divided the lower federal courts for over a decade.

The United States Supreme Court heard oral argument on March 1, 2005, and on June 23, 2005, rendered its decision affirming the District Court's exercise of jurisdiction over the claims of all members of the Class.

### 3.     The Claims Process

After trial and while the appeals were still pending, the District Court implemented a claims administration process for the purposes of processing individual class member claims for their respective share of the Class recovery. The Court approved a form of notice to the Class requiring each eligible Class Member to file a formal claim with the Claims Administrator by December 1, 2004 and to pursue that claim in an adversary damages proceeding against Exxon.

To manage the process of receiving, reviewing, and approving these claims for payment, the District Court appointed former United States District Judge Thomas Scott as Special Master and The Garden City Group, Inc. as Claims Administrator. As the party responsible for payment and as the potential beneficiary of any unclaimed funds, the Court ruled that Exxon is entitled to participate in the claims process and file objections to payment of individual claims.

As a consequence of the District Court's requirement that the litigation continue through the filing of individual dealer claims, Class counsel has, on behalf of the Class, participated in the claims

process in three distinct phases. The first phase involved the collection, digitizing and coding of all dealer records from Exxon's files. The second phase involved the location of Class Members or anyone who might claim rights through a Class Member, wherever they might be, to advise them of their right to collect these funds and assist Class Members in filing claims. The third phase is currently underway and involves the advancement of individual claims on a claim by claim basis to final judgment and, if successful, to payment.

### a.    Exxon Objects to All the Claims Filed, Asserts Set-Offs and Plans More Appeals

More than 11,000 claims were filed with the Claims Administrator by the claim filing deadline of December 1, 2004.

Exxon filed an objection to every claim, asserting that each Class Member's entitlement to recovery of damages and interest had yet to be resolved through the trial and appeals. Exxon announced its intention to appeal any judgments entered in the claims process based on the damages and interest determined at trial and the District Court's orders.

In addition, Exxon filed thousands of "set-off" claims in which it claimed that the DFC claim should be either reduced or eliminated altogether because of monies owed by former dealers to Exxon for such things as money paid upon signing of releases, fuel, accessories, rent or advances for station improvements.

Class counsel moved to sanction Exxon for these objections and for an order prohibiting Exxon from taking further appeals of any issues previously decided at trial and affirmed on appeal. The District Court granted the motion and entered an order sanctioning Exxon, restricting the objections Exxon could assert in the claims process, and narrowing the scope of Exxon's set-off claims. The District Court ruled that any appeals taken by Exxon of matters previously decided would impose upon Exxon a post-judgment interest rate equal to Exxon's internal rate of return on capital, which was 23.8 percent at the time the sanctions order was entered.

Exxon announced that it intended to appeal the sanctions order limiting its right to take further appeals. In addition, Exxon has continued to object to almost every claim filed in the claims process, requiring Class counsel to assist all claimants in establishing the validity of their claims. Exxon also has continued to assert approximately 650 set-off claims for damages totaling in excess of $40 million exclusive of interest.

Class counsel has moved for judgment against Exxon on all of the set-off claims. The Special Master has recommended allowing the claims, and Class counsel's appeal of that order to the District Court is pending.   Further appeal beyond the District Court is possible by the Class or Exxon.

### b.    Class Counsel's Effort to Categorize Claims to Facilitate Claims Administration

To facilitate claims administration, Class counsel has undertaken, with the approval of the Special Master, to advance the approximately 11,000 claims in an order that is based on the nature of objection that has been asserted. The first claims to be considered are those few hundred claims to which Exxon asserted minimal or no objections, requiring no further work on the part of the claimant. Those claims to which Exxon's objections can be resolved through moderate revision to the claim are to be processed next, followed by those for which Exxon's objections raise significant

legal or factual issues involving ownership (*e.g.*, dissolutions, bankruptcies, heir issues, and assignments).

With respect to those claims which compete with the claims of other dealers and at least one claim is valid, unless settled Class counsel is to identify the competing claimants in order that the dispute can be referred to the state court in which the underlying service station is located for determination and payment (a process legally referred to as interpleader).

### c.      Claims Filed After December 1, 2004

Nearly 200 claims were filed after the December 1, 2004 claim filing deadline. Exxon moved to strike and deny all such late-filed claims. The Special Master recommended entry of an order permitting some and disallowing others, including barring any claim that was filed after April 27, 2005. Class counsel has appealed that recommendation to the District Court, and the appeal remains pending. Further appeal beyond the District Court is possible for the late claimants or Exxon.

### d.      Opt-Outs

Following certification of the Class and prior to trial, Exxon dealers were given the opportunity to "opt-out" of the Class. A number of dealers did so. Since the favorable outcome, however, some of the dealers who opted out of the Class have filed claims or expressed a desire to be allowed to do so. Exxon objects to these claims, asserting that the claims of all dealers who opted out are barred as a matter of law.

### e.      State Governments Claim on Behalf of Claimants Who Did Not File Claims

Relying on state unclaimed property statutes, 21 of the 35 states in which Exxon dealerships were operated filed claims against Exxon asserting entitlement to recover the unfiled claims on behalf of the claimants who did not timely appear. At least one state that did not file directly in the claims process has advised Exxon and the District Court that it intends to bring claims outside of this action against Exxon on behalf of dealers who did not do so. If the state claims are allowed and the states recover payment on behalf of absent Class Members, these Class Members may file claims with the states for recovery as provided by the states' unclaimed property laws or statutes.

Exxon objects to the states' assertion of claims on behalf of Class Members who failed to timely do so. The Special Master and the District Court have not yet resolved the issue of whether the states are entitled to assert claims for absent Class Members. If the settlement is not approved and Exxon's objections against the state claims are successful, Exxon would be entitled to retain all unclaimed funds as well as the funds associated with claims that are disallowed during the claims process. Further appeals of a decision on the states' filed claims is possible by any state or Exxon.

### f.      Motions for Entry of Individual Judgments and Potential Further Appeals

Since July 5, 2005, Class counsel has filed weekly motions seeking summary judgment on claims as to which there is no remaining evidentiary dispute with Exxon. The process is in its early stages. As of December 19, 2005, twenty-two motions for summary judgment have been filed with respect to approximately 1,300 claims for a total of approximately $330 million. Of those, the Special Master has in open session recommended entry of final judgment for approximately 680 claims, totaling approximately $195 million. The parties were in the process of resolving the form of

recommended orders and other procedures necessary to transition those orders to final judgment. Exxon has sought to structure the final judgments in a manner that would permit appellate review of individual awards, and further appeals could be filed by Exxon.

**4.     The District Court's Rulings on Class Members' Obligation for Payment of Attorneys' Fees**

      **a.     The District Court Determines that Class Counsel Are Entitled to an Award of Attorneys' Fees as a Percentage of Payments Made to Class Members With Stores in 32 States**

The District Court has ruled that with respect to Class Members whose stations were located in states other than Texas, Arizona, and Arkansas, Class counsels' attorneys' fees shall be paid by deducting from each Class Member's payment a fixed percentage determined by the District Court. Class counsel have agreed the percentage shall not exceed 33 and 1/3 percent. The District Court has not yet determined the percentage to be awarded.

