10000.GEN

UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 91-0986 CIV-GOLD/SIMONTON

ALLAPATTAH SERVICES, INC., et al.,

Plaintiffs,

v.

EXXON CORPORATION

Defendant.

_____

RUSSELL A CLINE,

Plaintiff,

v.

THE GARDEN CITY GROUP, INC.,

Defendant.
_____/

## STATES' COUNSEL'S RESPONSE REGARDING THE SPECIAL MASTER'S REPORT AND RECOMMENDATION DATED SEPTEMBER 4, 2009

States' Counsel files its Response to Class Counsel's Amended Objections (DE 5820) to

the Special Master's September 4, 2009 Report and Recommendation (DE 5793).

The Special Master is correct in his recollection and finding that the States' interest had

been protected by institution of a $21.2 million *floor* to their recovery.  For the reasons set forth

below, States' Counsel respectfully requests that the Court enter an Order directing the

$19,862,000 shortfall to be funded from the 5% Reserve.[1]

_____

[1] While States' Counsel and the Special Master reach a similar conclusion as to *entitlement*, States' Counsel offers
an alternative method of *funding* this obligation.   As discussed below, States' Counsel recommends that this

We believe that Class Counsel has overlooked or misapprehended the bedrock principle underlying the Special Master's Report. That principle is straightforward – it was always the intention and the understanding of the parties that a substantial fund would be available to provide a source of recovery for those Class members who did not opt out, but whose rights flow from the States' exercise of their unclaimed property rights. The issue before the Court is important because it directly impacts the rights of both those Class members who have heretofore recovered a staggering percentage of their potential damages, as well as the rights of those Class members who did not opt out and who have the right – under the operative Settlement documents and Orders – to have an opportunity to recover *something*. The Special Master has correctly – in our judgment – identified an unnecessary shortfall in the Fund that should be dedicated to responding to the rights of the Class members who can recover through the States. States' Counsel submits that the 5% Reserve fund can and should be utilized, to ensure that all Class members, including those whose rights are derivative of the States, have a chance to recover in this historic proceeding. To deprive those Class members of their rights would work a substantial injustice that is not in accord with the great record established in this case by the Court and Class Counsel.

Class Counsel's current Objections are founded on the fundamentally incorrect premises that the Fund has an absolute obligation to disburse more money to the participating Claimants *than the Class even recovered from Exxon*, and that States' right to recover was *wholly* contingent upon the accuracy of Class Counsel's (significantly inaccurate) projections. Current projections reflect a nominal gross claim value of $1.1019 billion, approximately $52 million more than Class Counsel's initial projections (which were communicated to the Court at the time

---

obligation be funded from the 5% Reserve. States' Counsel submits that the Class was expressly placed on notice that the 5% Reserve may not be fully refunded under these circumstances.

of Settlement).  Class Counsel argues that the Class claimants, in the aggregate, have a vested right to recover $1,079,862,000 ($1,101,900,000 x 98%) - *$19,862,000 more than Exxon paid to settle the case* – before the States can recover a penny.  This is not borne out by the operative Settlement documents, nor is it fair.  Moreover, the absolute 2% Reduction found by the Special Master could be fully funded, including partially from the 5% Reserve[2], while still providing for a gross recovery to the Class in excess of the $1.06 billion that Exxon paid to settle the case [$1,101,900,000 - $21,200,000 = $1,080,700,000].  Class Counsel cannot argue that a gross payout to the claimants *more than $20 million in excess of the monies received from Exxon* is unfair or inequitable.

Class Counsel treats the 2% Deduction and the 5% Reserve as conceptually indistinguishable, and argues – contrary to the clear language of the Class Notice – that any and all claims "shortfalls" should be covered by Fund interest (otherwise accruing to the States for non-filing Class members), and not the 5% Reserve.  Class Counsel contends that the States did not have *any* protected recovery, but that the States are now in line to recover *some* amounts of interest.  This was not the deal.  This is not consistent with the assurances made to the States[3] contemporaneous with the culmination of the Settlement Agreement, and it is not consistent with the Special Master's recollection and understanding of the Agreement *which he had recommended for approval to the District Court.*

Class Counsel's argument suffers from factual, as well as conceptual errors.  In an attempt to "explain" how or why the States could be in line to recover as little as it suggests,

---

[2] More particularly, the $15,011,283 "shortfall" identified by the Special Master, which he recommended be funded by the Bowen/McGillicuddy forfeiture and Class Counsel's interest, could be funded from the 5% Reserve without materially affecting the Class. DE 5793 at 24-25. As discussed below, the Class was put on notice that shortfalls would be borne by the 5% Reserve.

[3] *See* George Waas Affidavit attached as Exhibit A.

Class Counsel intimates that the Fund's remainder has been diminished as a result of "delays." This is simply not true.

On the other hand, the Special Master's analysis starts with recognition of the primary fact that the 5% Reserve and the 2% Reduction were not one and the same. The former can – but not necessarily will – be returned to claimants. **But the claimants do not have any right or expectation to a recovery of the latter.** *See* DE 5793 at 15, 21; Settlement Agreement ¶ 4(g)(ii). As discussed below, Exxon – not Class Counsel – had requested the creation of a mechanism to ensure the States' recovery, thus giving rise to the advent of the distinct concepts of a 5% Reserve and 2% Reduction. The parties appreciated there were significant discrepancies in their respective estimates of the claims' aggregate value, and an Agreement which provided for a recovery to the States *only if* Class Counsel's (lesser) projections were true, would not have been acceptable and, frankly, does not make sense. If the 2% Reduction was to be distributed to the claimants, the purpose of the 2% Reduction would not be achieved.

