IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

ALLAPATTAH SERVICES, INC.,
et al.,

        Plaintiffs,

vs.

EXXON CORPORATION,

        Defendant.

**NO. 91-0986-CIV-GOLD/SIMONTON**

## CLASS COUNSEL'S REPLY TO STATES' COUNSEL'S RESPONSE TO CLASS COUNSEL'S OBJECTIONS TO THE SPECIAL MASTER'S SEPTEMBER 4, 2009 REPORT AND RECOMMENDATION

The States, who like the outcome if not the reasoning of the Special Master's September 4, 2009 Report, have advanced in their Response a series of arguments that were not raised by the Special Master and, as a consequence, were not addressed in Class Counsel's Objections.  We address the new arguments in this Reply.

**1.     Introduction**

At the outset we believe two preliminary points should be made.

First, both the Special Master's Report and the States' Response simply ignore the language of the Settlement Agreement which defines the rights of the respective parties.  Neither suggest that the words in the Agreement are ambiguous.  They are not.  Neither suggest that parol evidence is required to construe the Agreement.  It is not.  Nonetheless, both simply jump to the flimsiest of parol evidence – which is both inconsistent with the writing and refuted when considered by all of the parol evidence – as if there was no initial requirement of a finding of ambiguity in the underlying agreement

Allapattah Services, Inc. et al. v. Exxon Corp.
Case No. 91-0986-CIV-Gold

itself.  Because the Claims Process is the implementation of a contracted-for procedure, and the written allocation of the proceeds of the Settlement Fund its most critical part, the Settlement Agreement must be the starting point of any discussion about who is entitled to what and when – and it must be the ending point of any such discussion, absent ambiguity.  And here there is none.

Second, both the Special Master's Report and the States' Memorandum ignore the undisputed fact that before the Settlement, we had lost our initial effort to have any unclaimed monies resulting from the jury verdict escheat to the States.  Despite our best efforts, this Court and the Eleventh Circuit ruled that the jury verdict did not create a common fund, and that this meant that Exxon would be able to keep for itself the approximately $100 million it owed to non-claiming class members.

As a result of the Court's initial ruling, we developed an alternative mechanism for the States to attempt recovery of the unclaimed $100 million.  We advised the States attorneys general of the claims process and the magnitude of class member claims that had not been filed, and invited the States to file claims on behalf of the missing class members before the expiration of the claims deadline.  Some states did so, and immediately prior to the Settlement Agreement, the issue of the States' standing to claim the $100 million on behalf of non-filing class members had been fully briefed and argued but was undecided by the Special Master.

Thus, when Class Counsel achieved the Settlement Agreement with Exxon, the States were given a choice, fully explained in the Class Notice delivered at the Court's specific direction to every affected state government (which then included more than the

-2-

states that had initially appeared). The States were afforded the opportunity to object to the Settlement, and to demand a ruling on their standing to assert claims on behalf of the non-filing class members – a claim involving approximately $100 million – or they could accept what would be provided under the Settlement Agreement which was, by specific provision, what would be left over after every properly established claim was paid, in full, including a return of the 5% reserve and interest thereon. The first alternative gave the States a shot at recovering the entire unclaimed $100 million. At the same time, if they lost and the Settlement Agreement was not approved, they would receive nothing.

The second alternative provided by the Settlement represented a compromise. It gave to the States the opportunity to achieve some recovery, although the amount could not be determined until all the filed claims were adjudicated. At the same time, the amount of the States' potential recovery was enhanced by a mandatory reduction of each claim by 2%, and a termination of the claimants' right to prejudgment interest as of October 31, 2005. The States took the deal.

Now four years later, the claims process has succeeded beyond anyone's expectations. Despite all the potential impediments to approval of the claims now owned by successors in interests to the original dealers going back 30 years (including intervening corporate and partnership dissolutions, bankruptcies, divorces and deaths), 100% of the potential of all claims was awarded to timely filing claimants. The dollar value of the approved claims has subsumed the entirety of Exxon's principal settlement payment, and now requires the application of Fund interest income to satisfy the claims including the 5%

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

Allapattah Services, Inc. et al. v. Exxon Corp.
Case No. 91-0986-CIV-Gold

Reserve.[1] This means that the Remaining Balance left over to the States is limited to that part of the interest income not otherwise devoted to payment of the expenses of the claims process.

