IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
NO.: 91-0986-CIV-GOLD/SIMONTON
Special Master Thomas E. Scott

ALLAPATTAH SERVICES, INC., et al., )
)
    Plaintiffs, )
)
v. )
)
EXXON CORPORATION, )
)
    Defendant. )
_____)
)
RUSSELL A. CLINE, )
) **CONSOLIDATED WITH**
    Plaintiff, ) **CASE NO.: 05-21338-CIV-GOLD /**
) **SIMONTON**
vs. )
)
THE GARDEN CITY GROUP, INC., )
)
    Defendant. )
_____)

## ORDER REGARDING DISPUTED CLAIM D4.5 (CLAIM # 1016536C)

THIS CAUSE is before the Special Master upon Class Counsel's *Second Amended Fourth Motion for Adjudication of Disputed Claims (Motion D4)* **[D.E. 5237]**; *Memorandum in Opposition to Claim 1016536C (Dispute D4.5)* **[D.E. 5381]**; *Reply to the Memorandum in Opposition to Claim 1016536C (Dispute D4.5)* **[D.E. 5431]**; *Order Regarding Disputed Claim D4.5* **[D.E. 5462]**; *Memorandum in Support of Disputed Claim D4.5* **[D.E. 5488]**; *States' Counsel's Response to Woodfin Heating, Inc.'s Memorandum in Support of Disputed Claim 4.5, Dated December 2, 2008* **[D.E. 5486]**.

### I.     Procedural Background

On November 19, 2008, the Special Master conducted an evidentiary hearing to resolve

the disputed claim in D4.5. The claimant in this dispute is Woodfin Heating, Inc. (hereinafter, "Woodfin"), Claim No. 1016536C. The States oppose the claim. The claimant was represented at the hearing by Charles Ayers, Esq. The States were represented by Kenneth Winters, Esq.

Following the hearing on November 19, 2008, the undersigned took the matter under advisement to further review the submissions of the parties, the arguments made at the hearing, and to further review and analyze the case law cited in support of, and in opposition to, this claim. As a result of this review, the undersigned then entered the November 25, 2008 *Order Regarding Disputed Claim D4.5* [D.E. 5462], wherein it was stated as follows:

> The undersigned is concerned that no specific Exxon Sales Agreements, or assignments of the same, have been produced. Such assignments, whether specifically or by operation of law, have been referred to; however, no physical documentation in this regard was provided. Documentation was provided to show a sale and/or transfer of the real property upon which the station exists, as purchased through the referenced bankruptcy proceeding. It remains unclear whether the relevant Exxon motor fuel sales agreement(s) was part of the purchase from the bankruptcy proceeding.
>
> In the interest of fundamental fairness, the undersigned is providing the claimant with an additional opportunity to provide the following:
>
> > a. any Exxon sales agreement(s) in effect for the period of time for this claim, and any documents which support the conclusion that the claimant received an assignment of those agreements through the purchase of the real property in the bankruptcy matter (and/or agreements between the original buyer in the bankruptcy matter and the claimant);
> > b. the actual agreements between the original buyer in the bankruptcy matter and subsequent purchasers, including the claimant. For example, the April 1992 bankruptcy *Order Authorizing Sale to Carlos Leffler, Inc. Free and Clear of Liens and Encumbrances* mentions that the winning bid of Leffler (which the order was approving) was

> "reduced to an executed agreement of purchase."
> To the undersigned's knowledge this original
> agreement (which presumably would set forth what
> exactly was sold and approved by the bankruptcy
> court) has not been produced.

Woodfin was allowed to submit the documentation described above (and a brief memorandum), or any other documentation which the claimant believed helpful to show: (a) that an assignment of the relevant Exxon Sales Agreement(s) occurred as part of the original sale in the bankruptcy matter; and/or (b) what else, if anything, other than the real property was part of the approved sale in the bankruptcy matter.

Thereafter, on December 2, 2008, Woodfin submitted its *Memorandum in Support of Disputed Claim D4.5* [D.E. 5488]. Rather than the submitting the documentation specifically requested by the undersigned, the claimant instead provided additional argument expanding upon what was already argued at the November 19, 2008 hearing.

The undersigned finds that the claimant has failed to establish its right to the subject claim. Despite having been provided ample opportunity to provide documentation which would show that Woodfin received the rights (by assignment, transfer or sale) of the dealer of record (Virginia Travel Plaza) pursuant to the applicable Exxon Sales Agreements (from which the *Allapattah* claim arose), Woodfin has not provided any such supporting documentation.