      **b.     The District Court Determines That Class Members in Texas, Arizona and Arkansas Are Entitled to Have All or Part of Their Attorneys' Fees Paid By Exxon**

With respect to Class Members whose stores were located in Texas, Arizona or Arkansas, the District Court has ruled that the laws of those states entitle those Class Members to require Exxon to pay at least a portion of their attorneys' fees in addition to its obligation to pay damages and prejudgment interest. Exxon has stated it intends to appeal that order, and has also argued that any liability for these attorneys' fees should be measured by a different criterion than that applicable to the percentage awarded for attorneys' fees in the other 32 states.

In the event the District Court's award of fees against Exxon for Class Members from these states is less than the percentage awarded for the other 32 states, Class counsel have requested that the District Court order these Class Members to pay the difference, such that Class Members from all states have equal responsibility for payment of Class counsel's attorneys' fees.

      **c.     The District Court Extends the Time for Objection to Awards of Attorneys' Fees and Incentive Awards**

The District Court previously established a schedule for Class counsel and the Class Representatives to seek compensation for their services and recovery of their costs and for Class Members to assert objections to those petitions. Those petitions were filed. No objections were made. Subsequently, the announcement of this Settlement Agreement was made, causing the District Court to extend the time for objections to be made to the petitions for attorneys' fees and incentive awards.

**5.     Terms of the Proposed Settlement**

Following are the terms of the proposed settlement. The settlement compromises certain aspects of the interests of each of the various parties with a stake in these proceedings.

### a.    Settlement Fund and Exxon's Waiver of Objections and Appeals

If approved by the Court, this settlement will require Exxon to wire funds in the amount of $1,075,000,000 (the "Total Settlement Proceeds") to an account at a banking institution approved by the Court (hereinafter, the "Exxon DFC Class Action Account" maintained at the "Exxon DFC Depository Institution"). Of this amount, $1,060,000,000 will be designated for payment of claims (the "Settlement Fund") and $15,000,000 will be designated for payment of the attorneys' fees owed by Exxon for Class Members whose stores were located in the states of Arkansas, Arizona, and Texas (the "Three State Fund").

If, after all appeals have been exhausted, the settlement is finally approved, Exxon shall waive and relinquish all objections and appeals to all claims.

### b.    Release to Exxon

Upon payment and final approval of the Agreement including affirmance on appeal if an appeal is taken, Exxon will be released and discharged from any and all further liability for any and all causes of action, judgments, liens, indebtedness, costs, damages, obligations, attorneys' fees, losses, claims, liabilities and demands of whatever kind or character that are related to the cause of action that was adjudicated in this lawsuit.

### c.    Claims Process

The claims adjudication process will go forward before the Special Master to adjudicate each Proof of Claim that was postmarked on or before December 19, 2005, including those claims that were filed after the claims filing deadline of December 1, 2004 and including those claims that were filed by members of the Class who previously had opted out (if they filed claims prior to December 19, 2005).

Upon final approval of the settlement by the trial court and expiration of the time to appeal or final affirmance by all appellate courts, Exxon will no longer participate in the claims adjudication process, except that Exxon will be available to respond to inquiries by Class counsel regarding the need for additional documentation, revised answers to claims, details regarding station ownership, etc.

Throughout the duration of the claims process, Class counsel will remain responsible for designating and presenting all claims for adjudication before the Special Master on a rolling basis, marshaling the supporting documentation that may be available for each claim, and identifying those gallons as to which there are competing claims requiring decision by the Special Master.

### d.    Two Percent (2%) Reduction and Five Percent (5%) Reserve from Claims

If this settlement proposal is approved as herein proposed, each successful claim filed by a claimant by December 19, 2005 will be reduced by two percent (2%). In addition, when a claim is ordered to be paid, a five percent (5%) reserve will be taken from each claim to ensure that sufficient funds will exist at the end of the claims process to fund all claims timely filed by December 19, 2005 and determined to be valid. Payment of that reserve will be made only if sufficient funds exist at the end of the claims process to allow it to be paid and only in the amount of the funds then available. Although Class counsel estimates that there will be sufficient funds remaining at the end of the claims

process to refund the 5% reserve in full with interest calculated as provided herein, this estimate is based in part on an expectation that some percentage of the filed claims will be disallowed or reduced. There can be no assurances that this will turn out to be the case. Thus, until the end of the claims process, claimants will be paid 93% of their awarded recovery less deductions for attorneys' fees, costs, expenses and incentive awards.

Class Members' actual recovery will depend on the District Court's award of attorneys' fees to Class counsel. Two of the law firms serving as Class counsel, Stearns Weaver Miller and Pertnoy Solowsky & Allen, have proposed that the fee award should be reduced in consideration of the lessened risk arising from the proposed settlement with respect to the legal services that must continue to be provided in the claims process. That is, they have proposed that whatever fee award the District Court would otherwise have given to them, that fee should be reduced so that the 2% reduction in claims would be fully offset with fee reductions. If the District Court accepts the proposal from these firms, the reduction in fees would minimize or eliminate the practical consequence of the two percent (2%) reduction from each claim.

e.   **Termination of Prejudgment Interest and Funding of Costs of Claims Process**

Effective October 31, 2005, prejudgment interest will cease to accrue on each and every claim. The claims adjudication process will also establish a date for the accrual of prejudgment interest in the event that the settlement is disapproved on appeal, which date shall be thirty days after the date of the issuance of a report recommending entry of judgment in favor of a claimant, after which postjudgment interest will accrue. This provision will survive any reversal of the settlement unless it is specifically overturned on appeal.

f.   **Use of Interest Earned on the Settlement Fund for the Claims Process and to Add to the Settlement Fund**

Interest that accrues on the money held in the Exxon DFC Class Action Depository Account will be utilized to fund the costs of the claims administration process, including the payment of fees of the Special Master, the fees of the Claims Administrator, the fees and costs of the attorney(s) appointed on behalf of the state governments or Exxon as discussed below, all bank and transaction fees (collectively, the "Claims Adjudication Costs"), and any and all taxes on interest or investment income earned by the Settlement Fund. Any interest that is earned but not expended on Claims Adjudication Costs including taxes will be added to the Settlement Fund to be disbursed as otherwise provided in the Agreement.

g.   **Interest Earned on Reserved Funds**

If there is a surplus in the Settlement Fund after the last claim is adjudicated and paid (or sooner as otherwise provided in the Agreement) and after the five percent (5%) reserve has been paid in full to each claimant, to the extent funds are available in the Settlement Fund, an additional amount will be paid to each claimant equal to a pro rata share of five percent (5%) of the net interest earned on the Settlement Fund not to exceed three percent (3%) per annum, non-compounded. Net interest is the sum of all interest earned on the Settlement Fund less the Claims Adjudication Costs and any taxes or fees. The pro rata distribution will be based on the amount of each award as compared to the sum of all awards to all claimants. The three percent (3%) maximum rate of interest will be calculated on five percent (5%) of every claim from the period November 1, 2005 until the date that the five percent (5%) reserve is paid.

### h.   Exxon's Set-Off Claims Abandoned

If after all appeals have been exhausted, the settlement is finally approved, all of the thousands of set-off claims raised by Exxon in the claims process will be dismissed with prejudice.