## I.   Class Counsel's Arguments Fail to Appreciate Special Master Thomas E. Scott's Role in The Settlement Process

In his September 4, 2009 Report, the Special Master presented in great detail his recollection and understanding of the events leading up to and culminating in the District Court's Order of Approval, including by way of reference to his January 30, 2006 Amended Report and Recommendation (which was adopted by the Court), concluding that the States had been guaranteed *at least* a $21.2 million recovery. Class Counsel proffers a differing recollection and interpretation of these events, and argues that States' Counsel is estopped by the "bounds of fair advocacy" from considering the Special Master's view. This is hard to comprehend. How can States' Counsel ignore the Special Master's recollection and understanding of the pertinent settlement documents which were approved by the Court *where he had personally recommended*

*the Court's approval* and his Report and Recommendation had been relied upon and incorporated in the Court's Order of Approval?   As a result of the Special Master's original request for position papers, our analysis undertaken in response thereto, and the Special Master's exhaustive September 4, 2009 Report, we now recognize the existence of a 2% obligation of the Fund to the States for the benefit of the non-filing Class member dealers.[4]

Class Counsel continually discusses the Special Master's conclusions as being "erroneous" in the present tense, *i.e.,* the Special Master is (now) improperly construing the pertinent settlement documents. *See, e.g.,* DE 5820 at 13.  But this ignores the fact that the Special Master played a central role in 2005-2006 in obtaining Court approval of the Settlement Agreement.  If Class Counsel were right, it would appear that either one of only two scenarios could be said to exist:  either (1) the Special Master is (now) misconstruing his prior understanding of the pertinent settlement documents, including his own January 2006 Amended Report and Recommendation or (2) the Special Master was laboring under a misimpression *when he recommended the Settlement for Court approval.*[5]  This fundamental disconnect between Class Counsel and the Special Master cannot be disposed of as hastily as Class Counsel would suggest, and ultimately only the Court can speak as to how *it* understood the Settlement in April of 2006.

Class Counsel's suggestion that the States understood that the Settlement Agreement could result in "substantial disappointment" (DE 5820 at 20) is not consistent with that evidence marshaled by States' Counsel.  Rather, the Special Master's recollection and interpretation of the settlement documents in a manner which recognizes the States' right to recover from the Fund seems far more reasonable, and more importantly, more consistent, with the parties' and the

---

[4] It cannot be disputed that States' Counsel has consistently, and persistently, sought to preserve the States' recovery through multiple filings before the Special Master and the Court.

Court's intent.  The States' right to recover could not have been wholly contingent on the accuracy of Class Counsel's initial claims value estimates.

Retired United States District Court Judge Thomas E. Scott was appointed to serve as Special Master of the claims administration process in December of 2004.  The Special Master conducted a number of hearings on Class Counsel's Motions for Summary Judgment and Exxon's Oppositions.  Thereafter, on November 9, 2005, Class Counsel and Exxon (collectively "the Parties") informed the Court that they had reached an agreement to settle the case.  The Parties provided the Special Master with a brief outline of the general terms of the Settlement, and a hearing was convened in Judge Gold's Chambers.  Judge Gold voiced his concern that "careful consideration" be given to the terms of the Settlement Agreement and Notice to the Class, and specifically requested that the Special Master participate with the Parties in preparation of the pertinent settlement documents. DE 2607 at 8-9.

Thereafter, the Special Master conducted a number of Settlement Conferences wherein the form of the proposed Settlement Agreement and Notice to the Class were discussed.  The Settlement Conferences are memorialized in great detail in the Special Master's Amended Report and Recommendation on the Class Settlement Agreement. Id. at 10-33.  As memorialized by the Special Master, the First Draft of the Settlement Agreement sought to solve three fundamental matters: (1) the creation of a common fund for "all Class Members"; (2) **the right of various State governments "to receive a portion of the Settlement Fund"**; and (3) the ability of opt out Claimants to recover from the Fund. Id. at 11-15 (emphasis supplied).  As noted by the Special Master, fundamental matter 2 above [the States' right to recover] was considered

---

[5] The Special Master has been directed to file his own Response on or by November 13, 2009.

*ab initio* ( *i.e.*, from the outset of the settlement discussions), and it is this matter which is now

before the Court on Class Counsel's Amended Objections to the September 4, 2009 Report.

So how exactly were the States' to "receive a portion" of the Fund?  Class Counsel first

proposed that a 6% reserve be withheld from the initial payment of each claim for contingent

circumstances.  The Fund's "Remaining Balance" after the payment of claims would then be

distributed pro rata to each State in an amount corresponding to its percentage of unasserted

claims in relation to all unasserted claims.[6]  Exxon expressed concerns that the First Draft

provided no guarantee that the participating States would recover monies for the benefit of their

non-filing dealers, *i.e.,* the beneficial owners of the unasserted claims.[7]  This was important to

Exxon as they sought to obtain a complete release for all gallons sold during the Class period; as

the Court is aware numerous State-filed claims were pending at the time of the Settlement, and

Exxon did not believe an Agreement that did not protect the States' interest would be approved

by the District Court.[8]  *See* DE 2607 at 15.  The Parties resolved this "problem," not by increasing

the 6% Reserve to a 7% Reserve, but rather by instituting a 5% Reserve with a *separate and*

*mandatory 2% discount.* Id. at 18-19 (emphasis supplied).  If all of the money withheld from

claimants was intended to be refunded, why not the institution of a simple unitary 7% Reserve?