Now the States want to redo the transaction and recover more. They ask this Court to award them, ostensibly for non-timely filing dealers, part of the monies awarded by the jury and the Court to the timely filing claimants. This would be, to say the least, inconsistent with the bargain carefully and fully documented in the Settlement Agreement.

2.    **The States' Argument That: "Class Counsel's Current Objections Are Founded on the Fundamentally Incorrect Premises That the Fund Has an Absolute Obligation to Disburse More Money to the Participating Claimants than the Class Ever Recovered from Exxon."**

We agree that, to be paid the 5% Reserve in full, the timely filing Class members must collectively take from the Settlement Fund a total sum greater than the principal payment made by Exxon to settle the litigation. We also agree that to make up that shortfall and fully fund the 5% Reserve, a portion of the Reserve payment must come from the interest earned on the Fund.

The States claim, however, that (1) they are entitled to a minimum recovery of $21.2 from the Settlement Fund, and (2) this entitlement gives them priority, ahead of the claimants right to be paid their 5% Reserve, to the interest income earned on the Settlement Fund. This first argument was the subject of our objection to the Special

---

[1]The States characterize the success of the claims process as a "worst-worst" case scenario. We see it differently. We see it as an enormous success for which we are extraordinarily proud. No one would have predicted that thousands of dealers with complex problems standing between them and recovery would achieve their goal.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

Allapattah Services, Inc. et al. v. Exxon Corp.
Case No. 91-0986-CIV-Gold

Master's report and will not be repeated here except to say that the Settlement Agreement, the Class Notice, and this Court's order approving the Settlement make no provision for payment of a minimum recovery to the States.

The States' second argument regarding a claimed priority to interest income is new, but our response is the same — the Settlement Agreement expressly prioritizes the claimants' entitlement to interest income from the Fund over any entitlement of the States. This is clear because the Settlement Agreement expressly defines the "Settlement Fund" to include both the settlement principal paid by Exxon, **and the interest earned thereon:**

> The Payment, **and any interest or investment income earned from it** that remains after payment of taxes and claims expenses until the sums are fully disbursed, **shall constitute the Settlement Fund. . ."**

[Settlement Agreement ¶ 4.g, emphasis added].    Furthermore, the Settlement Agreement's "hierarchy of obligations" specifies, clearly and unambiguously, the payment priorities from the Fund, "including interest earned during the time between the date of Payment until that time after payment of all claims" resulting in a "Remaining Balance." [Settlement Agreement ¶ 4.g.vi]. Following the words of the Settlement in equation form, those priorities are expressed as follows:

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

Allapattah Services, Inc. et al. v. Exxon Corp.
Case No. 91-0986-CIV-Gold

Remaining Balance = Principal Payment    +    interest

                                         -    First Priority payments

                                              • valid claims (reduced by 2%)
                                              • attorneys fees
                                              • incentive awards
                                              • taxes
                                              • claim process expenses (GCG,
                                                Special Master, States Counsel)

                                         -    Second Priority: 5% Reserve

                                         -    Third Priority: Reserve interest

                                         =    Remaining Balance

The Settlement Agreement then provides that the Remaining Balance "will be divided among the 35 States, pro rata . . ." [¶ 4.g.vii]. Given that the Settlement Fund expressly authorizes payment of interest to Fund the 5% Reserve, and payment of the 5% Reserve has payment priority over payment of the Remaining Balance to the States, the States' claim to a priority to Fund interest is simply incorrect.

Indeed, the States candidly concede that the Settlement Agreement "unfortunately did not provide for any priority as to how [the 2% Reduction] was to be paid." [States' Counsel's Response at 18]. To fill the hole in their argument, the States offer parol evidence as to the intended, but unexpressed, meaning of the Settlement Agreement. As discussed below, application of the parol evidence rule, a substantive rule of Florida law that applies to the Settlement Agreement, precludes further debate as to the State's claim to priority over payment of the 5% Reserve.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON. P.A.
Museum Tower ■ 150 West Flagler Street, Suite 2200 ■ Miami, FL 33130 ■ (305) 789-3200

3.     **The Assurances Allegedly Given to the States "Contemporaneous With the Culmination of the Settlement Agreement" Have No Relevance to the Objections**