## II.     Factual Background and Findings

### A.     April 3, 1992 Bankruptcy Order – Sale by VTP to Carlos R. Leffler, Inc.

The time period for this claim is from October 8, 1985 through February 27, 1991. The dealer of record for this time period was Virginia Travel Plaza ("VTP"). The subject gas station was located in Virginia. Woodfin asserts that it acquired the rights of VTP though a chain of transfers. The chain, which is somewhat convoluted, began with the bankruptcy of VTP. VTP

apparently filed for bankruptcy protection, and as part of that proceeding certain assets were sold. Specifically, the Bankruptcy Court for the District of Maryland on April 3, 1992 entered the *Order Authorizing Sale to Carlos R. Leffler, Inc. Free and Clear of Liens and Encumbrances* (hereinafter, the "Bankruptcy Order").[1] Pursuant to the Bankruptcy Order, the court allowed VTP to sell "…its real property and improvements totaling 51.7162 acres . . . free and clear of all liens and encumbrances…" The authority provided was to sell the subject **real property** to **Carlos R. Leffler, Inc.**[2]

**B.     March 26, 1992 Deed – Real Property transfer to All American Plazas, Inc.**

Next in the chain of transfers of title regarding the real property, is a Deed dated March 26, 1992, provided by Woodfin, "granting the travel plaza, which [sic] the real property that is the subject of this litigation is part of, from Virginia Travel Plaza Limited Partnership to **All American Plazas, Inc.**" (emphasis added). Woodfin argues that All American Plazas, Inc. was owned by Carlos Leffler. Notably, no documentation has been provided to show that Carlos R. Leffler, Inc. (the corporate entity) ever properly transferred ownership of the real property of VTP to All American Plazas, Inc.[3]

---

[1] The Bankruptcy Order was attached by Woodfin as Exhibit A to Woodfin's *Reply to the Memorandum in Opposition to Claim 1016536C (Dispute D4.5)* [D.E. 5431]. However, it is noted that the complete order has not been provided, in that the order is missing its second page.

[2] Note – The Bankruptcy Order also mentions that Woodfin **Petroleum**, Inc. made a bid for the purchase of the subject real property and improvements, but Carlos Leffler, Inc.'s bid was accepted and Woodfin's rejected. Woodfin Heating, Inc., the claimant, states that it was the highest bidder for the Virginia Travel Plaza Limited Partnership, with a bid of $1,600,000 which was accepted by the Bankruptcy Court. However, the claimant asserts that during the confirmation hearing Carlos Leffler, Inc. submitted a bid for $2,000,000, after the cutoff date, yet the Court ordered Woodfin and Leffler to discuss a compromise. According the claimant, a compromise was reached whereby Leffler acquired the truck plaza and Woodfin acquired the service station in front of the truck plaza. *See,* D.E. 5488, pg. 2. No documentation was submitted by Woodfin to support or memorialize this "compromise."

[3] There appears to be significant disregard for proper corporate formalities. The Bankruptcy Order authorized the sale to **Carlos R. Leffler, Inc.**. The March 26, 1992 Deed between VTP and All American Plazas, Inc. reflecting the sale clearly does not involve Carlos R. Leffler, Inc. Rather, the Deed is signed by Carlos R. Leffler as President of BHCS, Inc. (the general partner for VTP) deeding the property to All American Plazas, Inc. as the grantee. The

### C.  May 13, 1992 Deed – Real Property Transfer to Doswell Properties, Inc. and assertion that Doswell is a subsidiary of Woodfin Heating, Inc.

The next step in the chain of real property title transfers (though, it appears to have been broken from the inception – see footnote 2, *supra*) involves a Deed dated May 13, 1992 which Woodfin provided. Through this May 13, 1992 Deed, All American Plazas, Inc. granted VTP's former real property to "Doswell Properties, Inc." Woodfin asserts that Doswell Properties, Inc. is a subsidiary of Woodfin Heating, Inc. (the claimant). In support, the claimant provides "stock certificate #4" of Woodfin **_Petroleum, Inc._** showing Woodfin's (Woodfin Heating's) stockholder ownership of Woodfin Petroleum, Inc. The claimant also provides the change of name document, filed with the State Corporation Commission of Virginia, to change Woodfin Petroleum, Inc. to Doswell Properties, Inc., effective March 30, 1992.[4]