### i.   Appointment of States' Counsel; Residual Funds Go to the States as Unclaimed Property

(i) Exxon's departure from the claims process will eliminate a role that it has heretofore filled — screening claims to challenge invalid claims in the claims process.  Class counsel cannot fulfill this role because it cannot take a position adverse to claiming Class Members.  The Claims Administrator, The Garden City Group, Inc., also cannot fulfill this role because it is acting in a neutral capacity as an arm of the District Court, as is the Special Master.  The governments of the 35 states (which includes Washington, D.C.) who have an unresolved claim to any monies not claimed by Class Members in the claims process, however, have a sufficient interest and the proper incentives to fulfill this role.  In particular, under the various states' unclaimed property laws, Class Members who did not assert a claim in the claims process may come forward at any point in the future to assert a claim with their respective states.  Thus, the states have no incentive to needlessly oppose or unduly delay payment of valid claims.

(ii) To fill the role that will be vacated by Exxon after the settlement becomes final (including approval by the District Court and final resolution of all appeals), upon the application of the States of New Jersey, Virginia, and Florida recommending appointment of a designated law firm or firms, the District Court shall appoint States' counsel to participate in the claims process on behalf of the collective interests of the interested state governments who will fully participate in the claims process, have legal standing to object to claims, assist in the resolution of conflicting claims, and facilitate the settlement of disputed claims (which settlements will resolve with finality the right to claim the gallons at issue).  States' counsels' attorneys' fees and expenses, as approved by the Special Master and District Court, shall be paid from the interest income earned on the Exxon DFC Class Action Depository Account.

(iii) Any money remaining in the Settlement Fund or the Three State Fund after adjudication and payment of all claims including payment in full of the 5% reserve together with interest earned thereon, taxes, and Claims Adjudication Costs will be disbursed pro rata to the 35 state governments in which the Class Member stations were located.  Any Class Member who did not submit a Proof of Claim on or before December 19, 2005 will be able to make a claim directly to the appropriate state government pursuant to that states' applicable unclaimed property statute or law.  The value of such a claim will be derived from the difference between the amount of the residual fund and the total of all claims that were not timely asserted.

(iv) If at any time during the Claims Adjudication Process it appears that the amount held in reserve exceeds the total value of all remaining claims and there are sufficient funds available to complete the Claims Adjudication Process, a motion can be made to accelerate disbursement of all or part of the funds held in reserve.  Upon recommendation of the Special Master, the District Court may under such circumstances accelerate payment of all or part of the reserve pro rata among the claimants from which those funds were withheld.

**j.     Special Master to Resolve All Claims Except as Specifically Provided**

The settlement provides that all claims, including disputes between competing claimants, must be adjudicated under the jurisdiction of the United States District Court for the Southern District of Florida pursuant to the authority and supervision of the Court and cannot be interplead to other courts unless ordered by the Special Master as provided in the Agreement. Any and all third-party liens, garnishments, attachments, and other claims against Exxon must be brought as part of this litigation and cannot be brought against Exxon in any other court of law or jurisdiction. Jurisdiction and venue for the resolution of any disputes between claims filing services or attorneys providing claims services (other than Class counsel) and any claimants that have contracted with them is a matter of disagreement that is neither addressed nor resolved in connection with the Agreement. This means that with the exception of interpleader actions brought as provided in the following paragraph, and the possible exception of actions to resolve disagreements between claimants and claims filing services or non-Class counsel, all other litigation arising out of any issue related to this case must be decided under the jurisdiction of the United States District Court for the Southern District of Florida.

**k.     Interpleader to State Courts of Some Claims**

On the motion of all claimants who seek recovery of damages on the same gallons purchased during the Class Period, the Special Master may order interpleader of the dispute subject to the provisions of the Agreement.  Any reference of a dispute to a state court shall provide that the movants have agreed that (i) no discovery shall be directed to Exxon but instead shall be directed to Class counsel who will coordinate the production of dealer records from Exxon's files as otherwise provided in the Agreement as if the dispute was being resolved by the Special Master; (ii) the Special Master will address and resolve any discovery disputes directed to Class counsel for dealer records; (iii) the monies involved in such disputes shall be retained in the Depository Account until a final judgment is entered in favor of one or more of the competing claimants and either the time for appeal has passed without an appeal being brought or, if an appeal is brought, upon disposition of that appeal affirming the final judgment; and (iv) no interpleader action shall establish greater rights to recovery by any claimant than otherwise would exist in the claims process.

**l.     Limited Appeals From Claims Decisions**

Any party seeking to recover monies in the claims process will be entitled to due process before a Special Master and review of any decisions following that process by appeal solely to the District Court.   There will be no appellate review of decisions of the District Court with respect to claims decisions.

**m.    Authority of the States' Counsel to Recommend Discounts of Claims Where Disputed Legal or Factual Issues Exist**

To facilitate the claims process, the States' counsel (which will not be appointed until such time as the settlement is finally approved at the trial and appellate level) will be empowered to recommend to the Special Master agreed-upon discounts of claims in recognition of the risk of litigation of those disputes in the claims process. The amount of any negotiated and approved discount will remain in the Settlement Fund to enhance the probability of excess funds in the Settlement Fund upon the adjudication of all claims.

n.    **Mediation**

Where requested by the parties or ordered by the Special Master, parties to contested claims will be directed to mediation to attempt to resolve disputes. It is anticipated that the Special Master will order mediation of most contested claims.

o.    **Procedure to Be Employed If Approval of Settlement Is Appealed**

If the settlement is approved by the District Court and is appealed, the claims process will continue while the appeal is pending. Claims will continue to be processed from reports and recommendations of the Special Master for entry of judgments against Exxon on behalf of Class Members during the pendency of any such appeal. However, the time to object to reports and recommendations will be extended, final judgments will not be entered and payments will not be made until after all appeals are resolved. Expenses of the ongoing claims process during an appeal, including those of the Claims Administrator, the Special Master, mediator(s), and Exxon's counsel costs and fees, will be paid out of the interest or investment income earned by the Settlement Fund, subject to approval of the Special Master and review by the District Court. If approval of the settlement is not affirmed on appeal, the entire then-existing balance of the Settlement Fund will be returned to Exxon, and the claims process will continue in its entirety. If approval of the settlement is affirmed on appeal, and no further review is sought, the District Court will immediately enter orders directing payment from the Settlement Fund on the claims approved by the Special Master according to the terms of the Agreement, there will be no possibility of further appeal, Exxon and its counsel will have no further role in the claims process, and the counsel appointed by the states will begin participating in the claims process as discussed above.

6.    **Effect of Adoption of the Settlement Proposed**

a.    **Timely Filed Claims Reduced**

The settlement, if approved, will reduce the claims of Class Members in two ways: (i) the two percent (2%) discount imposed on every claim, and (ii) termination of the accrual of interest on all but 5% of the claim as of October 31, 2005. Some part of that reduction, however, could be mitigated through the District Court's award of attorneys' fees. That is, recognizing the reduction in Class counsels' risk of payment in the claims process resulting from Exxon's payment of a sum certain, the District Court may choose, as proposed by some Class counsel, to reduce the attorneys' fees that it might have otherwise awarded if Exxon continued to participate in and contest claims in the claims process. This would reduce the adverse financial impact on claimants from the settlement.

With respect to prejudgment interest, the magnitude of foregone interest will be determined by the length of time it will take for a claim to be adjudicated and paid. The shorter the time, the lesser the impact. The longer the time, the greater the impact. Because the more complicated claims likely will be resolved later in the claims process, the accrual of interest for purposes of paying the ongoing expense of the claims process will correspond with the cost of the additional resources required to adjudicate the more complicated claims.