The mandatory 2% discount was adopted in the final Court-approved Settlement Agreement,

---

[6] By way of example the Parties discussed a theoretical Remaining Balance constituting 50% of all unasserted claims, which latter sum had been estimated at $100 million.  In other words, the First Draft discussed a Remaining Balance totaling $50 million. (DE2607 at 13-14) While States' Counsel does not rely on this figure as evidence of the quantum of the States' "guaranteed recovery," we do believe this figure provides some important context as to each interested parties'/entities' understanding and expectations at that time.  The provision in the Settlement Agreement that the Remaining Balance "[may] not be sufficient to pay all late filed claims in full" is absolutely consistent with a "floor" to the States' recovery of $21.2 million. *Cf.* DE 5820 at 8, n.12 (quoting Settlement Agreement at 12, ¶4.h).  State representatives were advised they would obtain significant multi-million dollar recoveries. See Waas Affidavit.

[7] It does bear noting that protection of the States' recovery was first raised by Exxon, not Class Counsel, despite the fact that Class Counsel had persuaded the States to intervene and then used the State-filed claims as leverage to bring Exxon to the bargaining table.

providing that 2% of the claim amount "[would] not be refunded." Settlement Agreement ¶ 4(g)(ii).

## II.  Class Counsel's Motion for Disbursement Leads to the September 4, 2009 Report

Faced with Class Counsel's Motion request for the disbursement of $55+ million from the Fund (DE 5613), the Special Master undertook a final, and critical, analysis of the operative settlement documents, including the disposition of the separate and mandatory 2% discount. Position papers were requested from all interested parties.  Both Class Counsel (DE 5741 and DE 5766) and States' Counsel (DE 5751) filed Position Papers on this important issue.  States' Counsel noted that it had not, by definition, been directly involved in the underlying Settlement discussions, and stated that, after performing an objective analysis of the source documentation, it would ultimately defer to the Court (including the Special Master as its organ) as to the intent and interpretation of the Rule 23 approved Settlement Agreement. Id.  The Special Master issued his Report on September 4, 2009 finding that the Fund did in fact have an obligation to pay the 2% Reduction amount to the States. *See, e.g.,* DE 5793 at 11 ("Under the Settlement Agreement, as approved, and as I interpret it, a full 2% Reduction was to be set aside and was not to be touched, as it was to be distributed to the States at the conclusion of the process, for the benefit of the non-filing dealers.")

## III. Class Counsel Argues the States Bear the Entire Impact of the Initial Understatement of the Amount of Claims

Class Counsel argues that the Settlement Agreement provided the States with the opportunity to be "substantial[ly] disappoint[ed]." (DE 5820 at 30)  Class Counsel is correct that the States will be extremely disappointed if Class Counsel's recommendations are adopted by the

---

[8] States' Counsel was conceived by the Settlement Agreement, and two law firms were ultimately appointed by the Court to assist with the claims administration.

Court.  That is because Class Counsel's current arguments, and current math, represent a marked departure from those made to encourage the States' participation in 2005-2006.

For example, George Waas in the State of Florida Attorney General's office was approached by Stearns, Weaver in 2005, and encouraged to participate in the *Allapattah* claims process.  Waas Affidavit at ¶ 3 .   While States' Counsel does not question Stearns, Weaver's motivations at that time, obviously the inclusion of additional potential claims increased Exxon's exposure, and thus enhanced the Class's position for settlement negotiations.  Mr. Waas was told that the State of Florida (alone) would be in line to receive a figure ranging upwards of $10 million. *Id*. at ¶ 7.  Ultimately, the State of Florida agreed to support the Settlement instead of objecting to it which it was fully capable of doing.  But now Class Counsel advocates a gross payment to all of the States of approximately $6.2 million, which could be expected to net the State of Florida approximately $471,000.[9]  How did this come to occur?

Class Counsel insinuates that Fund resources have been depleted due to "delays" and associated work by various Fund professionals (including the Special Master, States' Counsel, and the Fund's financial advisor), work which Class Counsel was "given no role in reviewing" as to costs. (DE 5820 at 26-30)  This is not only misleading, but arguably offensive to the Court, where each penny that has been paid out of the Fund for claims administration was paid pursuant to an Order of the Court.  More importantly, Class Counsel's discussion of the small universe of pending claims, with accompanying demonstrative exhibits, is an utter red herring.  Class Counsel complains that only twelve (12) claims have been adjudicated since February of 2009,

---

[9] The State of Florida represents approximately 7.6% of the unclaimed gallons.  Exxon's records indicate there are approximately 168 non-filing Class stations in Florida, representing gallons with a nominal value (compensatory damages + prejudgment interest) of $4.67 million.  This is out of a total universe of 3,336 non-filing Class stations, representing gallons with a nominal value of $82.365 million.  These numbers are all preliminary and approximate, and States' Counsel have recommended more detailed accounting of each non-filing dealers', and by extension each States', recovery in prior filings before the Special Master.