In their Response, the States argue that the amount they will receive from the Remaining Balance is "not consistent with the assurances made to the States contemporaneous with the culmination of the Settlement Agreement." [Response at 3]. As support for that proposition, they offer the affidavit of George Waas, special counsel in the Attorney General's office for the State of Florida, who states that "in or about early 2005" (nearly a year before settlement discussions commenced) he received a call from the undersigned advising of the Exxon litigation and the possibility that the State of Florida could recover "millions of dollars." He states that he "was never advised that it was possible that the states could receive nothing from the Allapattah settlement and if [he] had been advised of that, [he] would have objected." He recalls that "during the half dozen or so calls he had with Stearns, Weaver, [he] recall[s] a figure ranging upward of $10,000,000 that would be recovered just for the State of Florida."[2] He states that, "As a result of these discussions, the State of Florida decided not to directly prosecute claims filed on behalf of non-filing class members and did not oppose the settlement." Mr. Waas' affidavit admits

_____

[2]Mr. Waas' reference to a figure of $10 million is irrelevant to this discussion but, because of its implications, compels a brief response. We approached the States, including Florida, in early 2005. When the State of Florida was advised of the *potential* magnitude of the state's interest (which was always qualified as potential and by no means guaranteed), it was not unreasonable to believe that Florida's interest alone would approximate $10 million. After all, had the states prevailed on their asserted right to appear for the non-timely filing dealers, Exxon would have been compelled to pay an additional $100 million. Florida's share of that, coupled with the potential for abandoned claims in the claims process, suggested a huge potential recovery for Florida and other states as well. The States improperly juxtapose that number as being discussed "contemporaneous" with a settlement, first discussed nearly a year later.

that he had no involvement or knowledge of the negotiation of the settlement, and that the first time he learned of the settlement, its terms were already established.

This affidavit offers nothing relevant to the issues before this Court.

Paragraph 4.g.(vi) of the Settlement Agreement, which establishes the "hierarchy of obligations" from the Settlement Fund, is clear and unambiguous. The States' interest is last. End of story. Whatever Mr. Waas may have been told or may have believed is of no moment whatsoever.

Paragraph 15 of the Settlement Agreement contains an integration clause providing that the agreement is "an entire, complete, and integrated statement of each and every term and provision agreed to by and between the parties." Furthermore, as this Court has ruled, Florida's parol evidence rule bars the introduction of parol evidence to vary or contradict a written integrated agreement, and prohibits application of rules of construction to rewrite a contact's meaning in the absence of an ambiguity in the written terms of the agreement:

> If the terms of an insurance contract are "clear and unambiguous," Florida law requires a court to "interpret the contract in accordance with its plain meaning, and unless an ambiguity exists, a court should not resort to outside evidence or the complex rules of construction to construe the contract." (citing *Rigel v. National Casualty Co.*, 76 So.2d 285, 286 (Fla. 1954); *see also Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1290-91 (11th Cir.2001) ("[W]hen the terms of a voluntary contract are clear and unambiguous, the contracting parties are bound by those terms, and a court is powerless to rewrite the contract to make it more reasonable or advantageous for one of the contracting parties.") (quoting *Emergency Assocs. of Tampa, P.A. v Sassano*, 664 So.2d 1000, 1003 (Fla. 2d DCA 1995)).

• • • •

-8-

> Under Florida law, "evidence of a prior or contemporaneous oral agreement is inadmissible to vary or contradict the unambiguous language of a valid contract." *Johnson Enters, of Jacksonville v. FPL Group*, 162 F3d 1290, 1309 (11th Cir. 1998). "This rule applies when the parties intend that a written contract incorporate their final and complete agreement." *Id.* The parol evidence rule is substantive law, so it is applied by federal courts sitting in diversity. *Id.* at 1309 n. 47.

*Excess Risk Underwriters, Inc. v. Lafayette Life Insurance Co.*, 238 F. Supp. 2d 1319, 1338 (S.D. Fla. 2004).