Thus, Woodfin believes that it is the property holder of the real property acquired from VTP following the Bankruptcy Order. However, Woodfin's documentary submissions only demonstrate that Woodfin owned some stock (400 of the 15,000 authorized shares) of Woodfin Petroleum, Inc., which later became Doswell Properties, Inc. So, at most, based upon the documents provided, Woodfin (Heating) was a minority shareholder of Doswell when Doswell received the May 13, 1992 Deed. On this issue alone, it would appear that Woodfin (Heating) has insufficient standing to bring this claim as a minority shareholder of Doswell Properties – the owner of the real property upon which the subject station rests. Nonetheless, and without addressing the chain of title transfer issues, even if one assumes that Woodfin was the owner of

---

deed indicates that the contact person for All American Plazas, Inc. is Carlos Leffler. So, from the outset, it appears that the original Bankruptcy Order, which authorized the sale of the real property, was ignored and the property was sold/transferred to an entity called All American Plazas, Inc. which was also owned or controlled by Carlos Leffler.

[4] This date is almost two months prior to the May 13, 1992 Deed.

the real property (which property was formerly owned by VTP), Woodfin's *Allapattah* claim still must fail as discussed *infra*.

Woodfin summarizes its argument by stating that VTP held the "property in question," filed for bankruptcy, and conveyed the property to All American Plazas, Inc. Then All American Plazas, Inc. conveyed the property to Doswell Properties, Inc., which Woodfin claims was a subsidiary of Woodfin Heating, Inc.[5]

### III.   Analysis and Findings

Woodfin reasons that All American Plazas, Inc. "acquired the assets and rights of Virginia Travel Plaza, Inc. and subsequently, Doswell Properties acquired the assets and rights of All American Plazas, Inc...and the rights under the Exxon Sales Agreement were assigned to Doswell Properties, Inc..." Woodfin makes this last leap (acquisition of the rights under the Exxon Sales Agreements) without support.  The only thing originally sold and transferred as result of the Bankruptcy Order was the real property.  Woodfin provides no evidence to show there was any transfer, sale or assignment of any rights of VTP under the applicable Exxon Sales Agreements.  This showing is absolutely critical to establishing the claim since the *Allapattah* claim arises from the operative Exxon Motor Fuel Sales Agreement(s).

The original March 26, 1992 Deed between VTP and All American Plazas, Inc. was merely for the sale, purchase and transfer of **_real property_**.  It was not for the sale, transfer or assignment of any intangible property such as the *Allapattah* claim.  Woodfin refers to a "Sales Agreement," but no such agreement has been provided.  Without more, the claim was never

---

[5] Woodfin makes this argument at D.E. 5431, pg. 3.  The only evidence provided for this proposition was, again, a stock certificate for Woodfin Petroleum, Inc. (which became Doswell Properties, due to a name change, as of March 30, 1992), showing Woodfin Heating, Inc's (the claimant) ownership of merely 400 shares of the 15,000 authorized shares of Woodfin Petroleum, Inc.  *See*, D.E. 5431, Exhibit D.  Nothing was produced to show that Woodfin Petroleum, Inc. (or Doswell Properties) was a subsidiary of Woodfin Heating, Inc. (the claimant).

transferred with the real property; rather, it remains an asset of VTP, or the bankruptcy estate of VTP. Likewise, the May 13, 1992 Deed did not act to transfer, sell or assign the subject *Allapattah* claim (a chose-in-action). The *Allapattah* claim is not one which is transferred with the real property. Woodfin has provided no documentary support for its assertion that the rights under the Exxon Sales Agreement were assigned to Doswell Properties, Inc., and thus somehow to Woodfin.[6] Nor does the Bankruptcy Order indicate that anything of the sort was approved to be transferred, sold or assigned.

Interestingly, Woodfin, in its *Memorandum in Support of Disputed Claim D4.5* [D.E. 5488] cites to this District Court's opinion at 157 F.Supp.2d 1291, 1322, n.30 (S.D. Fla. 2001), *aff'd* 333 F.3d 1248 (11th Cir. 2003), *aff'd* 125 U.S. 546 (2005), as follows:

> There may be disputes between dealers as to who owns the claim for a particular station. In order to resolve the disputes, each class member submitting a claim must show he or she is the real party in interest with regard to the Sales Agreements on which the claim is based. For example, *a dealer who sells or assigns his rights under a Sales Agreement to a new dealer may (or may not) have reserved any claims he or she has in this litigation.* If so, it ultimately will be necessary to determine which dealer is the owner of the claim under that Sales Agreement.

(emphasis supplied by Woodfin).