The additional reserve of five percent (5%) of each Class Member's recovery until the end of the claims process is also potentially at risk of non-payment depending on the magnitude of the total payout on all claims. Moreover, the length of time required to determine whether the reserve will be paid will depend on the length of time required to complete the adjudication of all claims. If there is a

surplus in the Settlement Fund at the time the last claim is adjudicated and paid, and if there remains in the Settlement Fund interest earned on the Fund after payment of Claims Adjudication Costs, taxes and fees, five percent (5%) of the net interest earned not to exceed 3% non-compounded per annum will be distributed pro rata among the claimants from whom the reserve was taken.

### b.    Claims Filed After December 19, 2005 Will Be Reduced

Because the claims process will be limited to claims filed on or before December 19, 2005, any recoveries sought after that date would have to be asserted to the state government where the dealers' station was located in accordance with that state's unclaimed property law. Whether there will be excess funds to distribute to state governments and the magnitude thereof will be uncertain until all filed claims are adjudicated and paid. Absent settlement, the Special Master's order (unless reversed by the District Court) bars all claims filed after April 27, 2005 and imposes standards on which claims received between December 15, 2004 and April 27, 2005 will be allowed.

### c.    The State Unclaimed Property Claims Will be Reduced

If the settlement is not approved and the 21 states that have filed claims prevail on the pending motions to claim all of the amounts not timely sought by their resident station owners and operators, then the states would recover all the unclaimed monies from those states. If the states that have filed claims are not successful, they would receive nothing on their claims and Exxon would retain all unclaimed amounts. The settlement creates the potential for all states to collect some unclaimed monies through the revised claims process. It is impossible to predict whether the 21 states would have prevailed on their efforts to claim the unclaimed funds or whether if those states were successful, the District Court would allow the remaining states to also join the action by filing claims at some later time. Further, it is not possible to predict the nature, length, or outcome of any appeals from the states' claims.

### d.    Claims Process Should be Accelerated

Elimination of Exxon from the claims process is believed by Class counsel to be one of the most important elements of the proposal. It is believed that this should substantially shorten and facilitate the claims process and improve the likelihood of successful resolution of many of the claims to which Exxon has raised vigorous objection. The extent to which this will occur will likely turn on the manner in which the states pursue their interests in the claims process. There is no certainty as to how much, if any, of the sums distributed to the states will actually be paid to Class Members under state unclaimed property laws.

### e.    The Beneficiary of Failed Claims Will Not be Exxon

To the extent that claims were not brought by persons entitled to collect the sums due, these funds would add to the Settlement Fund and increase the probability of a surplus after all claims are adjudicated. The money would not be returned to Exxon. Instead, the beneficiary of failed, reduced or abandoned claims would be the states on behalf of claimants who did not timely assert claims for recovery.

f.  **The Successful Resolution of Claims and the Negotiation of Settlements of Complicated or Technically Deficient Claims Would be Enhanced**

The absence of Exxon from the claims process should enhance the successful resolution of claims and also allow for negotiated settlements including discounted payment of complicated and technically deficient claims on an expedited basis.

g.  **Claims Administration Would No Longer Be Funded by Exxon**

Upon payment, claims administration costs, including costs and fees due to the Special Master, to the Claims Administrator, to any mediator(s), and to Exxon's counsel, would be funded by interest or investment income on the Settlement Fund, and Exxon would no longer be responsible for those costs. Participation of the state's counsel in the claims process would be limited until such time as the settlement is finally approved at the trial and appellate level. Upon such time as the settlement is finally approved at the trial and appellate level, the costs and fees of the states' counsel would be funded by interest or investment income on the Settlement Fund, and Exxon's counsel would no longer be involved.

h.  **An End to Fourteen Years of Acrimonious Litigation with Exxon**

Exxon is a large company with substantial resources. It has vigorously litigated every phase of this dispute over fourteen years. If this proposal is not approved, Exxon has stated that it will continue to litigate (including through appeals) for years to come and continue to rigorously assert every available objection to claims in the claims process (including particularly those involving corporate dissolutions, bankruptcies, assignments, and inheritances), putting at risk the claimants' ability to recover on thousands of claims that present these issues. Exxon also has challenged the claimants' entitlement to prejudgment interest, which generally constitutes more than half of the value of each claim.

i.  **The Requirement that Class Counsel Continue To Prosecute Claims**

Pursuant to the terms of the settlement, Class counsel will continue to have a significant role in the claims administration process. All claims will be designated and presented for adjudication by Class counsel on a rolling basis. The less complicated claims will be resolved before the more complicated claims. While claimants will continue to be free to retain any other attorney at their own expense (and may be required to do so with respect to disputes among claimants), all requests for information or documentation from Exxon must be coordinated through the offices of Class counsel. Class counsel has in place a large staff of attorneys, paralegals and other professionals to assist claimants in prosecuting their claims and will stay in that role for the duration of the claims process.

7.  **Cash Available from the Settlement Fund and Interest Income to Satisfy Claims and Support Claims Administration**

The total of all claims timely filed, including those filed prior to December 19, 2005 and opt-outs, is estimated to be between $1.050 billion and $1.1 billion, with prejudgment interest terminating as of October 31, 2005. If all of those claims were found to be valid, assuming the accuracy of the $1.1 billion estimate, the $1.060 billion fund to pay claims would have a shortfall of approximately $40 million.

Once the Settlement Fund is deposited in an income-producing account, it will begin generating additional money for the Settlement Fund from interest or investment income. Expenses will be charged against that interest income, including income taxes on interest earned on the Settlement Fund, fees payable to the Special Master, the Claims Administrator, mediator(s) and the appointed states' counsel (or Exxon's counsel during the pendency of any appeal), and general administrative expenses of the DFC Class Action Depository Institution and for claims administration. The interest or investment income that will be earned on the Settlement Fund will be affected by the length of time the Funds are held on deposit, the volume and timing of reductions in the Fund over time, and the interest that will be earned based on market conditions.

As summarized in the table below, reducing each claim by 2% reduces the total potential value of all claims by approximately $22 million. That reduces the maximum shortfall to approximately $18 million. A reserve of 5% of all claims reduces the cash outflow by a total of approximately $55 million, leaving an estimated surplus cash amount (exclusive of the monies that may accrue in the Settlement Fund) of approximately $37 million before interest or investment income net of the costs of claims administration and income taxes.

| | |
|---|---|
| Total claimed dollars (maximum currently estimated) | $ 1,100 million |
| Total Settlement Fund (excludes $15 million for Three State Fund) | - $ 1,060 million |
| **Potential shortfall** | **$ 40 million** |
| | |
| 2% reduction of all claims | $ 22 million |
| 5% reserve on all claims | + $ 55 million |
| **Amount maintained in Fund due to reduction/reserve** | **$ 77 million** |
| | |
| Amount maintained in Fund due to reduction/reserve | $ 77 million |
| Potential shortfall | - $ 40 million |
| **Estimated surplus** | **$ 37 million** |

Class counsel and Exxon estimate that a certain percentage of the claims presenting complicated ownership issues will be disallowed or reduced. The estimates of the magnitude of this reduction range from tens to hundreds of millions of dollars. Although these estimates are formed by people with substantial knowledge of the thousands of claims, there is no certainty as to the magnitude of claims that will be denied or compromised. Thus, the 2% reduction and 5% reserve is required to ensure funds are available to pay substantially all claims and there may not be sufficient funds left in the Settlement Fund at the conclusion of the claims process to repay all or part of the 5% reserve from each claim.