that twenty (20) claims remain pending, and that considerable sums have been expended during that time. Clearly, this is meant to give the impression that considerable sums of Fund resources have been expended *directly in connection with the adjudication of this discrete universe of claims.* This could not be farther from the truth. Rather, the overwhelming majority of professional services rendered in this time period have involved the Fund's general administration, including the consideration of wind-up issues which had not adequately been addressed by Class Counsel in the original settlement documents. For example, while the Settlement Agreement does superficially address the method of allocation of the Fund's remainder, it wholly fails to provide any mechanisms as to *how* that subsequent transfer should or could be accomplished. States' Counsel has expended considerable resources analyzing these issues at the request of the Special Master, discussed herein at pp. 21-23. In addition, States' Counsel has vigorously argued against the continually diminishing Fund remainder, including the (formerly) joint request for reallocation of the Bowen/McGillicuddy forfeited fee and incentive awards.[10] Simply, aside from fairly minimal ordinary course expenses (*e.g.,* monthly updating of Fund assets, income, and expenses) – which could not have been avoided given the ongoing general administrative activities – it cannot seriously be argued that any "delays" as such have caused reductions in the Fund's remainder.

       **The fact of the matter is Class Counsel was always of the belief that the gross value of claims filed was (only) $1.05 billion**, not $1.06 billion, not $1.1 billion, and not $1.1019 billion. At the time of the Settlement, there was dissension amongst the parties as to the gross value of the claims on file with the Claims Administrator. Class Counsel believed, and

---

[10] Class Counsel previously supported this application, then changed its mind, discussed herein at pp. 19-21. Additional considerable resources have been expended in response to Class Counsel's Motion for Interpleader. States' Counsel has previously filed Motions with the Court requesting that those Fund resources expended in

represented to the Court, that the claims were valued at $1.05 billion. Class Counsel had estimated the value of all claims filed as $1.05 billion. *See* DE 2607 at 17.  Exxon, on the other hand, believed the claims were valued at $1.1 billion. Id.  While States' Counsel was not privy to these discussions or back-up work product, we can make an educated guess as to which numbers Class Counsel thought were more valid and realistic, and in turn utilized as the basis for its discussions with others (*e.g.,* George Waas).  The gross claims filed and in line for adjudication are valued at approximately $1.1019 billion.[11]

But Class Counsel argues this is of no moment, because the States, and not the claimants, bore the entire risk of its errors.  Class Counsel is, again, mistaken.  Each claimant was guaranteed a 93% recovery on his/her claim, and not a penny more.  Settlement Agreement at ¶ 4.g.(ii).  To the extent that the claims nominally exceeded the Fund's principal ($1.06 billion) that was to be paid from the 5% Reserve.  Class Counsel relies heavily on the Class Notice as "proof" of its waterfall theory[12], in particular the calculations discussed at pp.17-19 therein. (DE 5820 at 10-11)  Class Counsel notes the possible existence of an $18 million shortfall, and then remarkably asserts that "[l]ittle more need be said." *Id.* at 11.  There is plenty more to say.

Those very same calculations relied upon by Class Counsel show $18 million of monies being redirected from the 5% Reserve to fund claim shortfalls in the "worst case scenario," to wit, claims totaling $1.1 billion.  As luck would have it, the "worst case scenario" (in fact even a bit "worse") has come to pass:  as referenced above the claims have a gross nominal value of approximately $1,101,900,000.  So how exactly is it that Class Counsel maintains the entire $55

---

connection with "Bowen issues" be charged against the (currently) remaining portion of his fee award. (DE 5681).

[11] States' Counsel do not mean to suggest that "too many" valid claims have been paid.  Class Counsel has done an exceptional job prosecuting claims, and the Special Master has in turn done an exceptional job getting the "right people" paid.  States' Counsel concurs with Class Counsel that the claims process has been a success.

million+ 5% Reserve can now be refunded where the "worst case scenario" is even worse than had been contemplated?

Class Counsel suggests that claims shortfalls can, and should, be covered by the Fund's net interest. While this may now be convenient for Class Counsel where the worst case scenario has unexpectedly come to pass, that is not what the Class Notice states.

> "Interest that accrues on the money held in the Exxon DFC Class Action Depository Account will be utilized to fund the costs of the claims administration process, including the payment of fees of the Special Master, the fees of the Claims Administrator, the fees and costs of the attorney(s) appointed on behalf of the state governments or Exxon as discussed below, all bank and transaction fees (collectively, the "Claims Adjudication Costs"), and any and all taxes on interest or investment income earned by the Settlement Fund. Any interest that is earned but not expended on Claims Adjudication Costs including taxes will be added to the Settlement Fund to be disbursed as otherwise provided in the Agreement." Class Notice at 12.

The Class Notice then continued to show "worst case" calculations which did <u>not</u> include the use of any Fund interest to satisfy claims overages. Id. at 18-19. Instead the Class was put on notice that in the event the amounts claimed totaled $1.1 billion, <u>the 5% Reserve would be reduced by $18 million.</u> While Class Counsel points to language in the Notice that it (and it alone) "believe[d]" that net interest could be used to pay claims (*Id.* at 18), that language was not adopted in the Recommended Report or Order of Approval. Rather, the Amended Report incorporated Class Counsel's calculations showing an $18 million shortfall on $1.1 billion of claims to be satisfied <u>exclusively</u> out of the 5% Reserve.