Given the plain meaning of the words used in the Settlement Agreement in this case, the States' attempt to offer the general recollections of Mr. Waas, who states he was not even involved in the negotiation of the settlement, as the basis to alter the agreement in order to give the States $20 million from the reserved awards of over 10,000 Class members' money, is manifestly unsupportable.  Moreover, even were the Court to consider such parol evidence, this affidavit is insufficient on its face.  The substance of the affidavit about what the State knew and when it knew it stands in sharp contrast to the Class Notice and the Settlement Agreement itself, copies of which were delivered to the State of Florida through the Florida Attorney General's office prior to the Court's approval of the Settlement Agreement.  In the Class Notice, the States were specifically told that the "the Settlement creates the potential for all states to collect some unclaimed monies through the revised claims process." [Class Notice ¶ 6.c, emphasis added].  The Notice states that, "Whether there will be excess funds to distribute to state governments and the magnitude thereof will be uncertain until all filed claims are adjudicated and paid." [Id. at ¶ 6.b, emphasis added].

Prior to the Settlement, over our vigorous objections, this Court and the Eleventh Circuit had already ruled that any monies otherwise owed by Exxon under the verdict would

Allapattah Services, Inc. et al. v. Exxon Corp.
Case No. 91-0986-CIV-Gold

revert to Exxon if they went unclaimed in the claims process. And prior to the Settlement, whether the States would be allowed to assert claims on behalf of these non-filing claimants remained an open issue (it appeared the States were going to be denied standing).

Faced with the prospect of obtaining nothing, the Settlement provided the States the possibility of recovering at least something, and, depending on the failure rate of the filed claims, potentially substantial sums. Now, four years later, as a result of the unanticipated success of the claims process and the position taken by the Internal Revenue Service and the State of Florida on tax issues, the States' recovery is not as much as the States may have hoped for. Any disappointment the States may have, however, provides no legal basis to claim entitlement to monies belonging to Class members.

**3.      The States' Attempt to Downplay Their Actual Recovery is Unavailing**

As it has turned out, the Settlement Agreement also has proven a windfall for any non-timely filing dealers who actually go to the States to assert their claims. The sums going to the States is hardly the pittance the States suggest. That is because even though one potential avenue for recovery was frustrated – valid claims in excess of the Settlement principal were approved – the other potential source of recovery, interest income, was greater than necessary to fully fund the 5% Reserve with interest, pay for all claims expenses, and still leave a Remaining Balance. As a result, even after the extraordinary payout to Class members, and even after the additional administrative expenses associated with the length of time required to complete the last remaining claims, the State

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ■ 150 West Flagler Street, Suite 2200 ■ Miami, FL 33130 ■ (305) 789-3200

of Florida's recovery, as a percentage of unasserted claims, is hardly the negligible figure suggested by States' Counsel. Indeed, to a large degree, it is entirely consistent with what was anticipated in the Class Notice.

For example, the States' Memorandum notes that there were 3,336 Florida Exxon dealers who collectively held claims with a nominal value of $82.365 million. Of the 3,336 Florida dealers, only 168 — just 5% — did not timely file claims. Those 167 missing claims have a gross value of $4.67 million. Thus, an astounding 94% of the monies owed to eligible Florida dealers was approved in the claims process.

The States' brief ignores this good news, and complains instead that based on a projected Remaining Balance of approximately $6.2 million, the State of Florida's share will only be $471,000. Assuming that this is a correct figure for purposes of discussion, this would represent approximately 10% of the value of Florida's unasserted claims, a percentage recovery for people who never showed up that would be larger than most class action settlements and an extraordinary recovery for claimants whose claims were previously rejected by this Court and the Eleventh Circuit. *See Allapattah Services Inc. v. Exxon,* 454 F. Supp. 2d 1185, 1210 (S.D. Fla. 2006)(typical class actions settle for less than 3% of the alleged damages).

Even the 10% figure, however, substantially understates missing Florida claimants' actual recovery. First, one must subtract the amounts required of every claimant for attorneys' fees, costs and awards to the Class Representatives, a total of approximately 33%. Reducing $4.67 million by the 33% leaves a total net value of unasserted claims of $3.13 million. Comparing net to net, the $470,000 allocation to Florida represents a

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

recovery of 15% of the total of unasserted claims. And this still understates the recovery as it does not account for the fees paid to States' Counsel by the Fund, which properly also should be considered.

The States also neglect to mention that the Special Master has recommended that the States receive the benefit of the Bowen/McGillicuddy forfeitures in the amount of approximately $8.4 million. Were the Court to accept that recommendation, the total available to the States would be $14.6 million and Florida's share would be approximately $1.094 million. As a percentage of the total of all unasserted claims, Florida would receive approximately 35% of the amount owed to the non-filing dealers, not including the attorneys' fees and costs to States' Counsel that were paid for by the Fund. Such a recovery for people whose claims were never filed and had otherwise been extinguished would be, putting it mildly, unprecedented.