Ironically, Woodfin's citation of the above footnote bolsters the reason for Woodfin's need to produce the documentation requested by the undersigned, and it only serves to further distance Woodfin from ownership of this claim. The undersigned requested that Woodfin provide the Exxon Sales Agreements (relevant to the time period of the claim) and any documentation which supports the conclusion these agreements, or the rights thereto, were ever

---

[6] Again, Woodfin claims that Doswell Properties was a subsidiary of Woodfin; however, the evidence provided does not support this assertion.

sold, transferred or assigned to Woodfin. Woodfin has not done so, as thus has not shown itself to be the real party in interest pursuant to the Exxon Sales Agreements at issue during this claim period.[7]

Instead, the crux of Woodfin's position relies upon Woodfin's citation and interpretation of the Virginia Supreme Court case *Pollard & Bagby v. Pierce Arrow, LLC*, 258 Va. 524, 528, 521 S.E. 2d 761, 763 (Va. 1999). Woodfin argues that "it is well settled that an assignee of a contract obtains his rights from the assignor and, thus, 'stands in the shoes' of the assignor and acquires the same rights and liabilities as if he had been an original party to the contract." *Id.* Further, Woodfin states that the *Pollard* case stands for the proposition that any and all rights of the party, both real and personal, are conveyed with the deed unless restrict or omitted. Woodfin also cites to *Centex Construction v. Aestar Ins. Co.*, 448 F.Supp. 2d 697, 704 (E.D. Va. 2006), which is a federal case applying Virginia law. The *Centex* case cites *Pollard* and holds that "generally, where the circumstances of a transaction demonstrated an intent to effect an assignment, Virginia law will presume the assignment to be complete in nature and scope in the absence of express limitations on the rights and duties to be assigned." *Id.*

The undersigned does not agree with Woodfin that either *Pollard* or *Centex* apply to the facts of this matter. In *Pollard*, the court began its analysis as follows: "[by] noting that the trial court held that there was an assignment of the leases from Simmons to Pierce when Simmons conveyed the property. Since Pierce and Simmons have not asserted cross-error to this ruling, it

---

[7] States' Counsel has identified and supplied the Exxon Sales Agreements at issue, as set forth and attached to *States' Counsel's Response to Woodfin Heating, Inc.'s Memorandum in Support of Disputed Claim 4.5, Dated December 2, 2008* [D.E. 5486]. Those documents show that prior to the claim period at issue Woodfin was the dealer of record, but during the entirety of the claim period (October 8, 1985 to February 27, 1991), VTP was the dealer of record. Woodfin did not become the dealer of record again until February 27, 1991 (after the subject claim period).

became the law of the case and is not before us on this appeal." *Pollard & Bagby, Inc. v. Pierce Arrow, L.L.C., III.*, 521 S.E.2d 761,763 (Va. 1999) (citations and footnote omitted).[8] Accordingly, the *Pollard* Court's analysis was premised upon the undisputed existence of an assignment of the leases. Thus, the issue for the *Pollard* Court was to determine the extent of duties owed or limitation, if any, on the assignment as it related to payment of the commissions resulting from the assignment, since there existed no documentation or verification of the actual assignment in the record.

Woodfin also cites the *Centex* case, which itself cites to *Pollard*, for the proposition that "…where circumstances of a given transaction demonstrate intent to effect an assignment, Virginia law will presume the assignment to be complete in nature and scope in the absence of express limitations…" *Centex Construction v. Aestar Ins. Co.*, 448 F.Supp. 2d 697, 704 (E.D. Va. 2006), *citing Pollard & Bagby, Inc. v. Pierce Arrow, L.L.C., III*, 258 Va. 524, 521 S.E.2d 761, 763-64 (1999). However, the *Centex* opinion acknowledged the situation faced by the Virginia Supreme Court was one where the <u>parties stipulated that</u> a property <u>owner intended</u>, by virtue of his sale of the property, <u>to assign</u> to the purchaser the property owner's agreements with a leasing agent. The *Centex* court also acknowledged that there was no verification or documentation of any assignment in the record. As such, "[b]ecause **there was unquestionably an assignment** with no evidence of limiting language, the court concluded that it was a complete and total assignment, transferring all rights and liabilities." *Id.* at 704-05 (citations omitted, emphasis added).[9]

---

[8] The omitted footnote stated that "[t]here is no verification or documentation of any assignment in this record."
[9] In the instant matter there is indeed a question whether an assignment of the applicable Exxon Sales Agreements occurred, or were ever intended or contemplated as part of the original authorization from the April 3, 1992 Bankruptcy Order. As discussed below, there is no evidence that the rights to the Exxon Sales Agreements were sold, transferred or assigned (or that they were ever intended to be).