As summarized in the table below, the $37 million estimated surplus is $18 million short of allowing for a full repayment of the 5% reserve.

| | |
|---|---|
| 5% reserve on all claims | $ 55 million |
| Estimated surplus | - $ 37 million |
| **Shortfall in ability to fully fund the 5% reserve** | **$ 18 million** |

Class counsel believes that this $18 million shortfall (to the extent it exists, which it may not if the estimate of claimed dollars of $1,100 million proves to be higher than actual) will be recouped fully due to disallowed claims, abandoned claims, and/or interest accrued net of expenses, allowing

for a full repayment of the 5% reserve. However, there are no guarantees that this will be the case. For example, if the surplus instead remains at $37 million, approximately 3.4 of the 5% reserve would be refunded. All claims will be reduced by 2%, regardless of whether a shortfall exists.

## 8.   Class Counsel Recommends Approval of the Settlement Proposal

Class counsel has entered into this settlement after fourteen years of litigation, and Class counsel recommends that it be approved, because Class counsel believes that it is highly advantageous to the Class and presents many significant benefits over continued litigation with Exxon. Class counsel believes that the reduction in recoveries contemplated in this proposal are modest, particularly when compared to the substantial benefits that will be conferred on the Class as a whole.

Exxon will be removed from the claims process and Exxon's right to appeal any aspect of the case (to the extent such a right exists), including the entitlement of individual Class Members to recovery, will be terminated by the settlement. As a result, immediately upon orders approving and directing payment on particular claims and the receipt of a satisfaction and payment instructions from claimants, the money owed to claimants can be paid out and there will be no risk that any aspect of the case will be overturned on appeal.

Moreover, the relatively small magnitude of the discount should be compared to the outcome of most other class actions. Few if any class actions are tried to a jury. Fewer still are appealed all the way to the Supreme Court. Unlike here, studies report that the average federal class action settlement provides class members less than ten percent of the amount sought in the litigation. And in most class actions that do result in payment, fewer than fifty percent of the class seeks recovery of the monies owed to them.

In contrast, under the proposed settlement, Class counsel's view is that, even after the reductions contemplated in this proposal, Class Members will recover all of their compensatory damages, with a small reduction in the recovery of prejudgment interest much of which claimants would not have been entitled to in any event if the Court had entered an aggregate judgment after trial, with no further litigation risk or appellate delay. They believe that the recovery in this case, even after this modest reduction, establishes an unprecedented success.

From the standpoint of the state governments, the settlement represents a compromise of the potential interests of the 21 states who submitted claims asserting the right to unclaimed funds pursuant to their unclaimed property statutes. While the potential amount available to the 21 states is reduced, perhaps substantially, from the amount that would be available if the settlement does not proceed, the rights of the states to claim this money has been aggressively challenged by Exxon, and it is not known whether the Court would have allowed the states to assert claims and recover at all. Also, the outcome of an appeal from any decision involving the states or the time involved is uncertain. Accordingly, although the amount of the state claims is less than the total of all abandoned claims, the certainty of recovery that would be provided by this settlement is beneficial to the states and to any Class Member who might eventually seek to make a claim against the states for monies obtained and held on their behalf. Because of the aggressive efforts made by Class counsel and others to locate claimants and obtain a high claim before the claim filing deadline, it is anticipated that the number of additional claimants who come forward in the future will be small, and that the amount of money made available to the states will be significantly greater than the amount claimed by any rightful owners in the future.

With regard to those claimants who filed a Proof of Claim after the December 1, 2004 deadline, this settlement is highly advantageous because it allows these claims to go forward so long as they were asserted before December 19, 2005. The Special Master previously ruled that any claim received between December 1, 2004 and April 27, 2005 would only be allowed upon a showing of excusable neglect, and that any claim received after April 27, 2005 would not be allowed at all. If the settlement is approved, this order would no longer be applicable.

Likewise, the settlement is advantageous to those approximately 650 claimants against whom Exxon filed a set-off claim. These set-off claims are asserted against claimants based on Exxon's claim that these claimants owe Exxon for unpaid rent, unsatisfied amortization agreements, unpaid motor fuel, and other reasons related to the operation of dealer stations, and they range in amount (excluding interest) from a few hundred dollars to as much as almost $400,000 (although none can exceed the amount of the Class Member's claim). If the settlement is approved, Exxon will not pursue these set-off claims, which eliminates the possibility that affected claimants' recoveries would be reduced, and also avoids requiring these claimants to litigate what would otherwise be mini-trials on the set-off claims.

For claimants whose stations were located in the 32 states other than Arizona, Arkansas, and Texas, the effect of the settlement, if any, on the liability for attorneys' fees, costs, expenses, and Class Representatives' awards (defined above as the "litigation expenses") will be resolved by the District Court. Just as would be the case if the settlement is not approved, the Court will conduct a hearing to determine what will be awarded to cover these litigation expenses, and Class counsel has agreed that the amount of attorneys' fees will not exceed 33 1/3% (as they have agreed would be the case if the settlement is not approved).

For claimants whose stations were located in Arizona, Arkansas, and Texas, this settlement will compromise the claim that Exxon pay attorneys' fees on their behalf. The District Court previously ruled that pursuant to the laws of these states, attorneys' fees may be shifted to Exxon. Exxon has taken the position that this ruling is erroneous, and if the settlement is not approved, it remains possible that it could be overturned, in which case claimants from these states would be solely responsible for fees payable out of their recovery. In addition, Exxon has asserted that the applicable statutes require payment of attorneys' fees in an amount proportionately less than that owed by the Class as a whole. If the settlement is not approved and Exxon is successful in asserting this position, claimants from these states would be responsible for paying the difference between the percentage fee awarded by the Court for other claimants and the percentage paid by Exxon. Of course, it is also possible that the Court's determination of the entitlement to fee-shifting would be affirmed, on appeal, and that the Court would award fees against Exxon in the same amount as against the Class, in which case the claimants from these states would have no responsibility for attorneys' fees at all absent settlement. Accordingly, the settlement represents a compromise of the amount of fees to be paid by Exxon in exchange for the certainty of some recovery of fees. It provides that Exxon will pay $15 million into the Fee-Shifting Fund, to be allocated to claimants proportionally based on the amount of gallons they sold relative to the total gallons sold in the three states. This Fund is expected to pay approximately 10% of each claimant's recovery towards attorneys' fees (the precise percentage is to be determined, and may be less than this amount), with any remaining fees that may be awarded by the Court to be paid by the claimants through pro rata deductions from their recovery.

As stated above, there may be other benefits or detriments of the settlement as applied to individual circumstances. You should carefully consider all the terms of the settlement in determining whether to object to it.