> It should be noted that in an abundance of caution, the current version of the Notice before the Court utilizes Exxon's figure for the aggregate value of filed claims. As such, the class is on notice of the 'worst case scenario,' in which a potential shortfall could result, amounting to approximately $18 million. In the event that this unlikely scenario comes to pass, this $18 million shortfall would be deducted from the five percent "hold back," with any residual funds being distributed to the Class pro rata according to gallons pumped. Amended Report at 18, n.14.

---

[12] Class Counsel's "waterfall" theory, and the Special Master's associated recollection and findings, are discussed herein.

Utilizing the actual claims numbers, the 5% Reserve would now be funded, and (in part) refunded, as follows:

Total claims value:      $1,101,900,000

5% Reserve:              $55,095,000

2% Reduction:            $22,038,000

Total claims, less 2%:$1,079,862,000

Shortfall:               $19,862,000 [$1,079,862,000 - $1,060,000,000]

5%  Refund:              $35,233,000 [$55,095,000 - $19,862,000]

Simply, the claimants were put on Notice that *they* bore the risk of any "shortfalls" in the settlement recovery due to possible discrepancies in the initial claims projections.  Moreover, the protection of net interest for the States for the non-filing Class members by and through the 2% Reduction -- as illustrated in the Notice's "worst case scenario" -- is fully consistent with Class Counsel's recognition that the Fund had been structured so that the Remaining Balance would be funded by the Fund's net investment income. *See* DE 5820 at 25.

Accordingly, States' Counsel asserts that $19,862,000[13] of the 5% Reserve should not be refunded, in order to cover the Fund's "shortfalls" as set forth in the Class Notice.  Of note, this would allow for the immediate disbursement (subject to Court approval, of course) of **$35,233,000** from the 5% Reserve back to claimants, resulting in an approximate 96% recovery by each claimant on his/her claim.

## IV.   The Special Master Finds the Existence of the 2% Obligation, Creating the Floor to the States' Recovery

---

[13] As discussed above, the holdback of these funds would in turn "protect" the Fund's interest for the States, which would then be added to the current Remaining Balance of approximately $6.2 million, assuming full payment of Class Counsel's interest at the currently stated rates.  As such, the States would recover approximately $26 million consistent with the Special Master's recollection that the 2% was to act as a *floor* to the States' recovery, discussed herein.  States' Counsel continues to maintain that the forfeited Bowen/McGillicuddy amounts should be allocated to the Remaining Balance.

Consistent with its (misguided) argument that the States could recover $0, Class Counsel argues that the Special Master has improperly *sua sponte* recommended that the Court "replace" the Fund's "hierarchy of obligations" in favor of a new hierarchy. (DE 5820 at 2)  States' Counsel would submit the Special Master has done no such thing; rather the Special Master, based on his personal knowledge and renewed examination of the source documentation (including *his own* Amended Report and Recommendation on the Class Settlement Agreement which was adopted and incorporated in the District Court's Order of Approval) has issued a Report memorializing *his* findings as to the composition and operation of the Fund's "hierarchies of obligations" as he understands them today, and as he understood them at the time he recommended approval of the proposed Settlement Agreement to the District Court.   The Special Master has been tasked with general oversight of the Fund and the ongoing claims administration process, and as part of those responsibilities has conducted a final examination of the Fund's obligations prior to its final disbursements of significant sums of monies.[14]  Such responsible oversight and administration of the Fund could hardly be more proper.

Class Counsel portrays the September 4, 2009 Report as principally guided by the Special Master's personal convictions as to what would constitute an "equitable" result.  This is inaccurate.  It is not until *after* the Special Master found the existence of the 2% obligation – existing <u>prior to and outside of</u> the Fund's "waterfall" priorities – that he reverted to equity as a means to (now) fund this considerable obligation.[15] (DE 5793 at 21-25)

---

[14] Class Counsel agrees that it is not possible to pay the claimants the full 5% Reserve and the States $21.2 million without diverting significant amounts of the forfeited monies and Class Counsel interest. (DE 5810 at 1-2)

[15] States' Counsel does not advocate the position that the 2% Reduction Amount be funded, in part, by the redirection of interest on Class Counsel's fee award, and believes shortfalls would be more properly obtained from the contingent 5% Reserve fund.  This reduction of monies from the 5% Reserve is also supported by the Class Notice, discussed, *supra*.

Again, Class Counsel contends that the 2% discount did not create a "fund" for the benefit of the States, but rather only increased the "possibility" that they would recover monies from the Fund.  Class Counsel now suggests that Exxon had previously suggested an allocation to the States for a specified amount; although Mr. Stearns has "no recollection of this conversation at all," purportedly a review of the "email traffic…demonstrates…that it was immediately rejected and that was the end of it." (DE 5820 at 21, n.17)  It is unclear what "email traffic" Class Counsel is referencing in the abstract, or how this selective proffer could be analyzed by the Court.

In any event, the concept of a potentially "disappointing" non-guaranteed recovery to the States is not consistent with the creation of a solution to the second fundamental matter discussed above, to wit, Exxon's need for a full release, including of the State-filed claims, in exchange for a Settlement that would obtain the Court's approval as fair and adequate under Rule 23(e).  Exxon understood, and had communicated, this concern.  Class Counsel suggests that the States effectively relinquished their claims – and the Special Master and District Court approved of this - for *nothing*.