It remains ironic that the Special Master raised the current issue *sua sponte.* Had the Special Master recognized the States' standing under their abandoned property statutes to appear on behalf of non-filing claimants several years ago, and had this Court adopted such a recommendation, Exxon would have been approximately $100 million poorer and the States, including Florida, would have happily divided it, with the State of Florida the beneficiary of at least $7 to $8 million. We wish the concerns expressed currently had been expressed then. They were not.

**4.      The Allegation That the States Have Been Harmed by a Supposed Miscalculation Regarding the Total of all Timely Filed Claims**

States' Counsel also suggests that the States' "shortfall" is somehow created by "discrepancies" in the then-available estimates of total claim value. This is preposterous;

the Class Notice discussed the different estimates but, for purposes of a financial analysis, utilized Exxon's larger number.  Indeed, it stood to reason that Exxon's data, readily available to Exxon, was more likely accurate, particularly since the number was higher.  Exxon had no incentive to overstate its obligations.  The Notice made mention of our lower estimate only so that everyone involved in making a decision regarding the Settlement Agreement would have the material information necessary to make a decision.  There was a difference between our good faith estimate and Exxon's and it was reported.  But the higher number was always used for disclosure purposes in connection with the Settlement and Class Notice.

5.      **The Proposal to Advance Class Counsel Interest Ahead of the Class' Entitlement to Full Payment of the 5% Reserve Is Unacceptable**

The Special Master, without reference, notice or argument, concluded that it was equitable to have the interest earned on the attorneys' fees payable to Class Counsel go to the States to partially fund what he characterized as "the 2% Reduction."  We objected to that recommendation.  In their response, the States suggest that, rather than take the money from Class Counsel's interest, the States should get more by reducing what would be otherwise payable to the Class through the 5% Reserve.

Although we will be the first to say that there is no legal or equitable basis to reduce the attorneys' fees due to us, we do not agree that our interests are superior to that of the claimants.  Indeed, this Court has already established the relative priorities with respect to the interests of the claimants, Class Counsel and the States, and nothing has been offered which would cause those priorities to be changed after the fact.  In

Allapattah Services, Inc. et al. v. Exxon Corp.
Case No. 91-0986-CIV-Gold

determining that we would be entitled to collect interest on fees awarded but withheld, the Court was quite clear:

> In the meantime, the outstanding balance of their attorneys' fee will earn interest at the Florida statutory judgment rate. <u>This amount will be paid to Stearns Weaver before any distribution to the States.</u>

454 F. Supp. 2d at 1241 (emphasis added).

## 6.      How to Allocate the Forfeitures

The States complain that Class Counsel has reversed its recommendation with respect to the allocation of forfeitures. We have, and will not belabor the legitimate reasons for this change that we have already presented. We point out, however, that it would seem that the interests of the proxy have exceeded that of the principals. Where are these non-timely filing claimants? It is one thing for us to urge a benefit for the States that does not adversely impact what was promised to participating claimants. It is quite another to take money from people who were harmed to give it to people who weren't but who are unsatisfied that millions are not enough.

## 7.      Conclusion

We urge the Court to enforce the Settlement Agreement as it is written and reject this attempt to take money belonging to the Class to meet expectations without merit or substance. We urge the Court to direct immediate funding and payment of the 5% Reserve in full, with interest, award the forfeited funds to be included in the distribution to the timely filing claimants, and recognize Class Counsel's entitlement to interest after payment of the 5% Reserve, with interest, is made in favor of the timely filing claimants.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

Allapattah Services, Inc. et al. v. Exxon Corp.
Case No. 91-0986-CIV-Gold

Respectfully submitted,

STEARNS WEAVER MILLER WEISSLER
    ALHADEFF & SITTERSON, P.A.
EUGENE E. STEARNS, ESQ.
Florida Bar No. 149335
150 West Flagler Street
Suite 2200, Museum Tower
Miami, Florida  33130
Telephone: (305) 789-3437
Facsimile:  (305) 789-3395

By: _____
for    EUGENE E. STEARNS

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via CM/ECF on this 5th day of November, 2009.

By: _____
for    EUGENE E. STEARNS

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200