In the instant matter, however, there is no evidence that there was any intent to effect an assignment of the relevant Exxon Sales Agreements as part of the sale of the real property, pursuant to the Bankruptcy Order. *Pollard* and *Centex* first required there to be circumstances demonstrating an intent to effect an assignment, and only then will Virginia law presume such an assignment to be complete (in the absence of express limitations). Accordingly, *Pollard* is inapplicable, as the presumption in *Pollard* has no applicability to the facts of this dispute, since there is insufficient evidence to demonstrate any intent by VTP (or the Bankruptcy Court) to assign VTP's rights pursuant to the Exxon Sales Agreements

As held in *Woodbury Construction Company v. Commercial Cash Flow, L.L.C.*, 58 Va. Cir 222, 2002 WL 31431418 (Va.Cir.Ct. 2002), a case not cited by Woodfin which distinguishes *Pollard*:[10]

> ...*Pollard* does not stand for the proposition that the benefits and burdens of a contract universally travel together. The Supreme Court's holding in *Pollard* was driven by the curious procedural posture of that case. The court began its analysis by observing:
>
> that the trial court held that there was an assignment of the leases from Simmons to [defendant] when Simmons conveyed the property. Since [the defendants] have not asserted cross-error in this ruling, it became the law of the case and is not before us on appeal.
>
> A footnote to this passage revealed, "There is no verification or documentation of any assignment in this record." *In Pollard, then, the Supreme Court was interpreting the legal effect of an assignment without the benefit of any document memorializing its terms.* Thus, *Pollard* states a default rule of interpretation rather than an inflexible rule of law.

*Id.* (citations omitted, emphasis added).

---

[10] The opinion further notes that *Pollard* "involves a curious and unusual fact pattern..." *Id.* at *2.

The *Woodbury* court further explained as follows:

> This view of *Pollard* is bolstered by two facts. First, in *Caudill [v. County of Dinwiddie*, 259 Va. 785, 793 (2000)] the Supreme Court held that the benefits of a contract could be assigned without delegating the burdens. It did not cite *Pollard* as contrary authority. The Supreme Court would not have reversed itself so lightly. Second, the "default rule" view of *Pollard* accords with the *Restatement* which specifies:
>
> Unless the language or the circumstances indicate the contrary, *as in an assignment for security*, an assignment of "the contract" or of "all of my rights under the contract" or an assignment in similar general terms is an assignment of the assignor's rights and a delegation of his unperformed duties under the contract.
>
> *Restatement of the Law (Second), Contracts* §328(1) (emphasis added). In *Pollard*, the Supreme Court concluded that both the benefits and the burdens of the plaintiff's contracts had been assigned only because there was no written assignment agreement in the record to contradict the presumption. The *Restatement* rule is the best way of reconciling the superficially divergent results of *Caudill* and *Pollard*, and is therefor the best available embodiment of the Virginia law of assignments.

*Id.* at *3.

Unlike *Pollard* where the documents for the underlying sale of property related to assignment of the leases (which referenced the obligation to pay commissions – the duty at issue therein for which the assignment law was discussed), the sale of the real property in this matter in no way referenced the sale, transfer or assignment of the Exxon Sales Agreements between Exxon and VTP. Rather, all that was sold through the Bankruptcy Order by VTP (to All American Service Plazas, Inc.) was real property, as reflected by the March 26, 1992 Deed. That deed grants and conveys title to the real property, in fee simple, subject to various restrictions stated as "all easements, restrictions, covenants and agreements of record and contained herein applicable to the property herein conveyed." There is no reasonable argument to even suggest

that any of the applicable Exxon Sales Agreements between Exxon and VTP were assigned as part of the sale of the real property, or by means of either of the two deeds to the real property. The presumption of assignment argued by Woodfin, citing *Pollard* and *Centex*, does not apply to the facts of this dispute for the reasons discussed above.

Accordingly, it is hereby:

**ORDERED AND ADJUDGED** as follows:

The claim of Woodfin Heating, Inc., (Claim No. 1016536C) is DISALLOWED.

The Claims Administrator shall make the appropriate notation in the claim file concerning this dismissal and shall distribute the Special Master's Order to Woodfin Heating, Inc. (Claim 1016536C).

**DONE AND ORDERED** in Miami, Florida this 19th day of November, 2009.

_____
SPECIAL MASTER THOMAS E. SCOTT

Copies furnished to:
United States District Court Judge Alan S. Gold
All counsel of record

Charles Ayers, Esq.