## 9.    Class Representatives Recommend Approval of the Settlement

Class Representatives Alberto Gonzalez, Robert Lewis and John Pinder strongly support approval of the settlement. In our view, this settlement will benefit the Class greatly and will assist in bringing to an end this hard-fought case. We believe that obtaining a $1.075 billion payment from Exxon is an extraordinary result, and that eliminating Exxon's further involvement in the case will substantially improve the claims process and will prevent Exxon from causing any further harm to dealers who have waited a long time to obtain the money that is due to them. Class counsel has worked zealously throughout this case with great results, and in entering into this settlement on behalf of the Class, have achieved an unprecedented recovery for the members of the Class. We recommend quick approval of the settlement.

Class Representatives Paul Bove, Mickey Cook, George Dalton, Richard Durishin, Bill McGillicuddy, and David Wise support approval of the proposed settlement because it is likely to produce a quicker and larger net recovery for the Class as a whole than would continued litigation against Exxon. After learning of the proposed settlement, we worked closely with Class counsel and proposed several changes to the settlement. The parties agreed to some of the changes, which have made the settlement more beneficial to the Class. The parties did not accept other changes we proposed. We have concluded, however, that the overall benefits to the Class outweigh the disadvantages of particular terms. In considering whether to object to the settlement, Class Members should note that the Agreement will be more beneficial to the Class if it is approved and implemented quickly, thereby diminishing the impact of the termination of prejudgment interest. The net benefits of the settlement could be dissipated by a protracted approval process.

## 10.    Examples of Application of Settlement

In order to demonstrate the application of the settlement on a typical class member claim, following are two examples for representative Class Members with claims of $100,000 in compensatory damages and prejudgment interest through October 31, 2005. The first is for a store location in one of the 32 states, and the second is for a store location in Texas, Arizona, or Arkansas. The attorneys' fee, cost, and named plaintiff incentive awards are assumed to be the maximum requested, although the District Court might award less.

### a. Example of Class Member With $100,000 Claim from 32 States

| | Without settlement (assumes certainty of recovery, which is disputed for most claims, and assumes no further interest accrual[2]) | With settlement (certainty of recovery is ensured) |
|---|---|---|
| **Total Claim Amount** | **$100,000** | **$100,000** |
| – less 2% reduction | 0 | ($2,000) |
| – less 5% reserve | 0 | ($5,000) |
| – less attorneys' fees | ($33,333)[3] | ($31,300)[4] |
| – less .5% litigation costs | ($500) | ($500) |
| – less 1.5% class rep award | ($1,500) | ($1,500) |
| **Initial Payment** | **$64,667** | **$59,700** |
| Potential 5% reserve payment | n/a | $0 to $5,000 |
| **Total Potential Payment** | **$64,667** | **$59,700 to $64,700** |

---

[2] Attached as Exhibit A is a table setting forth the effect of settlement with estimated prejudgment interest included over various time horizons.

[3] This assumes that the District Court awards Class counsel a fee of one third of the total recovery. One of the firms serving as Class counsel, Stearns Weaver Miller, has argued that the maximum fee should be less even if the settlement is not approved.

[4] Assumes proposed 2% reduction in Class counsel's fees, from 33 1/3% to 31 1/3%, to be utilized to increase the Settlement Fund.

b.    **Example of Class Member With $100,000 Claim from Texas, Arizona or Arkansas**

|  | **Without settlement (assumes certainty of recovery, which is disputed for most claims, and assumes no further interest accrual)** | **With settlement (certainty of recovery is ensured)** |
|---|---|---|
| **Total Claim Amount** | **$100,000** | **$100,000** |
| – less 2% reduction | 0 | ($2,000) |
| – less 5% reserve | 0 | ($5,000) |
| – less attorneys' fees | ($33,333)[5] | ($31,300)[6] |
| – less .5% litigation costs | ($500) | ($500) |
| – less 1.5% class rep incentives | ($1,500) | ($1,500) |
| **Initial Payment** | **$64,667** | **$59,700** |
| Exxon fee-shifting obligation | To be determined (range of $0 to $33,333) | $10,000 |
| Potential 5% reserve payment | n/a | $0 to $5,000 |
| **Total Potential Payment** | **To be determined** | **$69,700 to $74,700** |

c.    **The Effect of Stopping Prejudgment Interest as of October 31, 2005**

The Agreement would terminate prejudgment interest on all claims as of October 31, 2005. Interest on the funds taken as a reserve will depend on the availability of a surplus in the Settlement Fund after all claims are adjudicated and paid. Although the average interest rate among all of the 35 states is now approximately 8%, the rate significantly varies from state to state. In most states, prejudgment interest is calculated only on the damage portion of the award, as interest does not compound. Thus, the ratio of damages to prejudgment interest on any claim varies significantly based on the age of the claim and the state in which the dealer was located. Because of all of these variables that would affect the calculation of prejudgment interest, it is not considered possible to provide simple illustrations of the impact of terminating interest as of October 31, 2005. Some examples for different scenarios are available at www.exxondealerattorneys.com (Class counsel's web site).

---

[5] This assumes that the District Court awards Class counsel a fee of one third of the total recovery. One of the firms serving as Class counsel, Stearns Weaver Miller, has argued that the maximum fee should be less even if the settlement is not approved.

[6] Assumes proposed 2% reduction in Class counsel's fees, from 33 1/3% to 31 1/3%, to be utilized to increase the Settlement Fund.

23

### d.   Class Members Who Executed Agreements with Claims Services

The recoveries of any Class Member who is subject to a valid fee agreement with a claims filing service or with independent counsel would be further reduced by the amount of that fee.

## 11.   Procedure for Consideration of the Settlement

This settlement is subject to approval by the District Court, and Class Members or those claiming the interest of Class Members have the right to object. If you fail to object, or if the settlement is approved over your objection, you will be bound by its terms. You may retain a lawyer of your own choosing to represent you in this proceeding. Retention of a lawyer will be at your own expense and you may not seek reimbursement of your fees or expenses from Exxon, the Class, or Class counsel.

Any member of the Class or person claiming the interest of a member of the Class may appear at the Hearing scheduled for April 5, 2006 at 3:00 p.m. in the Courtroom of the Honorable Alan S. Gold, United States District Court Judge, Southern District of Florida, U.S. Courthouse, 301 North Miami Avenue, Room 1017, Miami, Florida 33128. Appearances may be in person or by counsel and may be heard in support of or in opposition to the settlement in the manner and to the extent allowed by the Court; provided, however, that any person who seeks to object to the settlement must file written notice of the intent to object on or before March 24, 2006, by taking the following steps:

(a) file with the Clerk of the Court, United States District Court – Southern District of Florida, 301 N. Miami Avenue, Rm. 150 Miami, Florida 33128, a written notice of your intention to appear in opposition to the settlement; and

(b) simultaneously serve copies of such notice together with all other papers or briefs such person files with the Court in person or by mail upon Class counsel and Exxon's counsel, delivered or postmarked by March 24, 2006 to the following addresses:

Attorneys for Plaintiffs:

Eugene Stearns
STEARNS WEAVER MILLER
WEISSLER ALHADEFF & SITTERSON, P.A.
150 West Flagler Street, Suite 2200
Miami, FL  33130

Attorneys for Exxon:

Robert Burlington
BURLINGTON, WEIL, SCHWIEP,
   KAPLAN & BLONSKY, P.A.
Office in the Grove, Penthouse A
2699 South Bayshore Drive
Miami, FL 33133

The Court will set a hearing for the purpose of determining whether and to what extent discovery may be allowed and to take such other action as may be necessary to coordinate and consolidate the proceedings in connection with said motions.