For example, Class Counsel argues that the Class Notice illustrates a "worst case scenario" whereby each claimant would receive 96.36% of his/her award [93% initial award + refund of 3.36% [gross $37 million] of the 5% [gross $55 million] reserve], and the States would get $0. DE 5820 at 10-11 (discussing Class Notice at 18-19).  States' Counsel would submit if the States could potentially receive $0 in exchange for the release of their claims the Court-approved Class Notice would have explicitly said so, instead of "hiding" this disclosure in tables of arithmetic which do not even expressly discuss the States' interest.[16]  Certainly, this was not

---

[16] The Rule 23(e) Class Notice is designed only to be a "summary of the litigation and the settlement," and Class members thus have the right and opportunity to inspect the complete settlement documents, papers, and

consistent with the contemporaneous representations made to the State representatives. *See* Waas Affidavit.

Class Counsel similarly argues that the 2% reduction was not to be applied to the settlement amount, but rather (only) on a claim by claim basis, effectively "within the waterfall." This makes the States' recovery contingent on the accuracy of Class Counsel's initial projections, and is belied by language in the Amended Report, which speaks in terms of a 2% reduction of the "aggregate value of all filed claims...which would be withheld for the benefit of the of State claimants under the proposed two percent reduction" and the correlative need to apprise the Class "of the amount of real settlement fund dollars which **would be reallocated** for the benefit of State claimants." (DE 2607 at 20-21)(emphasis supplied)  As noted by the Special Master, the Amended Report was adopted and incorporated in the District Court's Order of Approval, and was not objected to.  Class Counsel's complaints that certain "notes" contained within the Amended Report are not entirely accurate – including Affidavits[17] prepared by its office almost four (4) years after the fact - are far too late, both procedurally and substantively, as to warrant serious consideration.

For these additional reasons, States' Counsel concurs with the Special Master's Report finding the existence a *floor* of $21.2 million as the States' Recovery.  However, States' Counsel recommends that the claims shortfall be funded as set forth above wholly out of the 5% Reserve, as an alternative to that funding recommended by the Special Master.  Based on the foregoing States' Counsel does not believe it is necessary to redirect the interest, if any, on Class Counsel's

---

pleadings filed in the litigation. Amended Report at 65, n.28 (quoting Newberg on Class Actions § 8:32). Class Counsel's attempts to prioritize (its interpretation) of the Notice to the Class over the clear language of the Amended Report are not consistent with Rule 23(e), and fail to recognize the District Court's adoption and incorporation of the Amended Report.  Also, as discussed above, the Class Notice shows all claims shortfalls being paid out of the 5% Reserve.

withheld fee award[18] in order to satisfy the claims shortfall. To the contrary, the 5% Reserve can and should bear this amount consistent with the Notice to the Class. Use of the 5% Reserve to cover the above-referenced "shortfalls" is not only consistent with the Class Notice, but also well within the Court's rights in administering the Fund.

## V. The Court's Administration of The 5% Reserve

As a guiding proposition, the modern class action lawsuit derives from an action in equity. *Yokoyama v. Midland Nat. Life Ins. Co.*, --- F.3d ----, 2009 WL 2634770 (9th Cir. Aug 28, 2009). Thus, a district court has the ability to exercise equitable authority to administer and implement a class action settlement. *In re Diet Drugs Products Liability Litigation*, 543 F.3d 179, 184 n.10 (3rd Cir. 2008); *Zients v. LaMorte*, 459 F.2d 628, 630 (2d Cir. 1972)("Until the fund created by the [class action] settlement is actually distributed, the court retains its traditional equity powers. It is not novel law to announce that a court supervising the distribution of a trust fund has the inherent power and duty to protect unnamed, but interested persons.") That equitable power is generally used to address situations in the implementation of class action settlements which were not provided for in the settlement agreement. *See, e.g., Valley Drug Co. v. Geneva Pharmaceuticals*, 262 Fed.Appx. 215, 217-18 (11th Cir. 2008) (extending opt-out deadlines set by court rather than settlement agreement); *Diamond Chemical Co. v. Akzo Nobel Chemicals*, 517 F.Supp.2d 212 (D.D.C. 2007)(applying equitable principles for distribution of unclaimed settlement funds when settlement agreement did not provide for disposition of unclaimed funds).

---

[17] Class Counsel's continued reliance on parol evidence seems to belie its argument that the Settlement Agreement is clear and unambiguous.

[18] In its July 2006 Order the Court retained jurisdiction to award Class Counsel interest on its withheld fee award "in the event that funds remain to pay such interest award." DE 2997 at 106, n.66.

Here, as the Special Master found, the Settlement Agreement provides that the 2% Reduction was to be set aside for the States, but, unfortunately, did not provide for any priority as to how it was to be paid. The "waterfall" provision in the Settlement provided only how the 5% Reserve was to be paid: first to be used for the listed administrative expenses, second for payment of the remaining 5% of allowed claims, third for any interest on the held-back 5%, and anything left over, the Remaining Balance, would be an additional recovery for the States, *on top of* the 2% Reduction. The States' claims were not extinguished upon the contingency that there might be something left over after all other claims, including interest on the 5% Reserve, was paid to everyone else.