## 12.   Procedure for Consideration of Attorneys' Fees, Costs, and Named Plaintiff Incentive Awards

As a Class Member, you have the right to object to any petition seeking an award of attorneys' fees, costs or an incentive award from your recovery. You may retain a lawyer of your own choosing

to represent you in this proceeding. Retention of a lawyer will be at your own expense and you may not seek reimbursement of your fees or expenses from Exxon, the Class, or Class counsel. Any member of the Class may appear at the hearing in person or by counsel and may be heard in support of or in opposition to the petitions in the manner and to the extent allowed by the Court; provided, however, that any Class Member who seeks to object to the petitions must:

(a) file with the Clerk of the Court, United States District Court – Southern District of Florida, 301 N. Miami Avenue, Rm. 150 Miami, Florida 33128, a written notice of your intention to appear in opposition to the settlement; and

(b) simultaneously serve copies of such notice together with all other papers or briefs such person files with the Court in person or by mail upon Class counsel and Exxon's counsel, delivered or postmarked by March 24, 2006 to the following addresses:

Attorneys for Plaintiffs:

Eugene Stearns
STEARNS WEAVER MILLER
WEISSLER ALHADEFF & SITTERSON, P.A.
150 West Flagler Street, Suite 2200
Miami, FL  33130

Attorneys for Exxon:

Robert Burlington
BURLINGTON, WEIL, SCHWIEP,
    KAPLAN & BLONSKY, P.A.
Office in the Grove, Penthouse A
2699 South Bayshore Drive
Miami, FL 33133

The Court will set a hearing for the purpose of determining whether and to what extent discovery may be allowed and to take such other action as may be necessary to coordinate and consolidate the proceedings in connection with said motions. Notice of the date of the attorneys' fee hearing will be announced at the hearing to consider the settlement, and will be posted on Class counsel's web site at www.exxondealerattorneys.com, but will not be separately noticed.

## 13.    Additional Information

For more information about this case or the proposed settlement, you can visit the official Court-sponsored web site, www.exxondealerclassaction.com, which contains a Question and Answer discussion of the terms of the settlement and how your rights may be affected.  In addition, you can contact Class counsel at www.exxondealerattorneys.com or by telephone at 800-810-3590.

# EXHIBIT A

a.   **Example of Class Member With $100,000 Claim in State Paying 6% Interest**

| | With settlement (certainty of recovery is ensured) | Without settlement (assumes no appeal and certainty of recovery, which is disputed for most claims) | | |
|---|---|---|---|---|
| | | 6 months to payment | 18 months to payment | 36 months to payment |
| **Total Claim Amount**[1] | $100,000 | $101,235 | $103,706 | $107,412 |
| – less 2% reduction | ($2,000) | 0 | 0 | 0 |
| – less 5% reserve | ($5,000) | 0 | 0 | 0 |
| – less attorneys' fees | ($31,300)[2] | ($33,745)[3] | ($34,569)[3] | ($35,804)[3] |
| – less .5% litigation costs | ($500) | ($506) | ($519) | ($537) |
| – less 1.5% class rep award[4] | ($1,500) | ($1,519) | ($1,556) | ($1,611) |
| **Initial Payment** | $59,700 | $65,466 | $67,063 | $69,460 |
| Potential 5% reserve payment | $0 to $5,000 | n/a | n/a | n/a |
| **Total Potential Payment** | $59,700 to $64,700 | $65,466 | $67,063 | $69,460 |

_____

[1] Assumes compensatory damages represent approximately 41% of claim (consistent with case-wide average).

[2] Assumes proposed 2% reduction in Class counsel's fees, from 33 1/3% to 31 1/3%, to be utilized to increase the Settlement Fund. The Court may award a lesser percentage, which could minimize or eliminate any financial impact from the settlement.

[3] This assumes that the District Court awards Class counsel a fee of one third of the total recovery. The Court may award a lesser percentage. One of the firms serving as Class counsel, Stearns Weaver Miller, has argued that the maximum fee should be less even if the settlement is not approved.

[4] Estimated award.

b.   **Example of Class Member With $100,000 Claim in State Paying 8% Interest**

| | With settlement (certainty of recovery is ensured) | Without settlement (assumes no appeal and certainty of recovery, which is disputed for most claims) | | |
|---|---|---|---|---|
| | | 6 months to payment | 18 months to payment | 36 months to payment |
| **Total Claim Amount**[5] | $100,000 | $101,647 | $104,941 | $109,882 |
| – less 2% reduction | ($2,000) | 0 | 0 | 0 |
| – less 5% reserve | ($5,000) | 0 | 0 | 0 |
| – less attorneys' fees | ($31,300)[6] | ($33,882)[7] | ($34,980)[7] | ($36,627)[7] |
| – less .5% litigation costs | ($500) | ($508) | ($525) | ($549) |
| – less 1.5% class rep award[8] | ($1,500) | ($1,525) | ($1,574) | ($1,648) |
| **Initial Payment** | $59,700 | $65,732 | $67,862 | $71,057 |
| Potential 5% reserve payment | $0 to $5,000 | n/a | n/a | n/a |
| **Total Potential Payment** | $59,700 to $64,700 | $65,732 | $67,862 | $71,057 |

---

[5] Assumes compensatory damages represent 41% of claim (consistent with case-wide average).

[6] Assumes proposed 2% reduction in Class counsel's fees, from 33 1/3% to 31 1/3%, to be utilized to increase the Settlement Fund. The Court may award a lesser percentage, which could minimize or eliminate any financial impact from the settlement.

[7] This assumes that the District Court awards Class counsel a fee of one third of the total recovery. The Court may award a lesser percentage. One of the firms serving as Class counsel, Stearns Weaver Miller, has argued that the maximum fee should be less even if the settlement is not approved.

[8] Estimated award.

**THIS PAGE IS INTENTIONALLY LEFT BLANK**

# EXHIBIT C

>>> Eugene Stearns 11/30/2005 4:17:36 PM >>>
No problem.  My responses are in the following:

Eugene E. Stearns
Stearns Weaver Miller
Museum Tower
150 West Flagler Street
Miami, Florida 33130
(305) 789-3400

**Attention:  The information contained in this E-mail message is attorney privileged and confidential information intended only for the use of the individual(s) named above.  If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited.  If you have received this communication in error, please contact the sender by reply E-mail and destroy all copies of the original message.  Thank you.**

>>> "Reiser, David A." <DReiser@zuckerman.com> 11/30 1:15 PM >>>
Gene:  thank you for setting up the call.  Wondering if you can answer or investigate the following:

1.  If the 5% reserve were deemed to accrue interest at the existing prejudgment interest rate, that might ameliorate objections.  Is that feasible given your cash flow analysis?

**I do not believe it to be feasible in light of all of the constraints of the deal.  It is simply taking money from one pot and putting it in another.  Again, if members of the class want to fight about the five percent holdback and the loss of prejudgment interest they should do so but I believe the trade offs to be more than fair for the Class as a whole.  The only potential unfairness might be that the Class reps who were paid had no hold back.  I think if the Class reps offered to put 5% of the incentive award in the holdback pot it would make the trade offs more acceptable to the few who would complain.**

2.  What is the rationale for the 2% deduction?  (Understanding that it would be offset by reduction in fees).  If I have the numbers right, Exxon's estimate of total filed claims is $1.1 billion; its paying $1.075, of which $15 million is attributed to fees, leaving about $40 million difference between total claims and Exxon's payment, so the gap is slightly less than 4%, which should be easily covered by a 5% reserve.  I realize my math must be off somewhere.  I understand that Exxon pegs the TOTAL claims higher, at $1.18-119, so $80-90 million higher, but that number is relevant if and only if the claims filing deadline is extended.  It is unclear to me that timely filed claims should be reduced to allow for untimely claims, if that is the rationale.