To be clear, the payment of the 2% Reduction to the States ahead of the 5% Reserve to allowed claimants will further the global purpose of the Settlement Agreement, *i.e.,* the compensation of Class members for Exxon's past wrongs, and is fully consistent with the Court's equitable authority under Rule 23 as outlined above. The 2% Reduction was and is intended to go to Class members. The 2% Reduction does not go to the States to keep, but, instead, goes to their respective unclaimed property funds. *See, e.g.,* Fla. Stat. chapter 717 et seq. The unclaimed property funds, in turn, have an obligation to attempt to locate Class members who did not opt out of the class but also did not participate in the claims process. If found, the States are obliged to give to these missing Class members their fair share of Settlement proceeds. Indeed, the Special Master recommended that the States bear the expense of attempting to locate missing Class members out of the 2% Reduction distribution. (DE 5793 at 31-33) States' Counsel does not understand the vehement objection of Class Counsel to payment of monies intended to go to Class members.

The 5% Reserve was just that, a *reserve*.  It was a hold-back of 5% of claimants' allowed claims to ensure that there would be sufficient funds to pay all claimants the initial 93% of their claims.  (DE 2773 at 9-10)  It was clear in the Settlement Agreement and in the Class Notice that, because of contingencies which might arise, this 5% Reserve might never be paid to successful claimants.   All successful claimants have received their guaranteed initial 93% payment, satisfying the intent of the 5% Reserve.[19]  It is hardly inequitable to divert a portion of contingent monies from Class members who have already been paid a substantial portion of their claims to Class members who have received nothing.   Further, and as noted, because the Settlement Agreement does not clearly articulate how the 2% was to be funded, making payment of the 2% from the entirely contingent 5% Reserve, is well within the parameters of Rule 23 and the principles outlined in *Diamond.*

## VI.   The Bowen and McGillicuddy Forfeited Amounts

In its July 6, 2006 Order Approving Class Counsel's Attorneys' Fee Petition, the Court ruled that 25% of the fees and incentive awards to Gerald Bowen, Esq. and William McGillicuddy, respectively, should be deemed forfeited where they had previously entered into a secret fee sharing agreement.  The Court held, given the facts known to it at that time (at the advent of the claims administration process), that it would be in the Class's best interests to refund those monies pro rata to the "Class Members prior to any distribution to the States." DE 2997 at 105.  States' Counsel does not assert that the Court's intent at that time was or is unclear, but rather that there has been a material change in circumstances.  States' Counsel also notes that it had not substantively participated in any of the proceedings (discovery, argument, evidentiary hearings, etc.) culminating in entry of the July 6, 2006 Order.

---

[19]     A handful of claims remain to be adjudicated, but funds to pay those claims have been allowed for in the above calculations.

As the claims administration process has moved forward since July of 2006, and the Fund's remainder continued to decrease, States' Counsel *and Class Counsel* jointly moved the Special Master to recommend a modification of the July 6, 2006 Order to allow for the distribution of these forfeited amounts to the States. Based on the parties' briefing and argument, the Special Master issued a Report requesting additional information from States' Counsel as to the States' respective unclaimed property schemes, including the manner in which they were to provide notice to putative property owners.

It is hard to view Class Counsel's "withdrawal" of their "support" for the distribution of the forfeited amounts to the States as anything other than sour grapes. (DE 5820 at 31-32) Class Counsel's assertion that States' Counsel seeks to "rewrite the Settlement Agreement" is simply wrong. States' Counsel can hardly be faulted for responding to an Order of the Special Master and independently reaching a similar conclusion: the States were never intended to receive $0. The justification for the distribution of the forfeited amounts to the States – in Class Counsel's own words – has not changed.

> "We had filed a pleading which we stand behind which says, essentially, that we join the States' argument that the money should flow to the States. And our reason for this is, first, whatever goes to the States essentially is going to the States on behalf of the members of the Class. And, therefore, it's a different group of class members....But, most importantly, these funds were not in the funds that were disclosed to the Class when the settlement was approved as funding the Class members' payments. And, therefore – and because, of course, the process has been so successful that the Class members who did timely file claims have received what amounts to essentially unprecedented recovery on their claims, their principal, their interest, and a relatively minor reduction – and now that the 5% is clearly going to be funded in full...we believe...it is appropriate for those Class members that did not timely file claims to be the beneficiaries of these forfeited funds." (April 14, 2009 at 9-10 attached as Exhibit B); *see also* Class Counsel's Position Paper Regarding the Disposition of the Forfeited Fees and Incentive Awards (DE 5634 at 2)("The participating claimants received 98% of their compensatory damages and the great majority of their interest...there are other Exxon direct-served dealers who are Class Members, and who were equally damaged by Exxon's wrongdoing, and yet by virtue of having failed to timely file a claim have not received a single penny of recovery.").