**The 2% reduction reduces the overall total dollars sought in all claims by roughly $22 million.  That reduces the potential shortfall if every claim is paid and Exxon's math is correct as to the total and enhances the prospects that there will be a balance for the states.  I have resisted Wallis' suggestion that 2% be directly allocated to the states as that would reduce the probability of full recovery of the 5% holdback.  The 5% reserve is more that what will probably be needed. We proposed it at that level because, in our view, Judge Gold will insist on a substantial reserve.**

**With respect to timely and untimely filed claims based on an arbitrary date, we know that many of the claims filed after December 1, 04 have valid excuses for late filing and we have already fully briefed the issues as to many. We cannot rationalize a distinction. I cannot measure the significance of the difference as we do not yet have a total volume and damage figure for late filed claims to date and cannot know if additional claims will be filed based on the new bar date that will be a real bar date.**

3. I am trying to work up a simpler costs/benefits analysis of the settlement, recognizing that the two big contingencies are: (1) whether there is an appeal; and (2) whether the claim process gopes a lot faster. But, assuming even a year faster to the end zone, there is a considerable gain to the class. That needs to be measured against the surrender of prejudgment interest. My guess is that your cash flow analysis would prodce a better fix on the foregone prejudgment interest over the expected life of the case. Hae you projected that? and/or reduced it to present value?

**The problem with a cost/benefit analysis of the settlement is the absence of certainty about the outcome of thousands of claims worth hundreds of millions of dollars, many of which have problems that cannot be overcome with Exxon as an adversary. As I mentioned this morning, had Judge Gold entered an aggregate judgment for the Class we would be worse off now than we are with this settlement. Exxon would not have fronted all of the costs of claims administration and we would have been earning post judgment interest at fed funds rates for the last four years. If we can eliminate the risk of loss of the claims process it will be an outcome that makes cost/benefit quite clear.**

David Reiser
Zuckerman Spaeder LLP
1800 M Street. NW, Suite 1000
Washington, DC 20036
(202) 778-1854
(202) 822-8106 (fax)

This electronic message transmission contains information from the law firm of Zuckerman Spaeder LLP, which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you have received this electronic transmission in error, please notify us by telephone (202) 778-1800 or by reply e- mail immediately.

# EXHIBIT D

>>> Eugene Stearns 11/30/2005 8:11:32 PM >>>
Late today Judge Gold's secy called and asked for an electronic version of the current draft of the notice. When I advised her that we were not yet at the last iteration, she said he wanted it anyway, even though he knows that we are discussing it with Tom Scott tomorrow at 3:30 in a conference call. It would seem that we are running out of time.

Bob Wallis has agreed that the opt outs can be moved to the end after the 5% is paid. We are rewriting the drafts to reflect this change. In any event, this is a non-issue amounting to so little that it hardly warrants the time we have spent on it (although, in fairness, our initial belief as to the magnitude of the opt outs then warranted discussion if not agreement).

With respect to the remainder of your concerns it appears that the positions are hardening. If what you say is true, we may have failed to persuade Bill and his colleagues of the wisdom of the delicate balance contained in this agreement. That would put us at odds with Bill and some of the other class reps over the proposal as our obligation is to the class as a whole.

From my perspective, it appears that your clients do not understand the staggering magnitude of the risks we are favorably resolving. With all due respect, neither you nor your clients have enough information to give _any_ advice about risk reward as you cannot weigh the risks we are painfully addressing.

Arguing about prejudgment interest on a 5% reserve in the context of this overall arrangement is not, in my opinion, constructive. It will do little for the class but make it more difficult to bring the states into the agreement. In the context of the overall agreement it will, in my view, appear petty and piggish and motivated by a desire to be seen doing something.

Similarly, the proposed 2% reduction in all claims, coupled with a reduction in the petition for attorneys' fees, is important to be able to show the states an opportunity to recover something for their effort without costing the class a dime. It is again a delicate balance. Exxon wanted more for the states to limit its exposure to the states - Wallis proposed a flat 7% across the board reduction in all claims - and we said no. A class member unwilling to accept a 2% discount under these circumstances should express that view at some risk of being thought, at best, a fool.

I note your stated view that these differences are motivated by a desire to help the class but I do not believe they will be perceived as such. That perception is amplified by expressing their views through the lawyer employed to advance their claim for an incentive award.

The notice has a place for the class reps to state their views. The three Florida plaintiffs have announced support for the agreement. If the others take a contrary view the notice will provide an opportunity for that contrary view to be seen. If your clients want you to write for them a contrary view have at it but we need your wordsmithing tomorrow morning.

Finally, this debate is unfortunate. If we could accomodate your objections without hurting the class we would do it. Indeed, we should be celebrating a hard won victory not quarreling among ourselves.

I will be out of the office until the afternoon hearing so your comments should be addressed to Mark and Mona.

H

Eugene E. Stearns
Stearns Weaver Miller
Museum Tower
150 West Flagler Street
Miami, Florida 33130
(305) 789-3400

Attention: The information contained in this E-mail message is attorney privileged and confidential information intended only for the use of the individual(s) named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this communication in error, please contact the sender by reply E-mail and destroy all copies of the original message. Thank you.

>>> "Reiser, David A." <DReiser@zuckerman.com> 11/30 5:47 PM >>>
Gene: I have conferred with my clients, hoping to do so with Kenly shortly. I wanted to let you know that they continue to have concerns about the features of the settlement I have identified. In particular, even if if the amount of opt-out claims is smaller than previously supposed, this is an absolute. There is no good reason to include the claims, and they will not support a settlement that includes such a provision (except as a lower priority claim to be recovered only after all class claims are paid in full). Second, the notice now makes explicit that no interest is to be paid on the 5% reserve. I am glad that it is clear, but it makes the 5% more of a permanent deduction than a reserve. I do not believe they will support a settlement without prejudgment interest on the 5% reserve. My sense is that the message that the states have to get something does not play well with many dealers, and that it is unlikely to satisfy their objections to a no-interest reserve or to a 2% reduction. One possibility, regarding the 2%, would be to make it payable to the class to satisfy claims if -- as you privately forecast, the amount of the ultimately unsuccessful claims is large. That way the states get a guaranteed minimum, but are not promised the 2% if they otherwise collect a large amount. Although my clients understand the potential advantages of the settlement to them as applicants for an award, they are looking at this in terms of what they see as best for the class. I would be happy to talk to you about this, since the goal is still to arrive at a settlement all of the class representatives can endorse.

David Reiser
Zuckerman Spaeder LLP
1800 M Street. NW, Suite 1000
Washington, DC 20036
(202) 778-1854
(202) 822-8106 (fax)

This electronic message transmission contains information from the law firm of Zuckerman Spaeder LLP, which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you have received this electronic transmission in error, please notify us by telephone (202) 778-1800 or by reply e- mail immediately.