If anything there may now be even a greater justification for the forfeited amounts to pass to the States where the Special Master has confirmed the existence of a $21.2 million Fund obligation which needs to be funded. Instead, Class Counsel, faced with an Order from the Special Master finding the States were entitled to *at least* $21.2 million, now argues their recovery should be limited to $6.2 million[20], with the forfeited amounts to be redistributed as a windfall to the claimants despite the fact these amounts had not been contemplated at the time of the settlement.[21]

## VII.    Notice and Wind-Up

Class Counsel further objects to that portion of the September 4, 2009 Report whereby the Special Master recommends that the Court require the Fund to provide notice to the States' Unclaimed Property Departments in a manner consistent with the governing statutory schemes. It is hard to understand the impetus of this blanket objection. Does Class Counsel seriously maintain that the one (1) sentence in the Settlement Agreement concerning the allocation of the Fund's remaining monies (2% reduction amount and/or Remaining Balance) definitively addresses the procedures (and related requirements) for that turnover? *See* Settlement Agreement ¶ 4.g.(vi).

It is entirely unclear how Class Counsel would recommend disbursement of the Fund's remainder. On the other hand, States' Counsel, after performing a comprehensive review of the participating States' unclaimed property schemes[22], effectively made two (2) recommendations

---

[20] Class Counsel seems to reserve the right to request even a larger interest award, at a rate "significantly greater" than the Fund's actual investment return. (DE 5820 at 34) Utilization of the Florida statutory rate would wholly deplete the Fund's Remaining Balance.

[21] It bears noting that the forfeitures were found after the Court had already entered its aggregate attorneys' fee award of 31.33%, with allocations to the various firms that had performed duties as Class counsel.

[22] The work performed by States' Counsel and basis for its recommendations is set forth at length in its Position Paper (DE 5751), and incorporated herein by reference.

to the Special Master: (1) that the Court enter an Order defining the unclaimed property to be distributed to a particular State and setting forth the notice to accompany such distributions, and (2) that the Fund provide notice to the putative property owners prior to turn-over to the States. The Special Master has rejected the latter recommendation on the basis such would be unduly burdensome to the Fund. DE 5793 at 32.   While States' Counsel continues to believe that the Fund has an obligation to provide pre-turnover notice to the putative property owners prior to turn-over -- consistent with the requirements imposed on any (other) holder of "unclaimed" property -- we do recognize that the Court can enter an Order under Rule 23 effectively disposing of this requirement, in light of the unique facts and circumstances of the underlying Settlement (which included considerable efforts by Class Counsel to contact these dealers).  The Special Master's recommendation that each State provide notice to its resident non-filing dealers at its own expense does little more than direct the States' to follow their own laws. DE 5793 at 34.

However, States' Counsel reiterates its concern that the ultimate provision of notice to the non-filing dealers -- whether performed by the Fund initially or only by the States -- must be preceded by an Order from the Court defining and valuating each non-filing dealer's unclaimed property, and approving the form(s) to be used by the Fund in connection with the turnover.  Simply stated, it is unclear how turnover could be accomplished absent definition by the Court as to what constitutes the unclaimed property, and for whose putative benefit it is to be held by the respective State.  Class Counsel seems to suggest that each State can be cut a lump sum check which it can then determine how to administer.  Not only would such a procedure undoubtedly lead to a logistical quagmire for each State, it does not appear that the States even have a mechanism in place that allows for the receipt of a lump sum as "unclaimed property" which in fact belongs to numerous individuals/entities.  Rather, all of the States' reporting forms

require the provision of specific information including the identification of the property's putative owner, as well as its amount/value.   Recommendation that the Court enter Orders allowing the Fund to turn over the remaining monies in a manner consistent with State law can hardly be characterized as "serv[ing] no useful purpose." DE 5820 at 37. The useful purpose could not be more straightforward:  States' Counsel suggests the Fund take reasonable efforts to facilitate not only the turn-over, but also the *acceptance*, of the remaining monies.

### Conclusion

As set forth above, States' Counsel respectfully request the District Court enter an Order:

- Directing the claims shortfall of $19,862,000 to be covered by the 5% Reserve, with that amount being allocated to the Remaining Balance;

- Ordering a pro rata refund of $ 35,233,000 of the 5% Reserve to the claimants;

- Allocating the $7,103,092 of forfeited attorneys' fees and incentive awards to the Remaining Balance; and

- Directing the Special Master to develop procedures for the identification,  valuation, and turnover of the unclaimed property for distribution to the States.


I HEREBY CERTIFY that on October 30, 2009, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

WICKER, SMITH, O'HARA, MCCOY &
FORD, P.A.
States' Counsel
515 E. Las Olas Boulevard
SunTrust Center, Suite 1400
P.O. Box 14460
Ft. Lauderdale, FL 33302
Phone: (954) 847-4800
Fax: (954) 760-9353

By:    _/s/ Jordan S. Cohen_____
    Dennis M. O'Hara
    Florida Bar No. 148434
    dohara@wickersmith.com
    Nicholas E. Christin
    Florida Bar No. 179561
    nchristin@wickersmith.com
    Jordan S. Cohen
    Florida Bar No. 551872
    jcohen@wickersmith.com

and

CARELLA, BYRNE, BAIN,
GILFILLIAN, CECCHI, STEWART &
OLSTEIN, P.C.
Attorney for Allapattah DFC Class Action
Settlement Fund
5 Becker Farm Road
Roseland, NJ  07068
Tel:  973-994-1700
Fax:  973-994-1744

By:    _/s/ James E. Cecchi_____
    James E. Cecchi, Esq., Pro Hac Vice
    jcecchi@carellabyrne.com
    Melissa E. Flax, Esq.,
    Florida Bar No. 0118583
    mflax@carellabyrne.com